**Stephen M. Feldman, OSB No. 93267**; sfeldman@perkinscoie.com
**Thomas R. Johnson, OSB No. 01064**; trjohnson@perkinscoie.com
PERKINS COIE LLP
1120 NW Couch Street, 10th Floor
Portland, OR 97209-4128
Telephone: (503) 727-2000
Facsimile: (503) 727-2222

      Attorneys for Plaintiffs

**Jerre B. Swann**; jswann@kilpatrickstockton.com
**William H. Brewster**; bbrewster@kilpatrickstockton.com
**R. Charles Henn Jr.**; chenn@kilpatrickstockton.com
**Christopher M. Hanes**; chanes@kilpatrickstockton.com
KILPATRICK STOCKTON LLP
Suite 2800
1100 Peachtree Street
Atlanta, GA 30309
Telephone: (404) 815-6500
Facsimile: (404) 815-6555

      Of Counsel for Plaintiffs

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **ADIDAS AMERICA, INC.** and **ADIDAS-SALOMON AG**,<br><br>     Plaintiffs,<br><br>   v.<br><br>**KMART CORPORATION; FOOTSTAR, INC.; MERCURY INTERNATIONAL TRADING CORP.; ELAN IMPORTS CO., INC.; NEXTTEC INTERNATIONAL, INC.;** and **INNOVATIVE CUSTOM BRANDS INTERNATIONAL, INC.**,<br><br>     Defendants. | NO. CV05-120 ST<br><br>**EXPERT REPORT OF DR. (MICHEL) TUAN PHAM**<br>In Opposition to Defendants' Motion for Summary Judgment and In Support of Plaintiffs' Motion for Partial Summary Judgment |

i-   EXPERT REPORT OF DR. (MICHEL) TUAN PHAM

**PERKINS COIE LLP**
1120 NW Couch Street, 10th Floor
PORTLAND, OREGON 97209-4128
(503) 727-2000
(503) 727-2222

## EXPERT REPORT OF DR. (MICHEL) TUAN PHAM

I, (Michel) Tuan Pham, Ph.D., hereby state as follows:

1.      I have been asked by adidas America, Inc. to examine and report on five sets of issues:

   a)      The value of the adidas brand and the importance of its related symbols;

   b)      The role that these symbols play in consumers' judgments, decisions, and behaviors;

   c)      The degree to which shoes marketed by the defendant elicit consumer confusion with the adidas brand;

   d)      The benefits to the Defendant that arise from imitating the adidas symbols, and

   e)      The damage to the adidas brand that will result from the conduct of the defendants in this action.

### Qualifications

2.      I am a Full, tenured Professor of Business at the Graduate School of Business of Columbia University, where I teach in the M.B.A., Executive M.B.A., Ph.D., and Executive Education programs. I am also the Faculty Director of Columbia University's Strategic Marketing Management program for business executives.

3.      I hold a Ph.D. and M.A. degrees in Business Administration from the University of Florida in Gainesville, which is considered one of the leading doctoral programs in consumer research. I also hold a License in Applied Economics degree from the Catholic University of Mons in Belgium.

4.      My academic expertise is in the area of consumer behavior and consumer

psychology, especially how consumers make judgments and decisions and how consumers respond to marketing information and communication. I have published extensively on these subjects in the leading scientific journals in consumer research, marketing, and decision research including *Journal of Consumer Research*, *Journal of Consumer Psychology*, *Journal of Marketing Research*, and *Organizational Behavior and Human Decision Process*, among other journals. My research has received multiple awards and recognitions including an Honorable Mention for the Robert Ferber Award for best interdisciplinary article based on a dissertation appearing in the *Journal of Consumer Research*, a finalist mention for the best article of the year appearing in the *Journal of Consumer Research*, and a Marketing Science Institute Young Scholar recognition, which identifies "The leading marketing scholars of the future." My curriculum vita is attached as Appendix I

     5.     I am a member of the Association for Consumer Research, the Society for Consumer Psychology, and the American Psychological Association.

     6.     I have been on the full time faculty of Columbia University's Graduate School of Business for 11 and ½ years. At Columbia University, I teach the core course in marketing strategy in the MBA and Executive MBA programs. I also teach a PhD seminar on consumer judgment and decision making and another PhD seminar on experimental research methodology. I have also taught an elective MBA course on consumer psychology. In addition, I frequently teach various marketing strategy topics such as customer insight, positioning strategy, and brand strategy to mid-level and senior-level business executives from various companies and industries.

     7.     I frequently conduct scholarly reviews of scientific papers submitted to the leading academic journals in marketing, consumer research, decision research, and psychology, and have

received an Outstanding Reviewer Award from the *Journal of Consumer Research*. I am currently

on the Editorial Boards of four journals: *Journal of Consumer Research*, *Journal of Consumer*

*Psychology*, *Journal of Marketing Research*, and *Recherche et Applications en Marketing*. In my

capacity as a scientific reviewer, over the past 11 and ½ years, I have evaluated the methodological

soundness of hundreds of consumer research studies submitted for publication.

8.      I am being compensated at a rate of $550 per hour.


**Materials Reviewed**

9.      To carry out the foregoing assignment, I have reviewed, among other materials,

the following:

> o      Likelihood of Post-Sale Confusion Survey Report of Gerald L. Ford, submitted in Adidas v. Kmart

> o      Likelihood of Post-Sale Confusion Survey Report of Gerald L. Ford, submitted in Adidas v. Target Corporation et. al.

> o      Likelihood of Post-Sale Confusion Survey Report of Gerald L. Ford, submitted in Adidas v. Payless Shoes

> o      Likelihood of Post-Sale Confusion Survey Report of Gerald L. Ford, submitted in Adidas v. Fortune Dynamic, Inc.

> o      Likelihood of Post-Sale Confusion Survey Report of Gerald L. Ford, submitted in Adidas v. Steve Madden, Ltd.

> o      Expert report of Marian Friestad, Ph.D., submitted in Adidas America and Adidas-Salomon AG v. Payless Shoesource

> o      Expert report of Ravi Dhar, Ph.D., submitted in Adidas America and

Adidas-Salomon AG v. Payless Shoesource

For this case and others, I have also reviewed, inter alia:

- o    Various athletic shoe web sites

- o    Journal articles, books, and other academic literature related to brands and branding

- o    Scholarly research on consumer psychology and consumer decision making

My opinions and the conclusions that support them are based on the evidence I have examined as of the date of this report.

### The Importance of Brands and Strong Brand Identities

10.    Although generally considered intangible, brands are among the most valuable assets of a corporation. It has been estimated, using well-accepted accounting methodologies, that prominent brands can be worth several billion dollars (Stobart and Perrier 1997). As a result, the notion of "Brand Equity" is now widely recognized as a fundamental business concept (e.g. Aaker 1991; Kotler and Keller 2006). In the latest *Business Week/Interbrand* Brand Valuation study, conducted in 2005, Coca-Cola, the world's most valuable brand was valued at 67.5 billion dollars; Microsoft, the world's second most valuable brand was valued at 59.9 billion dollars. A number of the world's most valuable brands come from the fashion, apparel, and footwear industry, including Nike (ranked 30 with an estimated value of $10.1 billion), Gap (ranked 40 with an estimated value of $8.2 billion), Chanel (ranked 61 with an estimated value of $4.8 billion), Zara (ranked 77 with an estimated value of $3.7 billion), Armani (ranked 95 with an

4

estimated value of $2.7 billion), and Levi's (ranked 96 with an estimated value of $2.7 billion). According to the same study, the financial value of the adidas brand was estimated to be 4.0 billion dollars.

11.     The financial value of strong brands to corporations takes on various forms: (a) goodwill value (e.g., when Ford paid a reported $6 billion to acquire Jaguar, it was mostly for the rights to the Jaguar brand), (b) superior stock returns (e.g., Aaker and Jacobson 1994), (c) easier access to external capital, and (d) above-average price-earning ratios. The various financial benefits that strong brands provide to the corporations that own them are themselves the product of various sources of competitive marketing advantage that strong brands provide in the marketplace: (a) greater market share potential, (b) ability to command price value premiums, (c) stronger support from the trade (distributors, retailers, wholesalers), (d) ability to leverage to brand to launch new products, (e) superior customer retention rates, and (f) lower marketing costs (see Aaker 1996; see Aaker 1991; Aaker and Joachimsthaler 2000; Kapferer 1995; Keller 2003).

12.     The various sources of competitive advantage that strong brands provide in the marketplace originate at the consumer level. That is, a brand cannot provide greater market share potential, stronger support from the trade, or superior customer retention rates *unless* it has a certain "strength" at the consumer level. At the consumer level, this strength is reflected in brand-specific motivations. Brand-specific motivations refer to the answer to the following question: What are consumers willing to do toward the brand that they would not be willing to do toward other brands?  These brand-specific motivations take on several forms: (a) a greater willingness to consider the brand's products as an option, (b) a greater receptivity to marketing information about the brand's products, (c) a stronger desire or aspiration for the brand's

products, (d) a greater loyalty and willingness to purchase the brand again, (e) a greater tolerance toward the brand in case of product failure or problems, (f) a greater willingness to pay for the brand's products, and (g) a greater willingness to recommend the brand to other consumers (see Aaker 1996; see Aaker 1991; Aaker and Joachimsthaler 2000; Kapferer 1995; Keller 2003).

13.    A basic requirement for eliciting the types of equity-generating brand-specific motivations mentioned above is to create and maintain a clear and compelling "brand identity" at the consumer level. A brand identity refers to the set of associations that are mentally linked to the brand in consumers' minds (e.g., Aaker and Joachimsthaler 2000). These associations include perceptions about the product's main attributes and properties (e.g., high quality), beliefs about the product's main benefits, perceptions about the brand's typical user, perceptions of the brand's personality, and, importantly, memory for the brand's various identification elements (e.g., brand name, logo, slogans, etc.). These brand identification elements, whether verbal (e.g., brand name, advertising slogans) or visual (e.g., logos, symbols, brand characters, recurring product design features), are critical to a strong brand identity: They provide a sort of "glue" that helps hold the various brand associations together into a coherent brand identity.  I shall return to the representation of brands in memory later in the report.

14.    The visual components of the brand's identification elements are sometimes called the brand's "visual identity" (Olins 1989). This visual identity includes one or more of the following elements: logos, trademarks, taglines, colors, and design aspects of the physical features of products, packaging, or promotional materials. In most cases, a company or brand's overall visual identity results from a combination of several visual elements. For example, FedEx uses a logo, a specific typeface, and a specific orange and purple color combination on a white background to create the visual identity of its brand of overnight delivery service. The company

uses this combination of visual elements consistently on various "media" including its signage, its shipping envelopes, its delivery trucks, and its website. In some instances, a single visual element may be a primary carrier of a brand's visual identity. This is the case, for instance, of the distinctive red "Levi's" label that Levi Strauss and Co. consistently uses on its denims. An even more dramatic example of the identifying power of single visual elements is the famous Nike "swoosh" logo.

15.     A strong brand identity does not only benefit the marketer. It also provides multiple benefits to consumers (Kapferer 1995; Keller 2003): (a) it allows them to identify the source of products and services without ambiguity, which helps them make more informed choices; (b) it allows them to organize vast amounts of product and market information by brands, which facilitates their learning and therefore their ability to make informed choices; (c) it reduces dramatically their cost of searching for information: instead of inspecting every offer, consumers may rely on what they already know about each brand; (d) it assigns responsibility and accountability in case of product failure or underperformance, which help protect the consumer; (e) it provides a set expectation standards and assurances (e.g., "You can't go wrong with IBM"), which reduces purchase risks; finally (f) it provides them a means of self expression (e.g, "I am an Apple guy;" "I am a Prada-type of person"), which is an important motivation for many consumers. All of these benefits and functions would be eroded, should a brand lose its unique identification properties.

**Background on How Consumers Make Decisions**

16.     Consumer decision making is generally conceived as consisting of several distinct stages (Hoyer and MacInnis 2003; Pham and Higgins 2005). The first stage, called "problem

recognition" or "need recognition," is the stage in which the consumer first experiences a

problem or a need (e.g., "My new job requires travel out of town"; "Our son is going to summer

camp next week"), and realizes that a product[1] of a certain category may be needed (e.g., "I need

a new car" or "He needs a new pair of tennis shoes").

17.     The second stage, called information search, is the stage in which the consumer

gathers information to make the decision. Different types of information may be searched at this

stage including (a) information about what options are available (e.g., "What are the cars in this

price range?"), (b) information about the main attributes of the options (e.g., "How much gas

mileage does Car X give?"; "How durable are tennis shoe A's soles?"), and (c) information

about how to make the decision (e.g., "A large trunk is more important than a powerful engine";

"You should ask the tennis coach what he recommends"). Consumers' information search can be

external (e.g., visiting car dealerships, browsing the web) or internal, that is, based on their

knowledge and memory (e.g., "I remember seeing a great looking pair of tennis shoes from

Brand X"). Often, information search will combine both internal and external searches.

Information search can be more or less extensive. Information search is generally more extensive

when the consumer is particularly motivated to make a "good decision," a notion called

"consumer involvement" (Beatty and Smith 1987).  Consumer involvement with the decision

tends to be higher whenever "the stakes are high" such as when the product is expensive (e.g.

buying a car), the decision has important consequences (e.g., where to go on vacation), the

product entails risks (e.g., choosing a brand of medicine), or the product has high symbolic or

expressive value (e.g., choosing a designer suit or a gift). The extent of information search also

depends on the amount of experience and familiarity that the consumer has with the decision and

---

[1] For sake of brevity, I use the word "product" broadly to refer to both physical (tangible) products and less tangible services.

the product category.

18.    The fact that consumers' information search is not only external but also largely internal has important implications for this case. It is important to recognize that a large part of the information that consumers learn about brands is *not* learned in the context of or in relation to a specific decision. Instead, a large part of consumer's knowledge is acquired *incidentally*, that is, without an explicit intention to learn the specific information (Krugman 1967; Beckwith and Lehmann 1975; Pham and Vanhuele 1997). A consumer with no need or intent to buy a pair of athletic shoes may still acquire, incidentally, a lot of athletic-shoe-related information (e.g., seeing a jogger while walking in the park; noticing a player's sneakers while watching a game on television, seeing different types of designs while passing by the sneaker aisles in a store, seeing an ad for athletic shoes while reading a magazine, etc.). Part of this information will eventually resurface if one day the same consumer *does* need to buy a pair of sneakers and starts searching through his or her memory. This implies that any source of confusion between a brand and another has consequences that extend beyond the particular setting where the confusion initially took place. For instance, if a consumer walking by the athletic shoes aisle of Kmart mistakenly encode a shoe with multiple diagonal stripes as an adidas shoe, his memory of this incident may influence this consumer's future attitude and behavior toward adidas even if the consumer uses a different channel (than Kmart's) to buy his athletic shoes.

19.    The next stage is called consideration set formation. Because product choice often involves a multitude of options—for instance, Nike's shopping website alone lists 185 different pairs of men's shoes and 164 different pairs of women's shoes—consumers almost always narrow down the set of options to a more manageable subset called the consideration set. The consideration set is the set of options that "the consumer considers seriously when making a

purchase and/or consumption decision" (Hauser and Wernerfelt 1990). Depending on whether information is searched externally or internally, consideration sets may be formed by paring down the set of options available in the external environment (e.g., a consumer "zooming in" on a subset of toothbrushes in the aisle of a supermarket; a consumer refining his or her search from a web-shopping site) or by searching the set of options that come to mind and selecting a subset for further consideration. Consideration sets have been found to contain typically between three and six alternatives across a broad range of product categories (Hauser and Wernerfelt 1990). Generally, it is only *after* they have narrowed down the options to this smaller set that consumers proceed with a more formal evaluation of the options (Payne 1976; Russo and Leclerc 1994).

20.    It is therefore extremely important for marketers that their brands or products be included in this consideration set. If a brand is included in the consideration set, the probability that it will eventually be purchased is, of course, not 100 percent. Rather, it is more or less inversely proportional to the number of options included in the consideration set. However, if a brand is *not* included in the consumer's consideration set, its chances of being eventually purchased by this consumer are virtually nil. Support for this proposition comes from the finding that the percentage of consumers who include a brand into their consideration sets has been found to be a major predictor of this brand's market share (Hauser 1978).

21.    The notion of consideration set is particularly important for this case. As mentioned previously, an important indicator of a brand's strength at the consumer level is the degree to which the consumer is willing to consider the brand as an option, that is, whether the brand is part of this consumer's consideration set. A primary source of competitive advantage for strong brands is therefore their ability to enter into the consideration sets of a larger number of consumers. This ability stems in part from these brands' higher levels of consumer memory

awareness. Everything else equal, brands that are better known (more accessible in consumers'

memory) are more likely to be considered, and therefore more likely to be purchased (Nedungadi

1990). For example, sales of Bruno Magli shoes, which previously were relatively unknown,

went up by 30 percent after these shoes' brand name was prominently featured in the O.J.

Simpson trial, and this in spite of the fact that the shoes were mentioned as being those worn by

the alleged murderer (Walton 1997). The ability of strong brands to enter consumers'

consideration sets also stems from their distinctive and compelling brand identity. For example, a

consumer in the market for a new digital (mp3) player is very likely to at least consider an iPod

as an option, not just because the consumer knows the brand, but this brand stands for something

compelling and distinctive in this consumer's mind (e.g., "cool", "popular"; "great design").

Therefore, any source of confusion between the brand and another or any dilution of what the

brand means for the consumer severely reduces this brand's ability to enter the consumer's

consideration set, and therefore the likelihood that it will eventually be chosen. This risk is

especially severe in a heavily populated product category such as athletic shoes, where

consumers' typical consideration sets will only contain a very small fraction of the available

options.

      22.     The notion of consideration set formation is also important in this case because, in

a crowded retail environment, a major way of narrowing down the set of options for further

consideration is to focus on the alternatives that one can recognize (Hoyer 1984). In this respect,

unique and reliable visual brand identifiers such as Nike's swoosh symbol or adidas's three

stripes on the side of the shoes play a vital role. Therefore, any erosion of the association

between these visual identifiers and the owner brand also reduces the brand's ability to enter the

consumer's consideration set and therefore the likelihood that it will be purchased.

23.     Once the consideration set has been formed, the consumer proceeds with a more detailed and careful evaluation of the alternatives included in this set (Payne 1996; Russo and Leclerc 1994).  This is the formal evaluation stage. In this evaluation stage, the options' main attributes and benefits are reviewed and compared. For example, a consumer trying to choose a pair of athletic shoes may compare the price, look, feel, construction quality and fit of two or three pairs. In this evaluation stage, trade-offs often have to be made. For instance, the most attractive pair being considered may also be the most expensive, or the most comfortable pair may also be less technologically advanced.

24.     Various mechanisms also favor strong brand identities at the evaluation stage. First, the brand itself may become a criterion for evaluation and a decision driver. A consumer who is comparing three digital music players, an iPod, an iRiver, and a Creative Zen player, may favor the iPod because "Apple is a cool brand," and this independent of the three players' objective attribute quality.  The valuation of the brand itself as a criterion for purchase is especially likely for products that are often used to express a self identity (e.g., clothing, sports cars, jewelry; Aaker 1999). Athletic shoes often fall into this category. Second, a consumer's overall liking of and attraction to a brand may also color how this consumer will perceive and interpret the brand's product attributes, a phenomenon known as "halo-effect" (Beckwith and Lehmann 1975). For instance, a consumer who generally likes Apple as a brand might perceive the iPod song selection mechanism as a "plus," whereas another consumer who is not as partial to Apple might perceive the same mechanism as a "minus." Finally, a strong brand identity may also help when no option clearly stands out based on a comparison of their attributes. In this case, a strong brand identity may serve as a "tie-breaking" heuristic. The formal evaluation stage generally culminates in a choice. A single product is selected and purchased.

12

25.     It is important to note that when the formal evaluation and choice takes place, all the relevant information about the options is not necessarily externally accessible to the consumer. Consumer researchers make a distinction between "stimulus-based" choice, where the information about the options is available in front of the consumer (e.g., a consumer in a drugstore comparing different brands of shampoo on the shelf) and "memory-based" choice, where the information about the options is only available from memory (e.g., a consumer trying to decide which brand of beer to order at a bar). In a third type of situation, called "mixed-based" choice, information accessible in the immediate external environment and information available from memory are combined. Many consumer decisions fall into the third category (Lynch and Srull 1982). This distinction is important because it emphasizes that memory plays a very important role in consumers' decisions (Alba et al. 1991). Therefore, any source of confusion or dilution in consumers' memory about options has important consequences for consumers' decisions.

26.     The final stage in the consumer decision making process is the post-choice or post-purchase stage. In this stage, consumers experience the product and can more fully evaluate the product's performance. Product satisfaction or dissatisfaction and purchase satisfaction or regret may arise as a result. High product satisfaction may result in consumers telling others about how pleased they are with the product through, for instance, word-of-mouth or web-product review postings. Strong product dissatisfaction may have mirror effects. Again, a strong brand identity can also play an important role at this stage. As mentioned previously, a strong brand identity may further motivate the consumer to share their satisfaction with others if they are satisfied with the product's performance. A strong brand identity may also mitigate consumers' negative reactions in case of product disappointment (Keller 2003).

## Background on Consumers' Memory for Brands[2]

27.    As mentioned in the previous section, memory plays an important role in consumer decision making and consumer behavior in general (Alba et al. 1991). The memory traces for branded products contain the brand associations (beliefs, perceptions) that make up a brand's identity at the consumer level (Keller 1993). Consumers' memory for product- and brand-related information is what they carry around with them when searching for, and deciding about which brand to purchase (Alba et al. 1991). Therefore, the content of consumers' memories for a brand is absolutely essential for establishing and maintaining a brand's identity and strength. Contamination or dilution of those associations through the presence of look-alike products can directly harm a brand (Keller 2003).

28.    Memory consists of associations among individual elements (e.g., ideas, images, experiences). These associations are often conceptualized as networks of nodes, representing individual memory elements, that are connected to one another (Anderson 1983; Collins and Loftus 1975). Memory networks are frequently represented as having central nodes that refer to the focal object around which the memory is organized and associated nodes, linked to the central node, that refer to information stored in memory about the focal object. For instance, it is generally believed that our knowledge about a person (e.g., our father) is organized around a central node referring to this person (e.g., "Dad"), which is connected to the various attributes we associate with this person (e.g., "profession = writer," "hard working," "born on February 15, 1942"; "married to Mom", etc.). The amount of information contained in a given memory network, and how tightly the nodes are interconnected, depends primarily on the experiences that the person has had with the focal object (e.g., person or event; Alba and Hutchinson 1987). For example, the memory network for a spouse

---

[2] In preparing this section, I have reviewed and concur with a previous expert report prepared by Marian Friestad, Ph.D. for adidas America, Inc. and adidas Solomon AG v. Payless Shoesource, Inc.

will have many highly interconnected nodes, whereas the memory network for a distant relative will be much simpler.

29.      With respect to consumers' memory for products, it is generally believed that the brand name often serves as a central node in a brand-related network (Keller 1993). In some case, the brand's visual identity (e.g., its logo, design elements, packaging) can be so closely connected to the brand name that it operates in virtually the same way as the brand's central node (Keller 2003; Schmitt and Simonson 1997). The association between a brand name and the brand's visual identifiers is not unlike the association between a person's name and this person's face in our memory networks for people: the two can be virtually indistinguishable. Other elements or nodes in a brand's memory network, sometimes called a brand's "memory trace," represent beliefs about the brand's main attributes and benefits (e.g., features, quality, price, where to buy it), experiences with the product whether direct (e.g., usage) or indirect (e.g., word-of-mouth), and other beliefs or feelings about the brand (e.g., knowledge about the company that makes the product, feelings about the brand's advertising). The figure below illustrates how brand-related memories may be organized as a network.



30.      In the case of adidas, a typical consumer's memory network may look as follows:

15



31.     The content and structure of a brand's memory network are critical to the company that owns the brand (Keller 1993; 2003). The product itself and its associated marketing activities are focused on creating and sustaining the types of associations in consumers' minds that will translate into a strong brand identity, strong and positive attitudes toward the brand, and ultimately consumer purchase. Experiences or activities that weaken or contaminate those brand associations can result in damage to the brand's equity and its value to the company (Bottomley and Holden 2001; Keller 1993).

32.     The overall brand memory trace and each of the associated nodes may also have an affective or evaluative component. In some models of memory, this is represented as the valence (positive, neutral, or negative) assigned to each node in the memory structure, not unlike the "charge" associated with the various parts of an atom. For example, a "high quality" node in a brand's memory network is likely to have a positive valence (or charge), while a "poor service" node will have a negative valence. The extent to which a particular brand network evokes positive or negative feelings is determined by the combination of these various "charges." When a brand's

16

memory network is activated, the overall affective tone of the network is also activated.

33.    The associative network structure of consumers' knowledge about brands explains in part why marketers often try to leverage consumers' knowledge about their brands through brand extensions, that is, the usage of a preexisting brand name to market a new offering. In brand extensions, it is generally hoped that the positive associations and feelings that consumers have about the preexisting brand will transfer to the new offering (e.g.,Bottomley and Holden 2001; Broniarczyk and Alba 1994). The same principle also underlies, in part, the rationale behind look-alike products: It is hoped that the positive memory associations of the original brand will be transferred to the imitator brand. However, while the underlying psychology may be similar, in the case of brand extension, the legitimate owner of the original brand is making a decision to trade on their prior investments in their own brand's positive associations, whereas in the latter case the imitator brand is free-riding on the same associations.

34.    Most brand names tend to be associated with a product category label that operates at a level of abstraction that reflects how people functionally organize their world (Aaker and Keller 1990; Meyers-Levy and Maheswaran 1992). Typically, for brands like Nike, adidas, or Reebok, the product category information in memory would be "athletic shoes," rather than the more abstract categories of "shoes" or "footwear" or the more concrete category "cross-training shoes" (Barsalou 1983; Barsalou 1985). This does not mean that consumers do not have information about these more abstract or concrete categories in their memory networks but rather that the midlevel category of "athletic shoes" is the category that is most likely to be used when accessing the memory network. As a result, the connection between a brand name and its most frequently-used product category label is a strong and resilient association that is not easily modified, whereas associations between a brand name and individual beliefs about the brand are more malleable. For example, whereas it would be difficult to reduce the strength of the connection between adidas and "athletic shoes" in consumers' minds, it would be easier to reduce the strength of the connections between the adidas brand name

and the beliefs that they make "exclusive" or "high quality" shoes. This is a reason why companies work so hard to build, nurture, and protect consumers' perceptions, beliefs, and experiences about their products.

35.    Retrieval is the process by which stored information is activated, and brought into consciousness, also called "working memory" (Anderson 2004). Activation of a memory network serves a number of functions. It facilitates the expansion and/or modification of the contents of the trace such as adding new associations or updating existing associations to reflect new information or experiences. Activation of a brand's memory network is therefore essential for the encoding and learning of brand-related information. As mentioned previously, activation of a brand's memory trace is also important for decision making (e.g., retrieving prior knowledge to help decide which brand to buy).

36.    An important process in the learning of brand associations is categorization. Categorization is the process of identifying instances of objects that we encounter as being a member of a category of objects that we already know. For instance, when a child encounters a Chihuahua for the first time, he or she could rely on categorization processes to identify it as "a dog." Categorization allows us to learn more efficiently about the environment by allowing inferences based on the already known characteristics of the category (called "category-based" inferences). For example, knowing that the Chihuahua is a dog would allow the child to infer that the Chihuahua can bark and could bite if annoyed. Although the exact principles by which individual instances are identified as members of categories have been widely debated (Cohen and Basu 1987), it is generally agreed that similarity between the instance's features and those of typical members of the category play a large role in the instance being identified as a member of the category. It is also generally agreed that, for an instance to be identified as a member of a category, we do not need to compare *every* feature of the instance to those of typical members of the category (Murphy and Medin 1985). Having to do so would defeat a primary purpose of categorization, which is to make learning more

efficient. For example, the facts that the Chihuahua has four legs, an elongated nose, eyes slightly to the side of the head, and moderately long ears—features that all are typical of dogs—would likely be sufficient to categorize the Chihuahua as a dog.

37.     Another important determinant of the likelihood that an instance will be categorized as belonging to a certain category is the accessibility of the category in memory (Higgins 1996). Holding the similarity of the instance to the category constant, the higher the accessibility of the category in memory, that is the more readily the category comes to mind, the more likely the instance will be assigned to this category. For example, if a person has recently been thinking about reckless behavior, he or she would tend to categorize an act of bungee jumping as an instance of reckless behavior. On the other hand, if the person has been thinking about courageous behavior, he or she may categorize the same act of bungee jumping as an instance of courageous behavior.

38.     Brands also function as categories (Keller 1993). If a consumer is to learn that adidas has introduced an interesting new shoe, a piece of information to be stored within the adidas memory network, it is critical that the consumer categorizes this new product as a member of the adidas category. In order to do so, the consumer does not need to verify every single feature of the product. Instead, the consumer only needs to match select distinct features of the new product (e.g., three stripe symbol, shell toe) with those of the typical members of the adidas category. The fact that in categorization not every feature of the stimulus is necessarily reviewed—only a few distinctive features are matched—increases the chance that look-alike products will be mistaken as instances of the brands that they seek to copy. This is especially true if the features that are being copied are precisely the ones that the consumer usually relies on in order to identify an instance of the brand (e.g., the three stripes or shell toe).

39.     Theoretically, when retrieving information from memory, any node in a memory

network could provide access to that memory trace; and, because these nodes are connected by association, when one node is activated, some or all the other nodes are also activated, a process known as "spreading activation" (Anderson 1983; Anderson 2004). The probability that a particular memory network (e.g., adidas) will be activated, and therefore come into consciousness, is directly related to the match between the information that is encountered (e.g., a look-alike brand) and the contents of the memory network. The more similar the stimulus (the look-alike brand) is to information in memory, the faster and more extensive the activation of the memory network.

40.    Retrieval processes can take two major forms: recall and recognition (Anderson 2004). Recognition is the ability to identify an object or event as having been encountered or occurred before. Recognition takes place when a stimulus (e.g., a sight, a sound, a smell) triggers a match with a preexisting memory trace (Gentner and Markman 1997). Something can be recognized as having been encountered before even if we are unable to specifically identify where or when the object was encountered. An example is the familiar experience of having met someone before without being able to retrace where and when. The subjective experience of recognition often involves a sense or feeling of "familiarity" (e.g., "I've heard that song before"). Recognition is relatively quick and easy. For instance, we can identify songs by the first few bars, a TV commercial by the first few seconds, a familiar package with just a glance. Although some types of recognition are highly accurate (e.g., memory for faces), errors can occur and false recognition take place, particularly if there is a high degree of similarity between the stimulus we are seeing and a stored memory trace. An example, central to this case, is when a product's visual features are designed to resemble those of a well-known brand.

41.    Recall is generally considered a more demanding form of retrieval than recognition. It is the ability to reproduce materials stored in memory, as opposed to just identify that it has been encountered before. Recall usually requires more effort and takes more time than recognition (Gallo 2004). Our ability to recall information from memory is a function of the strength of our memory

trace for this information. For example, we are much more likely to recall our parents' birth dates than our distant cousins' birth dates. Our ability to recall is also a function of the cues that we use to search our memory. For example, brand names such as adidas, Nike, and Reebok will be recalled more quickly if the memory search starts with the cue "brands of athletic shoes" than if it starts with the cue "brands of footwear."

42.    Just as recognition processes can produce errors, so can recall processes. An important source of recall errors is when a new association is encoded into the wrong category. For instance, if Bill is currently thinking about person X while John and Jim are discussing person Y. Some of the things mentioned by John and Jim in relation to person Y may be mistakenly encoded by Bill as being about person X. Similarly, if a person walking through the aisles of a Kmart sees an adidas-looking shoe with a "on sale" sign, this person may walk away with the false memory that "adidas's shoes are on sale." Recall errors may also arise *after* the encoding has taken place (i.e., even if the information was encoded properly).  The memory trace for an object or event may become confused with that of another object or event. For instance, if three months ago we attended two separate parties, A and B, we may mistakenly recall that person X was at party A, whereas person X was in fact at party B. The probability that this type of error will happen is a function of the degree of similarity between the two parties. If the parties were similar in many respects (e.g., same venue, same time of the day, similar sets of guests), the probability or erroneous recall will be greater than if the two parties were quite distinct.

## The adidas Symbols and Visual Identity Cues[3]

43.    adidas was one of the first athletic footwear companies to take advantage of the

---

[3] This section is also based in part on a previous expert report prepared by Marian Friestad, Ph.D. for adidas

powerful effects created by visual identity cues. Beginning in the 1950's adidas's shoes began using the Three Stripes symbol, a visual cue that the company has since applied to apparel, packaging, magazines, catalogues, etc. adidas's tagline, "The Brand with Three Stripes," reinforces this visual association to consumers. On many of adidas's shoes, the Three Stripes symbol is a dominant visual feature that provides a focal point of attention for the consumer. This intentional design element is reinforced by creating a contrast between the color of the stripes and the color of the shoes, which further draws consumers' attention.

44.    Because shoes with the Three Stripes symbol have been in production since the 1950s and have been widely sold, consumers have had numerous repeated opportunities to be exposed to the three contrasting stripes running diagonally across the sides of adidas's shoes. Even if consumers do not necessarily recollect where and when exactly they learned adidas's association to the three stripes, through repeated exposure, many consumers will have learned this association without realizing it because the learning of associations can be done subconsciously (Lewicki 1986). As a result, with a single glance at the three stripes, many consumers can rapidly identify adidas as the source of the shoes.

45.    The Three Stripes symbol is not the only visual cue that adidas has leveraged over the years. Beginning with the launch of the first-generation of "Superstar" basketball shoes in the 1960's, the company has become associated with a rubber "shell toe," a unique design feature that has become a distinctive visual cue for consumers and part of adidas's heritage. Like the Three Stripes symbol, the rubber shell toe also attracts consumers' attention. A quick visual examination reveals that it is ridged and that its overall design looks different from the toes of most other shoes. A quick tactile examination reveals that it is made of a different material (rubber) than other shoes. Therefore, the shell toe is also part of the overall visual identity of

America, Inc. and adidas Solomon AG v. Payless Shoesource, Inc.

22

adidas shoes.

46.    A third visual identity cue of many adidas' shoes can be the flat sole that it uses on many of its models in the classic series including the Daley Thompson, the Ali Classic, the Stan Smith, and the Superstar.  Although the flat sole, alone, may be less important to the adidas visual identity than the Three Stripes symbol or the shell toe, it can still contribute to the overall visual identity of adidas's shoes and the brand or trademark.

47.    A fourth visual identity cue that can contribute to consumers' recognition of a shoe as an adidas shoe is the swath of fabric stitched to the heel of the Superstar line of shoes, which typically is of the same color as the Three Stripes symbol. Like the Three Stripes symbol, this heel design feature has been in production for decades and has appeared on a variety of adidas models including the Samba, the Gazelle, and others. Although, like the flat sole, the heel piece alone may be less important to the adidas visual identity than the Three Stripes symbol or the shell toe, the heel piece nevertheless may contribute to the overall visual identity of adidas's shoes and the brand or trademark, particularly in combination with other cues.

48.    Visual identification and recognition is very sensitive to overall patterns (Anderson 1983). It is well known since the days of Gestalt psychology that three dark lines of equal length appearing on a lighter background and collected at their ends will almost invariably be encoded as "a triangle" rather than three separate lines. The collective perception of the three stripes, shell toe, flat sole, and heel tab symbols facilitates the opportunity for consumers to develop a distinctive and strong memory trace of an adidas shoe. Evidence of the strength of the association between the adidas brand name and the four design features of stripes, shell toe, flat sole, and moustache-shaped heel tab can be found in the studies carried out by Dr. Gerald L. Ford for this and previous cases (see Appendix II). An analysis of the verbatim responses of

consumers exposed to pictures of shoes that appear to mimic some aspects of these four design features reveal that these features do trigger frequent activation of the adidas brand, especially when several aspects of these four features are combined together. For instance, in the survey conducted for the adidas vs. Payless case, of those consumers who identified adidas when seeing a photograph of the Payless shoe, 65% of the reasons mentioned as an explanation refer to one or more of these four features. This suggests that consumers exposed to these visual cues encode them into a whole pattern that they identify as "adidas-made shoe." (The Ford studies are discussed in greater detail later in this report.)

### The Value of the adidas Symbols and Visual Identity Cues

49.    Building a strong brand identity requires not only the creation of positive associations to the brand in consumers' minds but also ensuring that these associations are consolidated into a tight consumer memory network structured around the brand's name. Trademarks, symbols, and visual identity cues play a critical role in "gluing" these associations around a central brand node. As mentioned previously, trademarks, symbols, and visual identity cues play the same role in brand-related memory as a person's face does in our memory for other people. Just like a person's face is closely linked to his or her name in our memory network for this person providing this person a real identity in our minds, these symbols and visual identity cues are closely linked to the brand's name in consumers' memory, reminding them what the brand "looks like," and giving the brand a genuine identity.

50.    Because they help glue brand associations into the brand's overall memory network, symbols and visual identity cues also help in the learning of new information about the brand. Remembering various facts about a person (e.g., "works for IBM," "married to Allie,"

24

"drives a Volvo") is much easier if we know this person's face than if we only know this person's name (e.g., "Jim"). Similarly, learning brand-related information is much easier if we know what the brand "looks like" (i.e., its symbols, logo, visual identity cues) as opposed to just its name. If adidas introduces a revolutionary new technology in the construction of athletic shoes, consistent symbols and visual identity cues such as the three stripes will therefore increase the chance that this technology will properly be linked to the adidas brand name in consumers' memory network for the brand.

51.    Highly recognizable symbols and visual identity cues also attract attention. The ability to attract consumers' attention is critical in a crowded marketplace. For example, in a retail environment such as a Footlocker store where dozens of pairs of athletic shoes are on display, adidas's visually salient and highly recognizable three stripes make these shoes "stand out" in the visual field. This standing out is extremely valuable in increasing the chance that the shoes will be selected for further consideration (included in the consideration set) and eventually purchased.

52.    The ability to stand out is important not only when the decision is stimulus-based (e.g., in the store or while shopping online), but also when the decision is memory-based or mixed based. If consumers find themselves in need of buying athletic shoes and search through their memory for the shoes that they remember seeing, shoes that stand out in memory will have an enormous advantage in terms of consideration (see Nedungadi 1990). To the extent that distinctive symbols and visual identity cues help a brand stand out from memory, they are valuable to the brand in memory-based decision making as well.

53.    Another benefit of brand-specific visual cues that attract attention is that they make consumers more receptive to brand-related information, and therefore make

25

communication more effective. A familiar analogy is the "cocktail party" phenomenon. We attend a party where all the guests are actively engaged in various conversations. As we walk around the crowd, these conversations are no more than background chatter noise. However, should we overhear our name being mentioned in one of the conversations, our attention will immediately be drawn to this particular conversation. Similarly, if a consumer flips through the pages of a magazine or watches a television program, this consumer's attention will tend to be drawn to those print ads or commercials that feature brands that he or she recognizes.

54.    Repeated exposure to a brand's distinctive symbol, such as the three stripes, not reinforces the brand's association with this symbol, it can also increases people's liking for the symbol itself. This phenomenon is known as the mere exposure effect (Zajonc). It has been found that repeated exposure to a stimulus generally enhances people's liking or affect toward this stimulus (Bornstein 1989; Janiszewski 1993), as illustrated by the common experience of increasingly liking songs the more we hear them being played on the radio. Overtime, through repeated exposure, many consumers probably have developed a similar intrinsic positive affect toward the three stripes themselves.

55.    As mentioned previously, a major function of brands for consumers is to serve as a means of self-expression (Aaker 1999). For these consumers, the brands that they buy and use are a way of communicating to others who they are. This is particularly true for products such as cars, fashion items, or athletic shoes, whose consumption is very public. Some consumers buy adidas's T-Mac 5 basketball shoes primarily because they identify with Tracy McGrady. For those consumers the brand's visual identifiers are obviously very important.

56.    In summary, a brand's proprietary visual identity cues fulfill several important functions for the brand owner: (a) they help glue brand-related information together into a brand

memory network, which is the foundation of a coherent brand identity; (b) they help consumers attribute and learn new brand-related information; (c) they attract attention in crowded stimulus-choice environments and enhance the brand's likelihood of consideration; (d) they perform similar functions in memory-based choice; (e) they make consumers more receptive to brand-related information, and therefore marketing communication more effective; (f) they can be a source of liking and positive feelings in and of themselves; and (g) they help deliver the self-expressive benefits that many consumers may seek from the brand. The Three Stripes as a symbol, the shell toe, the flat sole, and the heel patch are therefore important, proprietary assets that adidas would be wise to protect.

57.     Visual inspection of the athletic shoes distributed by the Defendant show that they bear a striking similarity with those marketed by the Plaintiff. It is my professional opinion that the similarity is too great to be only coincidental. I believe that this similarity was instead intentional and was done to achieve the benefits discussed further below.

## Conceptual Evidence of Likelihood of Confusion

58.     Multiple well-accepted theoretical principles grounded in sound empirical psychological and consumer research converge in predicting that the athletic shoes distributed by the Defendant will likely be confused with those of the Plaintiff or would be perceived as being marketed with the approval of the Plaintiff.  I will review these theoretical principles first, then discuss empirical evidence that directly tests the degree of brand confusion produced by the Defendants' shoes and other similarly trade-dressed shoes.

59.     As mentioned previously, a major mechanism through which people identify objects is through a process known as categorization in which they match selected features of the

objects to those of typical members of the category. For a "match" to be identified, not every feature of the object needs to be verified. Sufficient similarity based on selected features of the objects, especially those that are known to be generally predictive of category membership is generally sufficient. Examples of such features in this case would of course be the brand name and the logo, but also the diagonal stripes, the shell toe, or the flat sole. Categorization theory therefore predicts that the Kmart shoes are likely to be identified as and confused with those of marketed by adidas. This is because, as explained below, the Kmart shoes are perceptually very similar to those of adidas.

60.     A widely-accepted model of similarity (Tversky 1977) predicts that the perceived similarity between two objects A and B is a positive function of the set of features (i.e., characteristics, attributes, properties) that the two objects have in common (denoted $A \cap B$) and a negative function of the sets of features that they do not share, that is, the features that A possesses and B does not possess (denoted $A - B$) and the features that B possesses and A does not possess (denoted $B - A$). For example two individuals will be judged as very similar physically if they share many common physical features (e.g., same gender, same height, same body build, same hair color and style, same eye color, etc.) and only few features not in common (e.g., person A has a pointy nose, person B has a beauty spot on the cheek). Applying the logic of this model to the present case, one will notice that the Kmart and adidas shoes share many common features such as (a) multiple parallel stripes, (b) similar diagonal angling of the stripes, (c) rows of perforations that run parallel to the stripes on some models, (d) similar shell toes on some models, (e) similarly flat soles on some models, and (f) similarly-shaped heel tabs on some models (see Appendix III). In comparison, the sets of features that the shoes do not have in common appear to be relatively small and minor: four stripes for the Kmart shoes instead of three for the adidas shoes, differently shaped heel tabs on some of the models. Therefore, based

on the model's prediction, the perceived similarity between the Kmart and adidas shoes—hence the probability confusion between the two—is likely to be high.

61.    As mentioned previously, besides the sheer similarity between instances and typical members of a category, an important determinant of the likelihood that an instance will be categorized in a given category is the general accessibility of the category in memory (Higgins 1996).  Holding the similarity of the instance to the category constant, the higher the accessibility of the category in memory, that is the more readily the category comes to mind, the more likely the instance will be assigned to this category.

62.    Physical similarity between trademarks can lead to source confusion not only through categorization, as discussed above, but also indirectly through inferential processes. Consumers make source judgments not only via direct memory recollection (e.g., "I saw the adidas logo") or fact retrieval (e.g., "I know that Air Force 1 is made by Nike"), but also via inferences, that is, judgments based on reasoning and existing knowledge (Pham and Johar 1997). For instance, it has been shown that consumers who remember seeing the following claim "Mix your own blend of coffee at our store" in a print ad are more likely to attribute this claim to a store named "Food Village Market" than to a store named "Bargain Supermarket," and this *independent* of which store actually made the claim. Similarly, consumers who remember seeing a claim such as "Private label, generic orange juice available at our store" are more likely to attribute this claim to a store called "Bargain Supermarket" than to a store called "Food Village Market," and this again independent of which store actually made the claim. Presumably, these source attributions arise because consumers reason that "upscale" grocery stores are more likely to make "upscale" claims, whereas "downscale" grocery stores are more likely to make "downscale" claims. Inference making is a thus a powerful mechanism of source attribution in

the marketplace (Pham and Johar 1997).

63.     Source inferences from trademarks can be very simple (e.g., "They have parallel stripes, it must be adidas"). These simple direct inferences can be arrived at almost spontaneously if there is a strong connection in consumers' memory structures between a brand and its trademark elements, as is the case between adidas and the three parallel stripes. Source inferences from trademarks inferences can also be more elaborate and involve several logical steps (e.g., "The overall design looks like adidas. Since they would have to get approval from adidas to do this, adidas must be behind this").

64.     A powerful mechanism of inference making is called the representativeness heuristic (e.g., Kahneman et al. 1982; e.g., Tversky and Kahneman 1973). A heuristic is a mental short-cut that people often take when making judgments, predictions, and decisions. Simply stated, the representativeness heuristic functions as follows: "things that are physically or conceptually similar or seem related, must go or belong together." It has been shown that representativeness-based inferences is a very widespread and potent driver of source attribution in the marketplace (Johar and Pham 1999; Johar et al. 2005). For example, Johar and Pham (1999) found that when asked to identify the sponsor of an athletic event such as the "Olympics track and field event," respondents tended to attribute the event to athletics-related companies and brands (e.g., Reebok, Gatorade) that seem to "belong with" the event, rather than non-athletics-related companies and brands (e.g., Hewlett-Packard, Microsoft) that seem to be unrelated to the event. On the other hand, when asked to identify the sponsor of an event such as the "Super Classic Professional Chess Tournament," respondents tended to attribute the event to companies and brands that market more "mentally-oriented" products (e.g., Microsoft, Border's Books), which again seem intuitively related to the event, rather than athletics-oriented

30

companies and brands. These source (sponsor) attributions have been found to occur *independently* of who was the actual sponsor of the event (Johar and Pham 1999; Johar et al. 2005). Inference-driven source attributions can therefore be mistaken when guided by representativeness.

66. 65.    Because source identification is often inferential and often involves a representativeness heuristic, visual similarity between trademarks is likely to result in source confusion. Marks on athletic shoes that are highly similar to the well-known adidas marks makes these shoes subjectively "representative" of adidas, and as a result are likely to lead to inferences that adidas is indeed the manufacturer of the shoes, or at least approves the marketing of these shoes.

66.    Another basis of inference in source identification is the brand's familiarity or prominence in the marketplace. It has been found, that everything else equal, sponsored events (and presumably other forms of marketing communication) tend to be attributed to more prominent brands and companies as opposed to less prominent ones, and this again independent of who was the actual sponsor of these events (Johar and Pham 1999; Pham and Johar 2001). It was also found that, once these attributions are made, the image of the sponsored event could influence that of its supposed sponsor in consumers' minds (Pham and Johar 2001). Applied to this case, these findings imply that, everything else equal (i.e., perceptual similarity and perceived representativeness held constant), a multi-striped shoe such a K-Mart's is even more likely to be mistakenly identified as an adidas shoe given that adidas is a very prominent brand. The findings also indicate that once a pair of Kmart shoes has been attributed to adidas, associations to the shoes may affect the image of the adidas brand in the consumer's mind.

## Empirical Evidence of Confusion

67.     The above-mentioned predictions are indeed well supported by the existing

empirical evidence. To this date, seven surveys involving around 3,000 respondents have been

conducted by Ford, Bubala, and Associates regarding striped footwear. In each of these surveys,

the researchers assessed the probability that consumers who are potential buyers of athletic or

casual shoes will confuse different sets of shoes that, like those distributed by the Defendant,

share multiple common features with those of the Plaintiff with few distinctive features, as

originating from the Plaintiff. The results of these surveys, summarized in Appendix II, are very

consistent. Whenever shoes not marketed by adidas share some of adidas shoes' otherwise

distinctive trademark features, such as multiple parallel stripes that are diagonally angled, a

significant percentage of consumers will confuse these shoes as being adidas shoes. The

percentage of consumers who are confused varies, depending on the degree of feature overlap

with adidas shoes (which is consistent with the Tversky (1977) model of similarity). However,

this percentage is consistently high.

68.     In my opinion, the Ford surveys provide sound and probably conservative

estimates of the degree of brand confusion elicited by the various models of shoes. The samples

are very large (considerably larger than those typically used in academic consumer research) and

consist of consumers who are representative of potential buyers of athletic or casual shoes. All

the surveys use quasi experimental designs that include control cells, which serve as baselines

and allow meaningful comparisons that effectively control for noise in the data. The protocol is

double-blind in that neither the respondents nor the interviewers and their supervisors were

informed as to the purpose or sponsor of the surveys, which reduces the potential for respondent

or interviewer bias. Finally, interviewers appear to have been rigorously trained, and a large

percentage of interviews were subsequently validated by the survey supervisors.

69.    I believe that the Ford survey estimates are conservative in several respects. First, given that (a) the interviews are conducted face to face and (b) each respondent is shown a single picture of a shoe which is left with the respondent throughout the interview, attention to the stimuli in these studies should be relatively high. Therefore, one cannot attribute the observed amount of confusion to a lack of respondents' attention to the stimuli. In fact, in an actual marketplace setting (e.g., consumers walking through a store), many consumers will be exposed to the shoes under conditions of lower attention than those simulated in the Ford surveys, which conceptually should amplify the magnitude of confusion. Second, in the Ford surveys, respondents report their beliefs about the manufacturer's identity while looking at the picture of the shoe. If a substantial percentage of consumers can be confused about the identity of the shoes' manufacturer even while having direct visual access to the shoes, it is likely that an even greater percentage would be confused if they have to rely only on their recollection of a previous exposure to the shoes (e.g., in memory-based consideration set formation and evaluation). If consumers incidentally see a pair of shoes similar to adidas in a store, and then subsequently try to infer the shoes' manufacturer based on their recollection of what the pair they saw in the store looked like, they may be even more likely to attribute the pair they saw to adidas compared to consumers who made this inference "online" (stimulus-based). Third, only consumers who expressed an intention to buy a pair of athletic or casual shoes in the next six months were selected in the Ford studies. Given their purchase intentions, these consumers are presumably more involved about athletic or casual shoes than other consumers who do not intend to purchase a pair of athletic or casual shoes in the next six months. The typical finding in the judgment literature is that high involvement generally leads to more attention, more careful processing, and

therefore greater judgmental accuracy (Eagly and Chaiken 1993). This suggests that the level of confusion among consumers at large may be higher than those recorded in the Ford studies.

70.    Turning to the latest surveys, which involved Kmart shoes and were conducted from January 10 to 26, 2006, my interpretation is as follows. The Kmart Athletech shoe being tested had the following features: four parallel stripes angled backward, four rows of perforations running parallel to the stripes, a shell toe, and a nonflat sole (see Appendix III). Thirty-seven and half percent of the respondents shown this shoe identified it as being from adidas. The percentage increases to 40.74 percent when we include respondents who believed that, while the shoes were not from adidas, they were authorized by adidas. I note that these raw confusion rates (uncorrected for noise) are consistent with those observed in the Ford study conducted in the adidas versus Target case in December 2001, which involved a shoe that was quite similar to the one tested in this particular survey. (In the Target survey, the percentages were slightly higher, which I attribute to the fact that the Target shoe also had a flat sole and a heel patch similar to some well known adidas models.) The control shoe had three nonparallel stripes, no perforations, a shell toe, and a nonflat sole. It is my opinion that this control condition provides a very (and possibly overly) conservative baseline relative to the test condition. This is because the control shoe also included a shell toe, which is a characteristic junior mark of some of the more popular adidas shoes. This explains that, in this particular control condition, the adidas identification percentages are substantially larger than that observed in the control conditions of the previous Ford studies: 23.61% identification as adidas shoes, 25.46% if we include respondents who believed that the shoes were authorized by adidas. Indeed an examination of the verbatim responses of respondents who attributed the control shoe to adidas reveals that about 7.4% (14/216) explicitly did so because of the toe. Therefore, given the design of this study, the

difference between the test condition and the control condition provides lower-bound estimate of the amount of confusion likely to be produced by exposure to the Kmart Athletech shoe. Specifically, it is an estimate of the amount of confusion resulting from the four backward-angled parallel stripes and four parallel rows of perforation used on these shoes (i.e., the features that were modified in the control condition). This estimate does not include the probable additional confusion produced by the shell toe, which is also a distinctive adidas symbol. Still, in spite of the particularly conservative nature of this test, the observed amount of confusion with adidas produced by the Kmart shoe tested was substantial: $[37.50\%] - [23.61\%] = 13.89\%$ in terms of direct attribution to adidas, and $[40.74\%] - [25.46\%] = 15.28\%$ when we include respondents who believed that the shoes were authorized by adidas. If we remove from the control condition the respondents who attributed the shoe to adidas because of the shell toe $(14/216 = 7.4\%)$, the difference between the test and control conditions becomes larger: $[\text{Test:}$ $37.50\%] - [\text{adjusted control} = 16.2\%] = 21.3\%$ in terms of direct attribution to adidas, and $[40.74\%] - [\text{adjusted control} = 18.05\%] = 22.69\%$ when we include respondents who only believed that the shoes were authorized by adidas. These latter estimates are consistent with the magnitude of the effects recorded in the previous Ford surveys.

71.    The Ford survey results about the Olympian shoes are easier to interpret. The test shoe had the following design features: four parallel stripes diagonally angled backward, no perforation, a rubber toe, a flat sole, and a contrasted mustache-shaped heel patch (see Appendix III). Four of these features highly resemble those of adidas: parallel stripes diagonally angled backward, flat sole, rubber toe, and color-contrasted mustache-shaped heel patch. Not surprisingly, 43.52 percent of the respondents identified this shoe as being from adidas. The percentage increases to 49.07 percent when we include respondents who believed that the shoes

were authorized by adidas. The control shoe had three nonparallel stripes, a rubber toe, a nonflat sole, and a mustache-shaped heel patch that was not color-contrasted. This particular control shoe is thus more different from the test shoe to which it is compared (Kmart Olympian) than the previous control shoe (control 1) was to the other test shoe (Kmart Athletech). This particular control shoe is also more different from typical adidas shoes. Not surprisingly, the percentage of consumers who identified this control shoe as adidas was lower: 18.52 percent in terms of direct adidas attribution and 21.30% if we include respondents who believe that adidas approved the marketing of these shoes.  Compared to the comparison discussed in the previous paragraph, I believe that the difference between these particular test and control conditions, 25% in terms of direct attribution to adidas and 27.77% when we include respondents who believed that the shoes were authorized by adidas, is indicative of the true extent of consumer confusion elicited by the Kmart shoes.

### Situations in Which Confusion is Likely

72.     A likely point of confusion between the Kmart shoes and those of adidas is when the consumer scans the shelves of the store in the process of selecting a subset of shoes for further consideration. As mentioned previously, consumers virtually always narrow down the set of options to a more manageable subset. In a store environment (in stimulus-based decisions), this narrowing down is often done through recognition. To the extent that the look-alike features of the Kmart shoes will make them more likely to be falsely recognized as those of adidas, these shoes are more likely to "stand out" and be selected for further consideration. This is a considerable benefit to Kmart. Being selected for further consideration is a considerable advantage compared to shoes not selected for further consideration, and this even if, upon further

inspection, consumers eventually realize that these are not adidas shoes.

73.     As mentioned previously, a large part of the information that consumers learn about brand and products is acquired not in the context of a specific decision, but incidentally while not explicitly shopping for a particular product. Therefore, a consumer who is just passing by the aisle of a Kmart or browsing a Sunday advertising insert could still be confused about the originator of the adidas look-alike shoes, even if he or she is not currently shopping for shoes. This confusion may still affect this consumer's behavior well after the consumer has left the store. For instance, if two months later the consumer now wants to buy athletic shoes, his or her (mistaken) memory of having seen adidas shoes on the Kmart shelves or in Kmart ads may taint his or her perceptions and evaluation of the brand (e.g., "Sold at Kmart, must not be very high quality").

74.     The Kmart shoes are also likely to be confused with those of adidas after they have been purchased. Once a consumer purchases a pair of Kmart adidas-look-alike shoes, these shoes will be conspicuously visible to other consumers. Because these other consumers will not inspect these shoes carefully, they may mistakenly encode them as adidas shoes.

**Benefits to Kmart from Similarity to adidas**

75.     The consumer and psychological literature suggests that the Defendants benefit in multiple ways from the similarity and resulting confusion of its shoes with those of the Plaintiff.

76.     An important mechanism through which people make evaluative judgments and inferences about targets (e.g., people, products, movies, etc.) is by retrieving previous examples, called "exemplars," that the target reminds them of, and imputing salient characteristics of the exemplars to the target (Kahneman and Tversky 1972; Smith 1992). For example, to evaluate whether they would like a particular movie (e.g., a new science fiction movie involving future

intergalactic civilizations), consumers will often liken this movie to other movies that they already know that seem similar to this movie (e.g., Star Wars) and infer their liking of the new movie from their liking of these examplar movies (Glass and Waterman 1988). This "judgment-by-examplar" process is very common. It is, for instance, one of the main reasons why movie studios often launch sequels to box-office successes (e.g., Mission Impossible I, II, III) in the hope that the sequel will be evaluated favorably in light of its ostensible connection to the previous successful exemplars.

77.     This "judgment-by-exemplar" process is not always conscious. That is, consumers are not always aware that their evaluation of a target has been influenced by the target's similarity to a salient exemplar. For instance, in one study (Lewicki 1986), some participants were insulted by an experimenter while they were filling out a questionnaire; others were not. Later in the study, participants were instructed to bring their experimental materials to one of two assistants, one of whom had a similar hair style as the previously encountered experimenter. It was found that participants who had previously been insulted by the experimenter tended to avoid the similarly-hair-styled assistant and go the other assistant. Control participants who had not been insulted by the experimenter did not exhibit this bias. It was also found that, when prompted about their rationale for their choice of assistant, participants uniformly denied that their previous encounter with the experimenter had any influence.  This finding exemplifies a broader and classic finding in psychology: that people are not always aware of, and able to report on, how their evaluations and behaviors have been influenced by certain factors (Nisbett and Wilson 1977). Along with other conceptually related studies (e.g.,Gilovich 1981), the Lewicki (1986) study demonstrates two points about judgments, decisions, and inferences by exemplars. First, people are not always aware of how much they

have been influenced by previous exemplars in their evaluations of targets. Second, even superficial similarity between a target and an exemplar (e.g., a similar hair style) is sufficient for exemplars to influence evaluations of the target.

78.    The later point was further demonstrated in a classic series of studies by Gilovich (1981). In one study, political science students were asked to provide recommendations about a hypothetical political crisis that involved a country friendly to the U.S. that was threatened by a larger, aggressive, and totalitarian neighbor country. Participants had to recommend whether the U.S. should adopt a forceful strategy involving a U.S. military intervention or a more "hands-off" strategy involving United Nations mediation. In one condition, the materials included subtle, but irrelevant cues intended to prime[4] participants with World War II as an exemplar (e.g., the current president was described as being from New York, the same state as Franklin D. Roosevelt; minorities in the totalitarian country were fleeing by freight trains). In the other condition, comparably irrelevant cues were intended to prime participants with the Vietnam war as an exemplar (e.g., the current president was described as being from Texas, the same state as Lyndon B. Johnson and minorities in the totalitarian country were fleeing by small boats). These cues were nondiagnostic in that they did not speak to the true objective similarity between the current situation and World War II or the Vietnam War. These cues only varied the *superficial* similarity between the current situation and these previous exemplars. It was found that, when the current situation was made superficially similar to World War II, participants recommended a significantly more forceful policy than when the current situation was made superficially similar to the Vietnam War. Therefore, even superficial similarity between a target and an exemplar can result in characteristics of the exemplar being attributed to the target. Moreover, consistent with the Lewicky (1986) findings, participants again appeared unaware that their recommendations

had been influenced by the superficial similarity to the previous exemplars.

79.    Lewicky (1986) and Gilovich (1980) studies also show that people often impute attributes of a similar exemplar onto a target even when they are fully aware that the target and exemplar are distinct. For example, in the Lewicky (1986) study, participants presumably realized that the experimenter and the similarly-haired assistant were *different* individuals. Similarly, in the Gilovich (1980) study, participants presumably realized that the political crisis being described was *not* World War II or the Vietnam War.

80.    The effects of superficial similarity to exemplars on evaluations are not restricted to hypothetical decisions (e.g., the Gilovich study) and innocuous interpersonal decisions (e.g., the Lewicki study). Similar effects have also been observed when the financial stakes are very large. For instance, during the 1998-2000 stock market bubble, it was found that publicly traded companies that simply changed their names to "dotcom"-sounding names (e.g., by adding ".net" or ".com" to their names), recorded large abnormal increases in their stock values that cannot be explained by genuine changes in these companies' fundamental values (Cooper et al. 2001).

81.    Translated to this case, findings from the judgment-by-exemplar literature suggest that, by virtue of their sheer physical similarity to adidas shoes, the Kmart shoes are likely to be imputed salient evaluative properties of adidas shoes such as high quality, originality, and performance. To the extent that these properties are perceived to be desirable, this will lead to higher consumer evaluations of the Kmart shoes compared to a condition of low perceived similarity with the adidas shoes. These raised evaluations amount to the Kmart shoes "cashing in" on adidas's brand equity by virtue of mere superficial similarity.

82.    This effect can occur (a) without the consumers being necessarily aware of their changes in evaluation and its real explanation (see Nisbett and Wilson 1977); and (b) *even* if the

---

[4] Priming refers to the process of stimulating or activating some aspects of a person's stored knowledge.

consumers realize that the Kmart shoes are not from adidas. If the consumers fail to realize the Kmart shoes are not from adidas (i.e., be confused), the effect would only be magnified.

83.     Empirical support for the argument that visual similarity to a prominent brand increases the perceived attractiveness of the imitator comes from a recent series of experimental studies by Warlop and Alba (2004). In these experiments, respondents were shown a series of product triads, each of which consisted of a well-known brand and two lesser-known (unfamiliar or fictitious) brands.  The product categories varied across triads (e.g., laundry detergent, spaghetti, potato chips), but were held constant within triad. Within each triad (e.g., detergent), the package of one of the two lesser-known brands, the "copycat trailer" brand, was made visually similar to that of the well-known brand (e.g., "Tide"). The package of the other lesser-known brand, the "differentiated trailer" brand, was not altered, thus retaining its original difference from the well-known brand. (The role of copycat versus differentiated trailer brand was counterbalanced across respondents.) The key dependent measure was how well the copycat trailer brand was evaluated relative to the differentiated brand. This measure provides an indication of the degree to which copying the well-known brand's packaging benefits (or hurts) the copycat brand compared to using a differentiated packaging. Under almost every condition examined by the researchers, the relative evaluation and choice share of the copycat brand (compared to the differentiated brand) was higher. Therefore, a copycat strategy does generally benefit the imitator.

84.     The superficial similarity to adidas shoes benefits the Defendant in a second respect. As mentioned previously, one of the most important challenges for marketers is to attract consumers' attention to their products. This is especially true in a crowded shopping environment such as a Kmart's. Because consumers need to narrow down the set of options to a

more manageable subset and often do so through the recognition of familiar brands, the look-alike features of the Kmart shoes will make them more likely to "stand out" and be selected for further consideration.

85.    A third benefit of using adidas's visual identity cues that accrues to Kmart, is the fact that these cues, in and of themselves, probably elicit some positive affect by virtue of the numerous exposures that adidas has generated over the years. That is, the diagonally angled multiple parallel stripes, for instance, are likely to be well liked in and of themselves. As mentioned previously, this is a well-established psychological phenomenon known as the "mere exposure effect." Note that it is primarily thanks to adidas's extensive marketing expenditures over the years that these cues have come to acquire their likely pleasant value. Kmart is therefore cashing in on many years of adidas's marketing investments, and is diminishing the value of those investments to adidas in the process.

### Damage to adidas from Kmart Similarity of Shoes

86.    The strength of a symbol depends on its uniqueness (Henderson and Cote 1998; Kohli and Suri 2002). As mentioned previously, visual identity cues, as symbols, perform multiple important functions for the owner brand (see paragraphs 49 through 56). All these functions require that the visual identity cues (symbols, proprietary design features) be uniquely associated with the owner brand. Any confusion, that is, any compromising of the uniqueness of this association, severely damages the brand by interfering with the afore-mentioned functions.

87.    Specifically, loss of uniqueness of these visual identifiers may result in the following consequences:

a)    weaker consolidation of brand-related information into coherent brand memory

networks, and therefore weaker brand identity;

b)      lower ability among consumers to learn new brand-related information;

c)      decreased ability to attract consumers' attention in crowded stimulus-choice environments, and therefore lower likelihood of brand consideration and eventual purchase;

d)      decreased ability to stand out in consumers' memory in memory-based choice, and therefore lower likelihood of brand consideration and eventual purchase;

e)      lower consumer receptivity to brand-related information, and therefore lower marketing communication effectiveness;

f)      reduced ability to benefit from the inherent positive feelings associated with these visual identifiers through extensive prior exposure; and

g)      lower ability to deliver self-expressive benefits to consumers, and therefore lower brand appeal, especially in a product category strongly associated with self-expression needs.

88.      It is generally agreed that consumers' perceptions of brands are shaped in part by their perceptions of the retail environments in which these brands are sold (Keller 2003). This is one of the main reasons why marketers will sometime opt for a more selective if not exclusive distribution of their goods (e.g., being available only at high-end retailers) rather than a more intensive, widespread distribution.  Shaping of a brand's perceptions by the retail environment in which it is sold can happen as a result of different processes. First, it is very well established that close proximity of objects in time and space, especially if it is repeated, often results in a transfer of meaning between objects, a process known as evaluative conditioning (De Houwer et al. 2001; Staats and Staats 1957).  For instance, if every time we stay in a high-end hotel we see a

clean, white bathrobe provided in the room, we will gradually learn to associate the hotel's properties of comfort and luxury to this type of bathrobe even when we see them in settings (e.g., in a store). A second mechanism through which a retail environment may shape a brand's association is through inference processes. For instance, if a consumer sees a brand that she does not know very well at a high-end retail store like Nordstrom, she may infer that the brand must be of high quality.

89.    Many marketers are clearly concerned that certain retail environments will dilute or even tarnish their brand identity and therefore equity. For instance, in a highly publicized dispute Calvin Klein sued Warnaco, one of its licensees, because it was selling Calvin Klein-branded jeans and underwear to down-market discount stores such as Costco and Sam's Club (Agins 2001). More recently, Nike decided to stop selling its products to Sears, apparently because it feared that, following Sears' merger with Kmart, Nike products may end up being sold in Kmart stores (Yerak 2005). Academic research confirms that the brand image of a store does affect consumers perceptions of products sold in that store (Dodds et al. 1991)

90.    Therefore, a serious consequence of consumers mistakenly believing that adidas shoes are available at Kmart is a transfer of some of Kmart's brand associations (e.g., low price, moderate quality) onto the adidas brand. This transfer would dilute the desired brand identity and positioning of adidas.

91.    More generally, important damages could occur as a result of having shoes that look like adidas athletic shoes being marketed (e.g., constructed, priced and distributed) in ways that are inconsistent with the carefully constructed brand image of the original brand. Consumers' perceptions of a brand (the brand's identity) are derived from all of the experience and marketing elements associated with that brand. These perceptions are shaped not only when

the consumer is actively shopping for the product but also incidentally when they are not actively shopping (e.g., witnessing another user of the product).

92.     Empirical evidence that undesirable perceptions of perceived brand associations may damage perceptions of the brand comes from research showing that mistaken attribution of sponsorship to a brand can change how this brand can be perceived (Pham and Johar 2001). For example, respondents who mistakenly believed that UPS sponsored the Olympics Track and Field Event in Sydney tended to perceive UPS as a more "energetic" company than respondents who did not make this mistaken attribution. It has also been found that brand extensions that are poorly received by consumers can damage perceptions of the parent brand and of their products (Loken and John 1993; Roedder John et al. 1998). Therefore, if the Kmart look-alike shoes are not made to the same standards as an adidas shoe or cost much less, these perceptions, regardless of where and how they are acquired can erode consumers' perceptions of the shoes that are actually produced and marketed by adidas. Again, this type of damage does not require that consumers have actual buying and ownership experience with the look-alike product. It only requires that consumers be exposed to these look-alike products in the marketplace.

Executed this ___9th___ day of February 2006.



_____
(Michel Tuan Pham)

REFERENCES

Aaker, David A (1996), *Building Strong Brands*. New York, NY: The Free Press.

Aaker, David A. (1991), *Managing Brand Equity* (1st ed.). New York: The Free Press.

Aaker, David A. and Robert Jacobson (1994), "The Financial Information-Content of Perceived
Quality," *Journal of Marketing Research,* 31 (2), 191-201.

Aaker, David A. and Erich Joachimsthaler (2000), *Brand Leadership*. New York: The Free
Press.

Aaker, David A. and Kevin L. Keller (1990), "Consumer Evaluations of Brand Extensions,"
*Journal of Marketing*, 54 (1), 27-41.

Aaker, J. L. (1999), "The malleable self: The role of self-expression in persuasion," *Journal of
Marketing Research*, 36 (1), 45-57.

Agins, Teri (2001), "Calvin Klein, Warnaco Settle Their Bitter Feud," in Wall Street Journal.
New York, NY.

Alba, J. W. and J. W. Hutchinson (1987), "Dimensions of Consumer Expertise," Journal of
Consumer Research, 13 (4), 411-54.

Alba, Joseph W., J. Wesley Hutchinson, and John G. Lynch (1991), "Memory and Decision
Making," in Handbook of Consumer Behavior, Thomas S. Robertson and Harold H.
Kassarjian, Eds. Englewood Cliffs, NJ: Prentice-Hall.

Anderson, John R. (1983), The Architecture of Cognition. Cambridge, MA: Harvard University
Press.

---- (2004), Cognitive Psychology and Its Implications (6th ed.). New York, NY: Worth.

Barsalou, Lawrence W. (1983), "Ad Hoc Categories," Memory & Cognition, 11, 211-27.

---- (1985), "Ideals, Central Tendency, and Frequency of Instantiation as Determinants of Graded

Structure in Categories," Journal of Experimental Psychology: Learning, Memory, and Cognition, 11 (4), 629-48.

Beatty, Sharon E. and Scott M. Smith (1987), "External Search Effort - an Investigation across Several Product Categories," Journal of Consumer Research, 14 (1), 83-95.

Beckwith, N. E. and D. R. Lehmann (1975), "Importance of Halo Effects in Multi-Attribute Attitude Models," Journal of Marketing Research, 12 (3), 265-75.

Bornstein, Robert F. (1989), "Exposure and Affect - Overview and Meta-Analysis of Research, 1968-1987," Psychological Bulletin, 106 (2), 265-89.

Bottomley, Paul A. and Steven J. S. Holden (2001), "Do we really know how consumers evaluate brand extensions? Empirical generalizations based on secondary analysis of eight studies," Journal of Marketing Research, 38 (4), 494-500.

Broniarczyk, Susan M. and Joseph W. Alba (1994), "The Importance of the Brand in Brand Extension," Journal of Marketing Research, 31 (2), 214-28.

Cohen, J. B. and K. Basu (1987), "Alternative Models of Categorization - toward a Contingent Processing Framework," Journal of Consumer Research, 13 (4), 455-72.

Collins, Allan M. and Elizabeth F. Loftus (1975), "Spreading Activation Theory of Semantic Processing," Psychological Review, 82 (6), 407-28.

Cooper, Michael J., Orlin Dimitrov, and P. Raghavendra Rau (2001), "A rose.com by any other name," Journal of Finance, 56 (6), 2371-88.

De Houwer, Jan, Sarah Thomas, and Frank Baeyens (2001), "Associative learning of likes and dislikes: A review of 25 years of research on human evaluative conditioning," Psychological Bulletin, 127 (6), 853-69.

Dodds, W. B., K. B. Monroe, and D. Grewal (1991), "Effects of Price, Brand, and Store

Information on Buyers Product Evaluations," Journal of Marketing Research, 28 (3), 307-19.

Eagly, Alice H and Shelly Chaiken (1993), The Psychology of Attitudes. Orlando, FL: Harcourt Brace Jovanovich.

Gallo, D. A. (2004), "Using Recall to Reduce False Recognition: Diagnostic and Disqualifying Monitoring," Journal of Experimental Psychology: Learning, Memory, and Cognition, 30, 120-28.

Gentner, Dedre and Arthur B. Markman (1997), "Structure Mapping in Analogy and Similarity," American Psychologist, 52 (1), 45-56.

Gilovich, Thomas (1981), "Seeing the Past in the Present - the Effect of Associations to Familiar Events on Judgments and Decisions," Journal of Personality and Social Psychology, 40 (5), 797-808.

Glass, A. L. and D. Waterman (1988), "Predictions of Movie Entertainment Value and the Representativeness Heuristic," Applied Cognitive Psychology, 2 (3), 173-79.

Hauser, J. R. (1978), "Testing Accuracy, Usefulness, and Significance of Probabilistic Choice Models - Information-Theoretic Approach," Operations Research, 26 (3), 406-21.

Hauser, John R. and Birger Wernerfelt (1990), "An Evaluation Cost Model of Consideration Sets," Journal of Consumer Research, 16 (4), 393-408.

Henderson, Pamela W. and Joseph A. Cote (1998), "Guidelines for Selecting or Modifying Logos," Journal of Marketing, 62, 14-30.

Hoyer, W. D. (1984), "An Examination of Consumer Decision-Making for a Common Repeat Purchase Product," Journal of Consumer Research, 11 (3), 822-29.

Hoyer, Wayne D. and Deborah J. MacInnis (2003), Consumer Behavior (3rd ed.). Boston, MA:

Houghton Mifflin.

Janiszewski, Chris (1993), "Preattentive Mere Exposure Effects," Journal of Consumer Research, 20 (3), 376-92.

Johar, G. V. and M. T. Pham (1999), "Relatedness, prominence, and constructive sponsor identification," Journal of Marketing Research, 36 (3), 299-312.

Johar, Gita V., Michel T Pham, and Kirk Wakefield (2005), "How Events Sponsor Are Identified: A (Baseball) Field Analysis ": Columbia University.

Kahneman, Daniel, Paul Slovic, and Amos Tversky (1982), Judgment Under Uncertainty: Heuristics and Biases. Cambridge: Cambridge University Press.

Kahneman, Daniel and Amos Tversky (1972), "Subjective Probability - Judgment of Representativeness," Cognitive Psychology, 3 (3), 430-54.

Kapferer, Jean-Noel (1995), Les Marques, Capital de L'Entreprise (2nd Edition ed.). Paris: Les Editions D'Organisation.

Keller, K. L. (1993), "Conceptualizing, Measuring, and Managing Customer-Based Brand Equity," Journal of Marketing, 57 (1), 1-22.

Keller, Kevin L. (2003), Strategic Brand Management (2nd Edition ed.). Upper Saddle River, NJ: Prentice Hall.

Kohli, Chiranjeev and Rajneesh Suri (2002), "Creating Effective Logos: Insights from Theory and Practice," Business Horizons, 45 (3), 58-64.

Kotler, Philip and Kevin L. Keller (2006), Marketing Management (12th Edition ed.). Upper Saddle River, NJ: Prentice Hall.

Krugman, Herbert A (1967), "The Impact of Television Advertising: Learning without Involvement," Public Opinion Quartely, 29 (Fall), 349-56.

Lewicki, P (1986), Nonconscious Social Information Processing. Orlando, FL: Academic Press.

Loken, B. and D. R. John (1993), "Diluting Brand Beliefs - When Do Brand Extensions Have a Negative Impact," Journal of Marketing, 57 (3), 71-84.

Lynch, John G. and Thomas K. Srull (1982), "Memory and Attentional Factors in Consumer Choice - Concepts and Research Methods," Journal of Consumer Research, 9 (1), 18-37.

Meyers-Levy, Joan and Durairaj Maheswaran (1992), "When Timing Matters - the Influence of Temporal Distance on Consumers Affective and Persuasive Responses," Journal of Consumer Research, 19 (3), 424-33.

Murphy, G. L. and D. L. Medin (1985), "The Role of Theories in Conceptual Coherence," Psychological Review, 92 (3), 289-316.

Nedungadi, Prakash (1990), "Recall and Consumer Consideration Sets - Influencing Choice without Altering Brand Evaluations," Journal of Consumer Research, 17 (3), 263-76.

Nisbett, Richard E. and Timothy D. Wilson (1977), "Telling More Than We Can Know - Verbal Reports on Mental Processes," Psychological Review, 84 (3), 231-59.

Olins, W (1989), Corporate Identity: Making Business Strategy Visible through Design. London, UK: Thames & Hudson.

Payne, John W. (1976), "Task Complexity and Contingent Processing in Decision-Making - Information Search and Protocol Analysis," Organizational Behavior and Human Performance, 16 (2), 366-87.

Pham, M. T. and G. V. Johar (1997), "Contingent processes of source identification," Journal of Consumer Research, 24 (3), 249-65.

---- (2001), "Market prominence biases in sponsor identification: Processes and consequentiality," Psychology & Marketing, 18 (2), 123-43.

Pham, Michel T and E. Tory Higgins (2005), "Promotion and Prevention in Consumer Decision Making: The State of the Art and Theoretical Propositions," in Inside Consumption: Consumer Motives, Goals, and Desires, S. Ratneshwar and David Glen Mick, Eds. New York, NY: Routledge.

Pham, Michel T and Marc Vanhuele (1997), "Assessing the Memory Impact of Advertising Fragments," Marketing Letters, 8 (4), 407-17.

Roedder John, Deborah, Barbara Loken, and Christopher Joiner (1998), "The negative impact of extensions: Can flagship products be diluted?," Journal of Marketing, 62 (1), 19-32.

Russo, J. Edward and France Leclerc (1994), "An Eye-Fixation Analysis of Choice Processes for Consumer Nondurables," Journal of Consumer Research, 21 (2), 274-90.

Schmitt, Bernd and Alex Simonson (1997), Marketing Aesthetics. New York: The Free Press.

Smith, Eliot R. (1992), "The Role of Exemplars in Social Judgment," in The Construction of Social Judgments, Leonard L. Martin and Abraham Tesser, Eds. Hillsdale, NJ: Lawrence Erlbaum Associates.

Staats, C. K. and A. W. Staats (1957), "Meaning Established by Classical-Conditioning," Journal of Experimental Psychology, 54 (1), 74-80.

Stobart, Paul and Raymond Perrier (1997), Brand Valuation: Premier Books.

Tversky, A. and D. Kahneman (1973), "Availability - Heuristic for Judging Frequency and Probability," Cognitive Psychology, 5 (2), 207-32.

Tversky, Amos (1977), "Features of Similarity," Psychological Review, 84 (4), 327-52.

Walton, A. Scot (1997), "Bruno Magli: Shoe Sales are Up Because of Ad Campaign," in The Atlanta Journal-Constitution. Atlanta, GA.

Yerak, Becky (2005), "Nike Won't Sell Athletic Shoes to Sears/Kmart in "Brand Management"

Move," in Chicago Tribune. Chicago.

Zajonc, Robert B. (1968), "Attitudinal Effects of Mere Exposure," Journal of Personality and

Social Psychology, 9 (2P2), 1-&.

APPENDIX 1

CURRICULUM VITA

**(Michel) Tuan Pham**

515 Uris Hall                              25 Claremont Avenue
Columbia University                        Apt. 9C
New York, NY 10027                         New York, NY 10027
Tel.:    (212) 854-3472                    (212) 662-5275
Fax.:    (212) 316-9214
E-mail: tdp4@columbia.edu                  February 2006

## EDUCATION

- Ph.D. in Business Administration-Marketing, University of Florida 1994
- M.A. in Marketing, University of Florida 1992
- Licence in Applied Economics, Catholic University of Mons (FUCaM), Belgium 1987

## EMPLOYMENT

- Professor of Business (Marketing), Columbia University 1003-present
- Associate Professor of Business (Marketing), Columbia University 1998-2003 (with tenure since 2002)
- Faculty Director, Marketing Management Program, Columbia Executive Education 1002-Present.  (Associate Faculty Director 1995-2002)
- Assistant Professor of Business (Marketing), Columbia University 1994-1998
- Instructor, Catholic University of Mons 1987-1990

## ACADEMIC HONORS

- Finalist JCR Best Article Award (2004)
- ACR Doctoral Symposium Faculty (2001 1003 1005)
- JCR Outstanding Reviewer (2002)
- AMA Doctoral Consortium Faculty (2000 1002)
- MSI Young Scholar (2001)
- Robert Ferber Award, Honorable Mention (1999)
- Beta Gamma Sigma (1995)
- AMA Doctoral Consortium Fellow (1993)
- Fellow of the Intercollegiate Center for Management Science, Belgium (1990-1993)
- EDEN Fellow of the European Institute for Advanced Studies in Management (1988 1989)

- Graduated with Great Distinction, Catholic University of Mons (1987)

## PUBLISHED RESEARCH

*Selected Publications:*

21.   Raghunathan, Rajagopal, Michel Tuan Pham, and Kim P. Corfman (2006), "Informational Properties of Anxiety and Sadness, and Displaced Coping," *Journal of Consumer Research*, March, forthcoming.

20.   Pham, Michel Tuan and E. Tory Higgins (2005), "Promotion and Prevention in Consumer Decision Making: The State of the Art and Theoretical Propositions," in *Inside Consumption: Consumer Motives, Goals, and Desires*, S. Ratneshwar and David Glen Mick (eds.), London, UK: Routledge, pp. 8-43. (Lead chapter)

19.   Pham, Michel Tuan (2004), "The Logic of Feeling," *Journal of Consumer Psychology*, Vol. 14 (4), 360-369.

18.   Zhou, Rongrong and Michel Tuan Pham (2004), "Promotion and Prevention across Mental Accounts: How Financial Products Dictate Consumers' Investment Goals." *Journal of Consumer Research*, Vol. 31 (June) 125-135.

17.   Pham, Michel Tuan and Tamar Avnet (2004), "Ideals and Oughts and the Weighting of Affect versus Substance in Persuasion." *Journal of Consumer Research*, Vol. 30 (March), 503-518.

16.   Pham, Michel Tuan and A.V. Muthukrishnan (2002), "Search and Alignment in Judgment Revision: Implications for Brand Positioning." *Journal of Marketing Research*, Vol. 39 (1) 18-30.

15.   Pham, Michel Tuan, Joel B. Cohen, John Pracejus, and G. David Hughes (2001), "Affect Monitoring and the Primacy of Feelings in Judgment," *Journal of Consumer Research*, Vol. 28 (September) 167-188.  (Lead article, Finalist for the 2004 JCR Best Article Award.)

14.   Gorn, Gerald, Michel Tuan Pham, and Leo Yatming Sin (2001), "When Arousal Influences Ad Evaluation and Valence Does Not (and Vice Versa)," *Journal of Consumer Psychology* 11 (1), 43-55.

13.   Muthukrishnan, A. V., Michel Tuan Pham, and Amitabh Mungalé (2001),  "Does Greater Amount of Information Always Bolster Attitudinal Resistance?," *Marketing Letters*, Vol. 12 (2) 131-144.

12.   Pham, Michel Tuan, Tom Meyvis, and Rongrong Zhou (2001), "Beyond the Obvious: Chronic Imagery Vividness and Decision Making," *Organizational Behavior and Human Decision Processes*, Vol. 84 (2) 126-253.

11. Pham, Michel Tuan and Gita Venkataramani Johar (2001), "Prominence Biases in Sponsor Identification: Processes and Consequentiality," *Psychology and Marketing*, Special Issue on Commercial Sponsorship, Vol. 18 (2) 123-143

10. Muthukrishnan, A. V., Michel Tuan Pham, and Amitabh Mungalé (1999), "Comparison Opportunity and Judgment Revision," *Organizational Behavior and Human Decision Processes*, Vol. 80 (December) 128-251.

9. Johar, Gita Venkataramani and Michel Tuan Pham (1999), "Relatedness, Prominence, and Constructive Sponsor Identification," *Journal of Marketing Research*, Vol. 36 (August) 199-312.  (Lead article)

8. Raghunathan, Rajagopal and Michel Tuan Pham (1999), "All Negative Moods are Not Equal: Motivational Influences of Anxiety and Sadness in Decision Making," *Organizational Behavior and Human Decision Processes*, Vol. 71 (July), 56-77. (Most cited article published in this journal since 1999.)

7. Pham, Michel Tuan (1998), "Representativeness, Relevance, and the Use of Feelings in Decision Making," *Journal of* Consumer *Research*, Vol. 25 (September) 144-159. (1999 Robert Ferber Award: Honorable Mention. Nominated for the JCR Best Article Award in 2001)

6. Pham, Michel Tuan and Marc Vanhuele (1997), "Analyzing the Memory Impact of Advertising Fragments," *Marketing Letters*, Vol. 8 (4), 407-417.

5. Pham, Michel Tuan and Gita Venkataramani Johar (1997), "Contingent Processes of Source Identification," *Journal of Consumer Research*, Vol. 23 (December) 149-265. (Lead article. Nominated for the JCR Best Article Award in 2000)

4. Pham, Michel Tuan (1996), "Heuristiques et Biais Décisionnels en Marketing," *Recherche et Applications en Marketing*, Vol. 11 (4), 53-69.

3. Pham, Michel Tuan (1996), "Cue Representation and Selection Effects of Arousal in Persuasion," *Journal of Consumer Research*, Vol.  22 (March), 373-387. (Nominated for the JCR Best Article Award in 1999)

2. Derbaix, Christian and Michel T. Pham (1991), "Affective Reactions to Consumption Situations: A Pilot Investigation," *Journal of Economic Psychology*, Vol. 12, 325-355.

1. Derbaix, Christian and Michel T. Pham (1989), "Pour un Développement des Mesures de l'Affectif en Marketing: Synthèse des Prérequis," *Recherche et Applications en Marketing*, 4 (4), 71-87.*

* Reprinted as Derbaix, C. and M. Pham (1998), "For the Development of Measures of Emotion in Marketing : Summary of Prerequisites," in *European Perspectives in Consumer Behaviour*, M. Lambkin, G. Foxall, F. van Raaij, and B. Heilbrunn (eds.) Prentice Hall.

*Other Publications, Proceedings, and Reports:*

10. Michel Tuan Pham and Rongrong Zhou (2004), "Advanced in the Psychology of Investing," in *Advances in Consumer Research*, Vol. 31, Barbara Khan and Mary-Frances Luce (eds.), Provo, UT: Association for Consumer Research, 604-606.

9. Michel Tuan Pham and Jennifer L. Aaker (2002), "Consumers as Motivated Beings: The Influence of Self-Regulation on Judgment and Persuasion," in *Advances in Consumer Research*, Vol. 29, Susan M. Broniarczyk and Kent Nakamoto (eds.), Provo, UT: Association for Consumer Research, 308-311.

8. Michel Tuan Pham (2001), "The Instantiation, Shaping and Handling of Consumer Displeasure (and Pleasure)," in *Advances in Consumer Research*, Vol. 28, Mary C. Gilly and Joan Meyers-Levy (eds.), Provo, UT: Association for Consumer Research, 43.

7. Pham, Michel Tuan and Patti Williams (1999), "Teasing Processes Apart in Consumer Research: Novel Experimental Methodologies," in *Advances in Consumer Research*, Vol. 26, Eric Arnould and Linda Scott (eds.), Provo, UT: Association for Consumer Research, 372.

6. Pham, Michel Tuan (1997), "Really-Low Involvement Consumer Learning," in *Advances in Consumer Research*, Merrie Brucks and Deborah MacInnis (eds.), Provo, UT: Association for Consumer Research 121-122.

5. Pham, Michel Tuan (1995), "Anticipations and Consumer Decision Making," in *Advances in Consumer Research*, Vol.22, eds. Mita Sujan and Frank Kardes, Provo, UT: Association for Consumer Research 175-276.

4. Pham, Michel Tuan, G. David Hughes, and Joel B. Cohen (1993), "Validating A Dial-Turning Instrument for Real-Time Measurement of Affective and Evaluative Responses to Advertising," *Marketing Science Institute*, Report No 93-116.

3. Pham, M. Tuan (1992), "Effects of Involvement, Arousal, and Pleasure on the Recognition of Sponsorship Stimuli," in *Advances in Consumer Research*, Vol.19, eds. John F. Sherry and Brian Sternthal, Provo, UT: Association for Consumer Research, 85-93.

2. Pham, Michel T. (1991), "The Evaluation of Sponsorship Effectiveness: A Model and some Methodological Considerations," *Gestion 2000*, 7 (4), 47-66.

1. Pham, Michel Tuan and Luk Warlop (1990), "Assessing the Mediating Role of Affective States and Involvement on Responses to Sponsorship Stimuli", in Hans Mühlbacher and Christoph Jochum (Eds.), "*Advanced Research in Marketing: Proceedings of the 19th Annual Conference of the European Marketing Academy*", Innsbruck: EMAC.

**PAPERS UNDER REVIEW/WORKING PAPERS**

Avnet, Tamar and Michel Tuan Pham (2004), "Should I Trust my Feelings or not? The Metacognition of Affect-as-Information." To be resubmitted for second review at *Journal of Personality and Social Psychology*.

Wakesfield, Kirk, Gita Venkataramani Johar, and Michel Tuan Pham (2005), "How Event Sponsors are Identified. An (Baseball) Field Analysis." Under review at *Journal of Advertising Research*.

Michel Tuan Pham, Stuart, Jennifer Ames, and Donald R. Lehmann (2005), "Using Self-Awareness to Shape Customer Satisfaction." Being revised for second-round review at *Journal of Consumer Research*.

Cohen, Joel B., Michel Tuan Pham, and Eduardo Andrade "Affect and Consumer Judgment and Decision Making." Chapter to appear in the *Handbook of Consumer Psychology,* Curt Haugtvedt, Paul Herr, and Frank Kardes (Eds), Hillsdale, NJ: Lawrence Erlbaum.


**RESEARCH IN PROGRESS**

"Promotion Increases the Use of Feelings in Judgment; Prevention Decreases It." Four studies conducted. Draft in progress. Target: *Journal of Personality and Social Psychology*. (With Tamar Avnet)

"Product Category Moderators of the Effectiveness of Emotional Advertising: An Analysis of 1000 TV Commercials." Data being analyzed. Target: *Journal of Marketing*. (With Maggie Geuens and Patrick De Pelsmaker)

"Emotion and Rationality: A Review of The Empirical Evidence." Target: *Review of General Psychology*.

"Feelings Have One Degree of Freedom in Judgment and Decision Making." Data collection under way. (With Catherine Yeung.)

"Comparing the Attitude Strength of Ideal- and Ought-Based Evaluation." Two studies conducted. Draft in progress. Target: *Journal of Consumer Psychology*. (With Tamar Avnet)

"The Relaxed Decision Maker." Two studies completed. Additional studies underway (With Gerald Gorn)

"Effects of Regulatory Focus on Consumer Search." One study completed. (With Hannah Chang).

"Process Decomposition in Consumer Research." Data analyses completed (With Marc Vanhuele and Asim Ansari)

"Design Principles and Strategies for Inferences about Processes."

## CONFERENCE SESSIONS ORGANIZED and CHAIRED

"Consumer Behavior Goes to Wall Street: New Insights into the Psychology of Investing," Special Session, Society for Consumer Psychology Conference, San Francisco, February 2004.

"Advanced in the Psychology of Investing," Special Session, Association for Consumer Research Conference, Toronto, October 2003. (Co-chaired with Rongrong Zhou)

"Consumers as Motivated Beings: The Influence of Self-Regulation on Judgment and Persuasion," Special Session, Association for Consumer Research Conference, Austin, October 2001. (Co-chaired with Jennifer Aaker)

"The Instantiation, Shaping and Handling of Consumer Displeasure (and Pleasure)," Special Session, Association for Consumer Research Conference, Salt Lake City, October 2000.

"Shades of Pain: Consumer Responses to Anger, Sadness, Anxiety, and Fear," Special Session, Association for Consumer Research Conference, Columbus, October 1999. (Co-chaired with Laurette Dubé)

"Teasing Processes Apart: Novel Experimental Methods," Special session, Association for Consumer Research Conference, Montreal, October 1998. (Co-chaired with Patti Williams)

"Really-low Involvement Consumer Learning." Special session, Association for Consumer Research Conference, Tucson, October 1996.

"Consumers' Anticipation in Decision Making," Special session, Association for Consumer Research Conference, Boston, October 1994.

## CONFERENCE PRESENTATIONS

"The Logic of Feelings in Consumer Judgment and Decision Making" Association for Consumer Research Doctoral Symposium, San Antonio, September-October 2005.

"Promotion and Prevention in Consumer Decision Making: A Propositional Inventory" Association for Consumer Research Conference, San Antonio, September-October 2005. (With E. Tory Higgins.)

"The Consumption Regulation of Discrete Emotions." Discussant comments. Association for Consumer Research Conference, San Antonio, September-October 2005.

"Should I Trust My Feelings or Not? The Meta-Cognition of Affect-as-Information in Judgment," Association for Consumer Research Conference, Portland, October 2004. (With Tamar Avnet.)

"Promotion and Prevention across Mental Accounts: When Financial Products Dictate Consumers' Investment Goals," Society for Consumer Psychology Conference, San Francisco, February 2004. (With Rongrong Zhou)

"Ideals and Oughts and the Use of Feelings in Judgment," Association for Consumer Research Conference, Toronto, October 2003. (With Tamar Avnet)

"Promotion and Prevention across Mental Accounts: When Financial Products Dictate Consumers' Investment Goals," Association for Consumer Research Conference, Toronto, October 2003. (With Rongrong Zhou)

"Affect and Motivation in Consumer Research," Plenary Session, Doctoral Symposium of the Association for Consumer Research, Toronto, October 2003.

"Mixed Emotions and Juxtaposed Representations," Discussant Comments, Association for Consumer Research Conference, Atlanta, October 2002.

"On the Functional Independence of Feeling and Thinking," Association for Consumer Research Conference, Atlanta, October 2002. (With Rajagopal Raghunathan and Tamar Avnet)

"Opportunities for Impactful Consumer Research," 2002 Sheth-AMA Doctoral Consortium, Atlanta, June 2002.

"Implicit Self-Regulation and the Mechanics of Persuasion," Association for Consumer Research Conference, Austin, October 2001. (With Tamar Avnet)

"Motivational Influences of Negative Affect on Consumer Decision Making," European Association for Consumer Research Conference, Berlin, June 2001. (With Rajagopal Raghunathan and Kim P. Corfman)

"Emotional Rationality," Columbia/NYU/Wharton/Yale Colloquium, May 2001.

"How Do Vivid Imagers Process Vivid Information in Decision Making?" Society for Consumer Psychology Winter Conference, Scottsdale, February 2001. (With Tom Meyvis and Rongrong Zhou)

"On the Primacy of Affect Monitoring in Judgment and Decision Making." Association for Consumer Research Conference, Salt Lake City, October 2000. (With Joel B. Cohen and John W. Pracejus)

"Contextually Shaping Consumer Happiness." Association for Consumer Research Conference, Salt Lake City, October 2000. (With Jennifer Ames)

"Efficient Designs for Process Inferences," 2000 AMA Doctoral Consortium, London, Canada, August 2000.

"Hidden Influencers: What Sponsor Recall Really Means," IEG Event Marketing Conference, Chicago, March 2000. (Featured speaker)

"All Negative Moods are Not Equal: Motivational Influences of Anxiety and Sadness in Decision Making," Association for Consumer Research Conference, Columbus, October 1999. (With Rajagopal Raghunathan)

"Feelings and Consumer Decision Making," Ferber Award Session, Association for Consumer Research Conference, Columbus, October 1999.

"All Negative Moods are Not Equal: Motivational Influences of Anxiety and Sadness in Decision Making," Marketing Science Conference, Syracuse, May 1999. (With Rajagopal Raghunathan)

"Disentangling Processes of Sponsor Identification: A Process Decomposition Approach," Association for Consumer Research Conference, Montreal, October 1998. (With Gita V. Johar.)

"Attitude Reconstruction and Contingent Resistance," Association for Consumer Research Conference, Denver, October 1997. (With A.V. Muthukrishnan and Amitabh Mungale)

"When Cued Retrieval Fails: The Interplay Between Accessibility and Diagnosticity in Source Identification," Association for Consumer Research Conference, Denver, October 1997. (With Gita V. Johar)

"Subtle Communication Effects of Incidental and Uninvolving Exposure to Advertising Fragments," Association for Consumer Research Conference, Tucson, October 1996.

"Seeing How it Feels: Affect as Information in Decision about Future Consumption Episodes," Association for Consumer Research Conference, Boston, October 1994.

"Revisiting the Effects of Reduced Cognitive Capacity: Selection and Representation Effects of Arousal in Persuasion." Special session on "New Research on Limited Cognitive Capacity," Annual Conference of the Association for Consumer Research, Boston, October 1994.

61

"Testing A Dynamic Model of Affective Responses to Advertising."  Special session on "New Research in Processing Tracing of Responses to Dynamic Stimuli," Annual Conference of the Association for Consumer Research, Nashville, October 1993. (With Joel B. Cohen and G. David Hughes)

"Using A Dial-Turning Instrument for Measuring Affective and Evaluative Responses to Communications."  Conference on "New Methods in Consumer Research," Marketing Science Institute, Boston, September 1993. (With G. David Hughes)

"Effects of Involvement, Arousal, and Pleasure on the Recognition of Sponsorship Stimuli." Annual Conference of the Association for Consumer Research, Chicago, October 1991.

"Methodological Considerations for the Evaluation of Sponsorship Effectiveness."  Stichting Marketing Seminar on "Sponsoring: Investissement ou Gaspillage?,"  Brussels, September 1990.

"The Mediating Effects of Involvement and Arousal on the Recognition of Sponsorship Stimuli." 19th Annual Conference of the European Marketing Academy, Innsbruck, May 1990.

"Affective Reactions to Consumption Situations: An Investigation into Sex Differences," Workshop on "Consumer Behavior: Extending the Cognitive Structure Perspective," European Institute for Advanced Studies in Management, Brussels, November 1989. (With Christian Derbaix)

"Sponsoring et Communication: Etat de la Question et Perspectives de Recherche à venir." IREP Seminar on "La Recherche en Communication: Acquis et Perspectives," Paris, October 1988.


**INVITED COLLOQUIA (Selected)**

University of Chicago, October 2005
National University of Singapore, March 2005
University of Maryland, April 2004
Rutgers-Camden, April 2004
University of Michigan, February 2004
University of Houston, January 2004
Vanderbilt University, January 2004
University of Ghent, Belgium, June 2003
University of Kansas, October 2002 (Distinguished Speaker Series)
University of Texas, Austin, April 2002 (Marketing Camp)
Tilburg University, The Netherlands, December 2001 (Marketing Camp)
INSEAD, November 2001
London Business School, November 2001
University of Chicago, April 2001
University of California at Los Angeles, April 2000

Ohio State University, September 1999 (Marketing Camp)
Duke University, December 1998
University of California at Berkeley, December 1998
McGill University, November 1998
Concordia University, November 1998
University of Mainz, Germany, April 1998
INSEAD, March 1998
Stanford University, February 1998
China-Europe International Business School, August 1997
University of Connecticut, October 1996
Hong Kong University of Science and Technology, August 1996
MIT, November 1995
Katholieke Universiteit Leuven, November 1995
Cornell University, March 1995
University of Laval, Canada, November 1993
University of Toronto, Canada, November 1993
INSEAD, October 1993
HEC, France, October 1993
Universite Catholique de Louvain, October 1993
University of Chicago, October 1993
University of British Columbia, Canada, October 1993

## RESEARCH INTERESTS

Consumer and managerial decision-making (especially influence of feelings)
Marketing communications (especially under low involvement and sponsorship)
Behavioral research methodology

## TEACHING INTERESTS

MBA and EMBA:        Marketing Strategy, Marketing Management, Customer Psychology
Executive Education:  Marketing Strategy, Marketing Management, Decision Making
PhD:                         Judgment and Decision Making, Experimental Design and Analysis.

## GRANTS

Center for Research on the Marketing of Financial Service Grant (2000 1001)
Yoshida Hideo Memorial Foundation Grant (1999)

## Ph.D. STUDENT MENTORING

*Primary advisor or co-advisor to*:

Rajagopal Raghunathan (U. of Texas-Austin), defended at NYU (2000), Co-Chair
Rongrong Zhou (HKUST), defended at Columbia University (2001), Chair
Jennifer Ames Stuart (Novartis), defended at Columbia University (2003), Co-Chair
Tamar Avnet (U. of Toronto), defended at Columbia University (2004), Chair

*Other doctoral student involvement:*

Catherine Yeung, HKUST (2003), External Examiner


**PROFESSIONAL ACTIVITIES/SERVICES**

Editorial board:     *Journal of Consumer Research* (2001-present)
                     *Journal of Marketing Research* (2003-present)
                     *Journal of Consumer Psychology* (2001-present)
                     *Recherche et Applications en Marketing* (1998-present)

Ad Hoc reviewer:     *Journal of Marketing Research* (1993-2003)
                     *Journal of Consumer Research* (1995-2000)
                     *Journal of Consumer Psychology* (1992-2001)
                     *Journal of Marketing*
                     *Journal of Personality and Social Psychology*
                     *Marketing Letters*
                     *International Journal of Research in Marketing*
                     *Journal of Advertising*
                     *Journal of Business Research*
                     *Journal of Behavioral Decision Making*
                     *Psychology and Marketing*
                     *Cognition and Emotion*
                     *Social Cognition*
                     *Asia Pacific Management Journal*
                     AMA Best Dissertation Award
                     ACR Conference
                     AMA Summer Educators' Conference
                     SCP Conference
                     MSI Doctoral Dissertation Proposal Competition
                     National Science Foundation
                     Research Grant Council, Hong Kong


Member:              Association for Consumer Research
                     Society for Consumer Psychology
                     American Psychological Association

<u>External Services</u>

Selection Committee of the <u>Advertising Education Foundation</u> Visiting Professor Program (1996 1998 1002)

Education Committee of the <u>Advertising Education Foundation</u> (1999-present)

Interactive Committee of the <u>Advertising Education Foundation</u> (1999-present)

Program Committee, ACR 2000 Conference

Chair of the *Journal of Consumer Psychology* Best Young Contributor Award Committee (2005)

Program Committee, ACR 2005 Conference

<u>Services to the Business School and University</u>

Marketing Faculty Search Committee, Graduate School of Business, Columbia University (1996 1998)

Executive MBA Strategy Committee, Graduate School of Business, Columbia University (1998 1999)

Co-Coordinator Ph.D. program in marketing, Graduate School of Business, Columbia University (1998-2000)

Co-Coordinator visiting scholar program in marketing, Graduate School of Business, Columbia University (2002-present)

Marketing Ph.D. program committee, Graduate School of Business, Columbia University (2002-2004)

Communication Committee, Graduate School of Business, Columbia University (2002-2004)

University Institutional Review Board, Columbia University, (2005-present)

Social Intelligence Committee, Graduate School of Business, Columbia University (2006-present)

Marketing Electives Committee, Graduate School of Business, Columbia University (2006)

<u>Board Membership</u>

Board of Directors of the <u>Advertising Education Foundation</u> (1998-2003).

**LANGUAGES and PERSONAL**

Fluent in English and French; Functional knowledge of Vietnamese and Spanish.
Married, one child
Belgian citizen
Permanent U.S.A. resident

APPENDIX II
SUMMARY RESULTS OF THE FORD, BUBALA, and ASSOCIATES SURVEYS

| Adidas vs. Target – Collected December 11 – December 20 2001 | | | | | | |
|---|---|---|---|---|---|---|
| N = 417 respondents | Shoe features | | | | Identified as adidas | Composite (made or authorized by adidas) |
| Test Cell | 4 parallel stripes | 4 parallel rows of perforation | Shell toe | Flat sole w/ heel patch | 43.81% | 48.57% |
| Control cell | No stripes | Non-parallel perforation | Shell toe | Flat sole w/ no heel patch | 14.98 | 15.94 |
| Adidas vs. Madden – Collected August 13 – September 12 2002 | | | | | | |
| N = 385 respondents | Shoe features | | | | Identified as adidas | Composite (made or authorized by adidas) |
| Test cell 1 | 2 parallel stripes | 3 parallel rows of perforation | Flat sole | Jagged sole | 26.04% | 29.17% |
| Control 1 | No stripe | No perforation | Nonflat sole | Jagged sole | 5.21% | 6.25% |
| Test cell 2 | 2 parallel stripes | Perforation on front of shoe | Flat sole | Jagged sole | 28.13% | 30.21% |
| Control 2 | No stripe | Perforation on front of shoe | Flat sole | Jagged sole | 4.12% | 8.24% |

| Adidas vs. Madden – Collected October 28 – November 13 2002 | | | | | | |
|---|---|---|---|---|---|---|
| N = 433 respondents | Shoe features | | | | Identified as adidas | Composite (made or authorized by adidas) |
| Test Cell | 4 parallel stripes | No perforation | No shell toe | Nonflat sole | 19.36 | 22.12 |
| Control cell | No stripes | No perforation | No shell toe | Nonflat sole | 2.78 | 4.63 |
| Adidas vs. Bum – Collected December 6 – December 30 2002 | | | | | | |
| N = 433 respondents | Shoe features | | | | Identified as adidas | Composite (made or authorized by adidas) |
| Test Cell | 4 parallel stripes | No perforation | No shell toe | Flat sole w/ heel patch | 17.59% | 20.83% |
| Control cell | No stripes | No perforation | No shell toe | Flat sole w/ heel patch | 1.84% | 1.84% |
| Adidas vs. Payless – Collected August 16 – September 24 2002; February 4 – February 12, April 22 – April 28 2003 | | | | | | |
| N = 646 respondents | Shoe features | | | | Identified as adidas | Composite (made or authorized by adidas) |
| Test cell | 4 parallel stripes | 4 parallel rows of perforation | Shell toe | Flat sole | 42.40% | 47.47% |
| Control 1 | No stripe | Nonparallel perforation | No shell toe | Nonflat sole | 5.09% | 6.02% |
| Control 2 | 3 non parallel stripes | No perforation | No shell toe | Nonflat sole | 9.39% | 10.33% |

68

| Adidas vs. Fortune Dynamic – Collected April 19 – April 28 2005 | | | | | | |
|---|---|---|---|---|---|---|
| N = 324 respondents | Shoe features | | | | Identified as adidas | Composite (made or authorized by adidas) |
| Test Cell | 4 parallel stripes | No perforation | Shell toe | Flat sole | 18.06% | 20.83% |
| Control | 3 non-parallel stripes | No perforation | No shell toe | Flat sole | 0.93% | 0.93% |
| Adidas vs. Kmart – Collected January 15-26; Januuary 10-26 | | | | | | |
| N = 648 respondents | Shoe features | | | | Identified as adidas | Composite (made or authorized by adidas) |
| Test Cell 1 Athletech | 4 parallel stripes | 4 parallel perforations | Shell toe | Nonflat sole | 37.50% | 40.74% |
| Control 1 | 3 non-parallel stripes | No perforation | Shell toe | Nonflat sole | 23.61% | 25.46% |
| Test Cell 2 Olympian | 4 parallel stripes | No perforations | Rubber toe | Flat sole Contrast-ed heel patch | 43.52% | 49.07% |
| Control 2 | 3 non-parallel stripes | No perforation | Rubber toe | Nonflat sole Non contrast-ed heel patch | 18.52% | 21.30% |

69

APPENDIX III
SHOES TESTED BY FORD, BUBALA, & ASSOCIATES IN ADIDAS VS. KMART



Test 1: Kmart Athleteck



Control 1



Test 2: Olympian



Control 2