**Stephen M. Feldman, OSB No. 93267**; sfeldman@perkinscoie.com
**Thomas R. Johnson, OSB No. 01064**; trjohnson@perkinscoie.com
PERKINS COIE LLP
1120 NW Couch Street, 10th Floor
Portland, OR 97209-4128
Telephone: (503) 727-2000
Facsimile: (503) 727-2222

      Attorneys for Plaintiffs

**Jerre B. Swann**; jswann@kilpatrickstockton.com
**William H. Brewster**; bbrewster@kilpatrickstockton.com
**R. Charles Henn Jr.**; chenn@kilpatrickstockton.com
**Christopher M. Hanes**; chanes@kilpatrickstockton.com
KILPATRICK STOCKTON LLP
Suite 2800
1100 Peachtree Street
Atlanta, GA 30309
Telephone: (404) 815-6500
Facsimile: (404) 815-6555

      Of Counsel for Plaintiffs

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| ADIDAS AMERICA, INC. and ADIDAS-SALOMON AG,<br><br>        Plaintiffs,<br><br>   v.<br><br>KMART CORPORATION; FOOTSTAR, INC.; MERCURY INTERNATIONAL TRADING CORP.; ELAN IMPORTS CO., INC.; NEXTTEC INTERNATIONAL, INC.; and INNOVATIVE CUSTOM BRANDS INTERNATIONAL, INC.,<br><br>        Defendants. | NO. CV05-120 ST<br><br>**EXPERT REPORT OF DR. ERICH JOACHIMSTHALER**<br>In Opposition to Defendants' Motion for Summary Judgment and In Support of Plaintiffs' Motion for Partial Summary Judgment |

i-   EXPERT REPORT OF DR. ERICH JOACHIMSTHALER

## EXPERT REPORT OF DR. ERICH JOACHIMSTHALER

I, Erich Joachimsthaler, Ph.D., hereby state as follows:

1.      I have been asked by adidas America, Inc. to examine and report on three issues:

a)      The fame and value of the adidas brand and its related symbols;

b)      The role of the Three Stripes symbol and the Superstar design in the adidas brand arsenal; and

c)      The damage to the adidas brand that will result from the conduct of the defendants in this action.

### Qualifications

2.      I am the Chief Executive Officer of Vivaldi Partners (formerly known as The Brand Leadership Company), a strategic marketing and brand strategy consulting firm with headquarters in New York and offices in London, Munich, and Hamburg.

3.      I have been a professional in the brand and marketing field for more than 20 years and have provided expert brand and marketing advice to a diverse set of clients in industries such as telecommunications, automotive, consumer products, technology, financial services, entertainment and energy among others.

4.      Before founding Vivaldi Partners, I co-founded a company with Professor David A. Aaker called Aaker - Joachimsthaler & Partners, which we sold to Prophet, in 1999.  I was a Chairman at Prophet before founding Vivaldi Partners.

5.      I am recognized as an authority on marketing strategy and building strong brands. My book, *Brand Leadership*, which I co-authored with David Aaker, was published by The Free Press in January, 2000, and I am currently working on my next book.

6.      Over the past 15 years, I have been involved in building strong brands for many clients in North America and Europe, including adidas, Deutsche Telekom, IBM, General Electric, Levi's, and Siemens.  I have worked for clients in extending brands into premium sectors of markets as diverse as food, automotive, durables and fashion. I have assessed the value of brands and their potential for development in several hundred situations and I have led research into the extension of brands or well-known trademarks.

7.      I have held faculty positions at the Darden Graduate School of Business Administration at the University of Virginia, the University of Southern California, University of Houston, and Institute Estudios Superiores de la Empresa (I.E.S.E) in Barcelona, Spain.

8.      I am Visiting Professor of Business Administration at IESE (Instituto Superiores de la Empresa) in Barcelona, Spain, one of the leading European business schools offering MBA and executive education programs.

9.      In 1988, I completed a post-doctoral fellowship at the Harvard Business School, and in 1985, I received my Ph.D. in Business Administration (with emphasis on statistics and marketing) from the University of Kansas.  In 1981, I received my Master's Degree of Science (with emphasis in quantitative methods) and in 1979 I received my Economics degree from the Fachhochschule Giessen-Friedberg, Germany.

10.      I have published extensively in academic journals such as the Harvard Business Review, Journal of Marketing Research, Journal of Marketing, Journal of Consumer Research and Sloan Management Review.  A more detailed summary of my training, past experience and prior testimony appears at the end of this document.

11.      I am being compensated at my normal and customary hourly rate of $700 per hour.  My consulting firm is also being compensated for the time spent by its research staff at

their normal and customary hourly rates.

## **Materials Reviewed**

12.    To carry out the foregoing assignment, I have reviewed, among other materials, the following:

o    Likelihood of Post-Sale Confusion Survey Report of Gerald L. Ford, submitted in Adidas v. Target Corporation et. al.

o    Likelihood of Post-Sale Confusion Survey Report of Gerald L. Ford, submitted in Adidas v. Payless Shoes

o    Likelihood of Post-Sale Confusion Survey Report of Gerald L. Ford, submitted in Adidas v. Fortune Dynamic, Inc.

o    Likelihood of Post-Sale Confusion Survey Report of Gerald L. Ford, submitted in Adidas v. Steve Madden, Ltd.

o    Expert report of Marian Friestad, Ph.D. submitted in Adidas America and Adidas-Salomon AG v. Payless Shoesource

o    Expert report of Scott Galloway, submitted in Adidas America and Adidas-Salomon AG v. Payless Shoesource

For this case and others, I have also reviewed, inter alia:

o    Various apparel and shoe web sites

o    Print media and articles related to shoes and apparel

o    Journal articles, books, and other academic literature related to brands and branding

o    adidas advertisements

3

o       The adidas case study in *Brand Leadership* at pps. 165-195

I also have visited at least one Kmart retail store, as well as numerous stores in which adidas footwear has been sold.

## The Value of Brands in Consumer Footwear and Apparel Marketing

13.     The word brand originates from the Old Norse word "brandr," which means to burn.  Indeed, branding or burning was (and is) the method by which farmers mark their livestock to identify who owns them.[1]  In this sense, a brand is a distinguishing name and/or symbol intended to identify services or goods.[2]  A brand has two key components, the tangible and the intangible. When David Aaker defines a brand as "a distinguishing name and/or symbol intended to identify goods or services," he refers to the tangible component of a brand.  The tangible components, or physical manifestation, of a brand include a name, a logo, an image or a package design. These components, however, are only one part of the brand.

14.     The components of the brand that give meaning to the brand beyond its name or logo are the intangible components.  As David Ogilvy, the advertising guru, wrote in his book, *Confessions of an Adman*, a "brand is a consumers' idea of a product."  Ogilvy refers here to the second and most important part of a brand namely everything that is stored in a consumers' memory and linked to a name of a product, service or company.  Metaphorically speaking, a brand can be viewed much like a box in someone's head.  As people receive information about a brand, positive or negative, they file it away in the box labeled with the name of the brand.[3]  After repeat exposure to or experience with a brand, the consumer will have a number of

---

[1] Keller, Kevin L. (2003), *Strategic Brand Management: Building, Measuring, and Managing Brand Equity*, 2nd Ed., Englewood Cliffs, NJ: Prentice-Hall, p. 3
[2] David A. Aaker, *Managing Brand Equity*, The Free Press, 1991

thoughts and feelings about the brand stored in this box.

15.    Symbols are important tangible components that serve to trigger intangible thoughts, feelings, emotions, and experiences about a brand. Symbols can be "anything that represents the brand," including a logo, a character, a color, a gesture, or a package.[4] Visual elements, such as symbols, "play a critical role in building brand equity, especially in terms of brand awareness,"[5] and also trigger associations that a consumer has with a given brand. Because of their visual nature, logos and other symbols are often easy to recognize and therefore a valuable way to identify products. In particular, a strong symbol can enhance the strength of a brand by providing "cohesion and structure to an identity, making it much easier to gain recognition and recall."[6] When a consumer has recognized a logo or another symbol on a product or advertisement, it is almost certain that thoughts, feelings, emotions, and experiences he or she holds about the particular brand will be called to mind. Besides the name, a symbol is perhaps the most important tangible component of a brand for bringing to mind these thoughts and feelings.

16.    Though it is considered an intangible asset on the company's financial statement, a strong brand can contribute real value to a company. In fact, the company's brand is in many cases its most valuable asset. This value was recognized by marketers as far back as 1900, when John Stuart, Chairman of Quaker stated "If this business were split up, I would give you the land and bricks and mortar, and I would take the brands and trade marks, and I would fare better than

---

[3] David Aaker, *Building Strong Brands*, The Free Press, 1996
[4] Aaker, David and Joachimsthaler, Erich, *Brand Leadership*, pg. 54
[5] Keller, Kevin L. (1998), *Strategic Brand Management: Building, Measuring, and Managing Brand Equity*, 1st Ed., Englewood Cliffs, NJ: Prentice-Hall, p. 143
[6] Aaker, David and Joachimsthaler, Erich, *Brand Leadership, pg.* 54

you."[7] Over the years, supporting evidence has mounted from many sources—academic, media, ruling bodies, and business – to support the well accepted idea that brands can create and retain significant economic value.  Academic work by Aaker and Jacobson has shown a relationship between brand equity and shareholder return.[8]  Firms experiencing the largest gains in brand equity saw their shareholder return average 30 percent; conversely those firms with the largest losses in brand equity saw stock return average a negative 10 percent.  Another study has shown that a portfolio of high brand value companies outperformed a total stock market index by a wide margin (23 % per annum versus 16%) throughout most of the 1990s.[9]  Additionally, a strong corporate brand can add between 5 and 7 percent to a company's stock price during a bull market, and can diminish losses during a bear market.[10]

17.    For those who still do not see the financial value of a strong brand, the U.S. market provides clear evidence:  Intangible assets (including brand assets) as a percentage of total U.S. non-financial assets have grown from 24% to 48% from 1955 to 2002, with much of that growth occurring after 1980.[11]  Furthermore, intangible assets on average account for 75% of the value that investors place on the firm.[12]  A different study concluded that on average brands accounted for more than one-third of shareholder value.[13]

18.    As brands have increasingly been recognized by companies and investors as core assets, government regulators have responded by formalizing how these assets are accounted for.

---

[7] *Brands and Branding*, (2003) Economist book series, Bloomberg Press,
[8] David A. Aaker and Robert Jacobson (1994), "The Financial Information Content of Perceived Quality," *Journal of Marketing Research,* 31 (Spring), 191-201.
[9] Madden, Thomas, Fehle, Frank R. and Fournier, Susan M., (2002), "Brands Matter: An Empirical Demonstration of the Creation of Shareholder Value Through Brands," Social Science Research Network working paper.
[10] Parkhurst, Jeffrey (2002), "Leveraging Brand to Generate Value," in *From Ideas to Assets*, Bruce Berman, ed., NY: John Wiley & Sons, 395-420.
[11] Wall Street Journal article posting a Federal Reserve Board table on April 4, 2002.
[12] Knowles, Jonathan (2003), "Value-Based Brand Measurement and Management," *Interactive Marketing* 5(1), July/September, 40-50.

In 2001 the Financial Accounting Standards Board (FASB) introduced FASB statements 141 and 142, which address how intangibles and goodwill as assets will be accounted for going forward. International accounting standards allow the placement of brands as assets on the balance sheet in certain countries. These statements reflect increased interest in proper measurement and interpretation of intangible assets.

19.    Recently, methodologies have been developed to calculate the specific numerical value of a brand. *BusinessWeek* publishes an annual survey of the 100 best global brands based on numerical brand value, a study tracked and used by many companies to keep track of their brand health relative to competitors.  In the 2005 *BusinessWeek* survey, a number of apparel and footwear brands were represented in the top 100, including Nike (number 30 with a brand value of $10.11 billion), Gap (number 40, $8.19 billion), and Levi's (number 96, $2.65 billion). Adidas made this list, ranking 71st with a brand value of $4.03 billion.

20.    Particularly in the consumer footwear market, the establishment, maintenance and enhancement of a brand is of significant importance.  Apparel and footwear brands provide a number of benefits to both the manufacturer and the consumer:

Benefits to the Manufacturer

21.    In terms of benefits to the manufacturer, strong brands provide a means of differentiating one product from another.  The branded aspects of the products, such as the name, logo, label, or unique design elements, are what invoke in consumers' memory the information he or she has stored about a brand. This information or memories such as images, associations, attributes, perceptions, past experiences, feelings, emotions and opinions are what consumers rely on to draw comparisons between two apparel products by two different manufacturers.  A

---

[13] BusinessWeek, Interbrand/JP Morgan league table, 2002.

strong brand enables a manufacturer to differentiate its brand from that of the competition in order to generate preference, choice and loyalty.  A study conducted in 2004 found that for the jeans category, brand attitudes directly impact consumers' purchase decisions, with more favorable attitudes strongly influencing brand preference and brand choice.[14]

22.     An additional benefit to the manufacturer of a strong brand is sustaining relevance with consumers.[15]  Especially for footwear targeting young adults, relevance is needed to sustain the business amid constantly changing tastes and rapid turnover of core customers.  A typical young adult target market is 18-24 year-olds, which means that every 7 years a footwear company is addressing a completely new group of consumers.  Fashion companies targeting teens must therefore carefully manage their brands through constant refinement of brand positioning and user imagery, plus consistent investment in the brand.

23.     A third benefit to the manufacturer of strong brands is building and sustaining competitive advantage over others in the market.  Apparel companies with a strong orientation toward building brands achieve competitive advantages in the following dimensions of fashion retail: merchandise, communication, trading format, and customer service.[16]

24.     A fourth benefit to the manufacturer of strong brands is providing the basis for brand extensions, which involve using an existing brand name introduce a new product.  Brand extensions can serve to bring new customers to the brand franchise and increase market coverage.[17]  Brand extensions are commonly used the apparel industry to enable companies to

---

[14] Xue Li, "How Brand Knowledge Influences Consumers' Purchase Intentions," Doctoral Dissertation, University and Alabama, May 14, 2004
[15] Aaker, David, "The Innovator's Prescription: The Relevance of Brand Relevance." *Strategy+Business*, Special Report, Summer 2004; Aaker, David, Brand Portfolio Strategy. New York: The Free Press, 2004, pp. 103-127
[16] Kerry Bridson and Jody Evans. "The Secret to a Fashion Advantage Is Brand Orientation." International Journal of Retail & Distribution Management, Vol. 34, Number 8, 2004
[17] Kevin Lane Keller, *Strategic Brand Management*, Prentice Hall, Upper Saddle River, New Jersey, 2003

access new market segments or new categories. Examples of brand extensions in the apparel industry include Gap Kids, Levi's Red Tab, and Diesel Style Lab, while footwear industry brand extensions include Nike Golf, adidas Originals, and Kenneth Cole Reaction. In some cases, strong brands have been able to extend into apparel from other industries. For example, Harley-Davidson leveraged the strength of its motorcycle brand to develop a large general merchandise business, of which apparel is the biggest contributor, that generates annual revenues in excess of $200 million.[18]

### Benefits to the Consumer

25.    A benefit to the consumer of strong brands is the reduction of the risk inherent in purchase decisions. Because apparel products carry significant risks of quality and peer-group acceptance, brands play an important role in consumer purchase decisions. Consumers cope with these risks by purchasing well-known brands.[19] According to research by KSA/NPD, brands are important to 46% of women and 58% of men when making an apparel purchase.[20] Another study found that 80% of men shopping for apparel sometimes or always seek out brands.[21]

26.    Strong brands also provide self-expressive benefits for consumers.[22] A self-expressive benefit exists when the brand "provides a vehicle by which a person can proclaim a particular self-image."[23] A consumer may express a self-image of "adventurous" and "outdoorsy" by wearing Merrell hiking boots. Similarly, the purchase of Gucci loafers may be a

---

[18] Chapman, Mary M. "Riders Drive Sales of Harley Accessories," *Detroit Free Press*, August 28, 2003.
[19] Kevin Lane Keller, *Strategic Brand Management*, Prentice Hall, Upper Saddle River, New Jersey, 2003
[20] KSA/NYD Branding Report 1996
[21] Daily News Record National Survey conducted by America's Research Group (1995)
[22] Jennifer Aaker, "The Malleable Self: The Role of Self-Expression in Persuasion," *Journal of Marketing Research*, Winter, 1999
[23] Aaker, David and Joachimsthaler, Erich, *Brand Leadership, pg.* 50

means of expressing an "elite" and "successful" self-image. As with functional and emotional benefits, a question exists to test the presence of a self-expressive benefit: "Because I use Brand X, I am (self-expressive benefit)." As fashion items, consumer apparel brands offer significant self-expressive benefits to consumers who wish to project a certain image or persona to others. A self-expressive benefit of an apparel article is, for example, the expression to others that one belongs to a certain group or community, that one is stylish, young, hip, or unpretentious.

27.    The self-expressive benefits of brands can be credited for much of the value that consumers ascribe to brands. This view is confirmed by leading branding and marketing experts, who state:

> People express their ... identity in a variety of ways, such as job choice, friends, attitudes, activities, and lifestyles. Brands people like, admire, discuss, buy, and use also provide a vehicle for self-expression.... The purchase and use of a branded product—whether it is Apple, Betty Crocker, or Nike—provides a vehicle for expressing a personality and lifestyle.[24]

> [Self-expressive] benefits relate to underlying needs for social approval or personal expression and outer-directed self-esteem. Thus, consumers may value the prestige, exclusivity, or fashionability of a brand because of how it relates to their self-concepts.[25]

28.    Design and aesthetics are more important than ever to today's consumers when they make purchase decisions,[26] and as a result it is all the more essential for companies to use logos and other symbols both to differentiate the product, such as shoes, and to enable consumers to express elements of their self-concepts. One study found that consumers who seek to express different aspects of themselves prefer different shoe brands.[27] For example, if they wished to appear athletic, a consumer was more likely to choose an Adidas shoe than a shoe by L.A. Gear.

---

[24] Aaker, David *Building Strong Brands pg.* 153-154.
[25] Keller, Kevin, *Building, Managing, and Measuring Brand Equity,* p. 99.
[26] Postrel, Virginia. *The Substance of Style*, New York: HarperCollins, 2003.
[27] Aaker, Jennifer L. (1999). "The Malleable Self: The Role of Self-Expression in Persuasion." *Journal of Marketing*

Adidas' three stripes, as the primary visible brand symbol on its shoes, are the primary source of expression to observers. Wearers of adidas shoes are able to enjoy whichever self-expressive benefits they derive from the shoes in large part because the three stripes are such a noticeable and expressive symbol. Without the three stripes, it would be left to the other, less prominent brand symbols present on the shoes to deliver these important self-expressive benefits.

29.    Today, consumers are choosing to express elements of their self-concepts that echo, or directly mirror, the self-expression that influential individuals, also called influencers or opinion leaders, develop through the products they use and promote.[28] As a result, brands that influencers adopt and use are more likely to find success in the wider market than those that are not adopted. This is especially true in the context of athletic footwear, a market that contains a number of different influencer groups, including professional athletes, popular musicians, actors, fashion models, as well as peers. These opinion leaders are at the top of what has been termed a "hierarchy of influence," for they exert relatively more influence over what consumers further down the hierarchy decide to buy.

30.    Top athletic footwear companies have two sets of influencers at the top of the hierarchy of influence, professional athletes and entertainment industry figures. For professional athletes, the companies ensure that its products are manufactured to the highest standards and incorporate the latest technology to ensure that professional athletes use the products on the field of play. Once a brand has established credibility at the top of the pyramid, it can leverage the approval of this influential group to spur demand by "weekend warriors" and amateur athletes, who take sport and exercise seriously and want to use the same equipment as the pros.

---

*Research* Vol. 36, pp. 45-57.
[28] Keller, Ed and Berry, Jon (2003). *The Influentials*, The Free Press.

Ultimately, a successful footwear company will witness a "trickle down" effect of this influence to the mass market of casual users, who do not necessarily rely on the product to support athletic endeavors on a regular basis but still look at the choices of professional athletes to inform their purchase decisions. The mass market for footwear also is heavily influenced by celebrities in the entertainment industry. For example, if a famous recording artist such as Jay-Z appears on TV or in a magazine wearing a pair of Adidas shoes, consumers who admire and respect Jay-Z might take notice of his shoes and elect to purchase a pair of their own.

31.    Influencers also play a role in the emotional and self-expressive benefits that consumers derive from their use of brands, because using a product associated with a prominent public figure can generate certain feelings (e.g., "I feel stronger and tougher wearing the same brand as The Rock") or self-concepts (e.g., "I am like Mike"). It is therefore essential that a footwear company maintain a brand that will attract and retain influencers, which requires that the brand sustain premium connotations for its brand. If a brand falls out of favor with influencers and they cease to use or recommend the brand, then the adverse business consequences will be witnessed at every other level in the hierarchy of influence.

32.    Because strong brands create considerable economic value for their owners and provide benefits to both consumers and manufacturers, building, maintaining and preserving brand strength is of critical importance. This brand strength is commonly referred to by the well-known and accepted concept of "brand equity." Brand equity is defined as the set of assets or liabilities that add or subtract from the value provided by a product or service.[29] A benefit of building brand equity is the resulting price premiums that brands enable their owners to realize

---

[29] David Aaker, *Managing Brand Equity*, The Free Press, 1991; David Aaker and Erich Joachimsthaler, *Brand Leadership*, The Free Press, 2000

and value premiums that enable brand owners to provide greater value to their customers. This ability to realize price/value premiums is evidenced by the fact that 72% of customers say they will pay a 20% premium for the brand of their choice across a number of product categories.[30] Intel shows how building brand equity can yield price/value premiums, since it secured a 10% price premium following its brand-building efforts.[31] Price premiums in general, and in Intel's case in particular, can lead to increased shareholder value. Between 1991, prior to the start of the famous "Intel Inside" branding campaign, and 1998, Intel's market capitalization rose from $10 billion to over $200 billion.

33. Building brand equity also has a positive impact on a company's financial returns. A study of 33 major brands found that those experiencing the biggest gains in brand equity over a period of one year experienced an average stock return of 30 percent, while firms with the biggest loss in brand equity saw stock returns fall by 10 percent.[32]

34. Before using the concept of brand equity to identify the sources of adidas' brand strength and analyze the manner in which the presence of Kmart's knock-off shoes in the market affects that strength, I will briefly discuss the history of the adidas brand to provide the proper context for a discussion of its brand equity.

### The History of the adidas Brand[33]

35. The adidas brand has been the subject of many case studies.[34] Adidas was

---

[30] K&A, Brandkey.
[31] Aaker, David, *Building Strong Brands*, pg. 321
[32] Aaker, David and Joachimsthaler, Erich, *Brand Leadership, pg.* 21
[33] This section on adidas' history draws on the expert report of Scott Galloway submitted in Adidas America and Adidas-Salomon AG v. Payless Shoesource
[34] For example: David Aaker and Erich Joachimsthaler, *Brand Leadership,* Free Press, Pg165-193; Adidas Case Study, Jacques Horovitz, Giana Boissonnas and Ursula Hilliard, IMD International Institute for Management Development

founded in 1948 by German shoemaker and dedicated amateur athlete Adi Dassler. Dassler had

been in business since 1926, when his family set up a factory to produce special lightweight

track and soccer shoes. Following a family dispute, the original Dassler Company split into two

firms and in 1948, adidas was formed.

36.     Adi Dassler was a sports enthusiast and inventor who valued craftsmanship,

quality and dedication to innovation.  He listened to top athletes and watched track meets to

assess their needs.  Dassler pioneered the concept of improving athletic performance through

technical improvements in shoes and apparel.  With the slogan, "The Best for Athletes," adidas

developed a reputation as a company that made shoes for serious athletes.

37.     From the beginning, Dassler believed that one key success factor was to convince

top athletes to use his shoes in competition. Dassler's shoes got their first international exposure

at the 1928 Amsterdam Olympics, where they were worn by the members of the German team.

In 1936, Dassler garnered priceless international exposure when photos of Jesse Owens winning

his record-breaking four gold medals in Dassler shoes (with their trademark stripes) were

reprinted around the world. In 1954, the German soccer team won the World Cup, and its adidas-

made soccer shoes with screw-in studs were considered an important component in the victory.

At the 1956 Olympics in Melbourne, 72 medals were won and 33 records were broken in adidas

footwear. At the 1960 Olympics in Rome, 75% of all track and field athletes relied on adidas

footwear.[35]

38.     In the 1960s and 1970s, adidas' major strategic thrust was to expand globally and

to extend the brand to apparel, equipment and tote bags, all of which carried the adidas logo.

Adidas also focused on building its brand through celebrity endorsement, recruiting

serious/professional athletes to use its products. Backed by Dassler's innovations, adidas used a hierarchy of influence model of brand building, which worked on three levels. First, the serious athlete was enticed to use adidas not only by incentives, but also because it delivered innovation and quality supporting the highest performance standards. Second, the visibility of the brand as worn by top athletes (facilitated by the Three Stripes symbol and the distinctive appearance of the products) created demand among a larger layer of potential customers: amateur athletes and weekend warriors. Word-of-mouth communications and products that delivered to their needs played key roles at this level. Finally, the preferences of athletes at both levels filtered down to casual users, the largest segment of the market.

39.    As a result of its highly successful hierarchy of influence model, adidas reached sales of $1 billion by 1980, with market shares as high as 70% in some key product categories. Adidas offered roughly 150 different shoe styles, producing 200,000 pairs per day in 24 factories in 17 countries. Its diversified product line (including clothing, sports equipment, and athletic gear) sold in more than 150 countries.[36]

40.    By the early 1980s however, the Adidas brand-building model began to lose power. Adidas's fortunes started taking a downward turn beginning in the late 1970s through the 1980s and right up to the early 1990s. Upon the death of Adi Dassler in 1978, adidas lost its primary source of technical innovation. Dassler's widow Käthe and son Horst took over the company, but with the untimely death of Horst in 1987, adidas lost its brand visionary. The adidas brand began to drift and lose focus, and in 1989, the company was sold to Bernard Tapie, a controversial businessman who provided little guidance. Three years later, Bernard Tapie

---

[35] *"At A Glance": The adidas Story,* www.adidas-group.com
[36] Aaker and Joachimsthaler, p. 168

found himself in financial difficulties and ceded control of adidas to a consortium of French banks.

41.    During this period, the picture could not have been gloomier for Adidas. Between 1988 and 1992, adidas' total annual sales dropped from nearly $2 billion to $1.7 billion, while in the same period, Nike's sales mushroomed from $1.2 billion to more than $3.4 billion. From being the U.S. market share leader in the late 1970s, adidas's market share dropped to 3% in 1992. In Germany, adidas's key European market, its market share dropped from 40% to 34% between 1991 and 1992, while Nike's share grew from 14% to 18%. In the same year, Nike's European sales grew by 38% while adidas sales decreased by almost 20% and the company lost over $100 million.[37]

42.    There were a number of reasons for this situation. After the death of Adi Dassler, the company's management did not have the know-how or the vision to deal with Nike and Reebok, brands that were hitting consumers hard with a sophisticated marketing and advertising onslaught, while riding on the new wave of jogging, aerobics, and athletic-gear-as-fashion trends in the U.S.[38] In contrast to Nike and Reebok, adidas missed picking up on the jogging and aerobics movements and when it did belatedly respond, its new products and appeals lacked direction and deviated from the brand's core values. While adidas had a strong presence in running among athletes, the adidas brand-building model did not work for joggers. There were few teams, clubs, or associations (and no national or global federations) for jogging with which adidas could build relationships.[39]

43.    In 1993, amid the worsening financial difficulties, the French banks that owned

---

[37] Aaker and Joachimsthaler, p. 183-184
[38] For example, the number of contestants in the New York City Marathon increased from 156 to 5,000 between 1970 and 1977. Source: Randall Rothenberg, *Where the Suckers Moon*, Alfred A. Knopf, 1995

adidas sold the company to an investor group headed by Robert Louis-Dreyfus. The arrival of Louis-Dreyfus, who became the CEO, was preceded by the hiring of Rob Strasser, a former Nike executive, and Peter Moore, a creative talent with substantial Nike experience. Once Dreyfus took over, he launched a complete restructuring of adidas. He installed new management with a strong marketing background, cut production costs by moving production to Asia and Eastern Europe, discontinued cheaper lines of shoes, and doubled media advertising spending.

44.    The new executive team realized that the adidas brand, once strong and focused, had drifted. They wanted to bring back the brand identity back to its roots, to recall what adidas had once stood for, and at the same time, bring more emotion and a contemporary feel to it. As a result, they refocused adidas on its mission of being a performance brand. The new adidas brand identity included dimensions such as *Performance, Active Participation* (not just top athletes) and *Emotion* (the thrill of competing), with a brand personality that was energetic, genuine, competent, and that of a supportive teammate.[40]

45.    The new adidas identity made a powerful brand statement in 1993, creating focus for the brand and clarifying how it differed from Nike. It retained the adidas heritage of technology, innovation, and performance while also stretching the brand in new directions. Brand-building initiatives included investing in its new high-end equipment subbrand called EQUIPMENT[41], a new brand management structure, revitalized advertising, a refocused sponsorship program, and adidas-branded grassroots events. This change manifested itself in new sponsorships, media advertising, and branded grassroots events. Sales grew from $1.7 billion in 1992 to $4.8 billion in 1998. After the last year of losses (1993), profits grew steadily

---

[39] Aaker and Joachimsthaler, p.169
[40] Aaker and Joachimsthaler, p.186
[41] *"At A Glance": The adidas Story,* www.adidas-group.com

to $425 million in 1998.[42]

46.    Adidas thus experienced a significant repositioning of its brand. According to one study, three of the top associations consumers noted with the adidas brand were trendy, modern, and cool.[43] Another survey showed that 50% of athletes perceived that adidas had changed in the past few years, becoming more modern, more contemporary, and more youthful.[44]  Interbrand's rankings of "the best global brands" from 2001 to 2005 ranked adidas as the second most powerful footwear brand in the world.[45]

47.    The increase in sales and the improved consumer perceptions reflect adidas's status in consumers' minds. In recent years, the brand has added a fashionable cachet to its already strong associations of authenticity and performance, illustrated by the following article excerpts.

> Surely you've noticed that the classic adidas three-stripe motif is not only back, but looking as contemporary, elegant and simple as ever. It is not only the nicest looking gear ever created for tennis, it's also unspeakably hip. Everyone from Anna Koumikova to gangsta rappers to cyber-hipsters is wearing the three stripes.[46]

> adidas's famous three-stripe footwear and sports apparel is scoring big right now.[47]

48.    Moreover, adidas has been able to instill fashionable brand associations by collaborating with famous fashion designers. In October 2001, the company teamed with Austrian crystal specialist Swarovski to launch a limited, high-end line of shoes called the

---

[42] Aaker and Joachimsthaler, p.192
[43] Aaker and Joachimsthaler, p.193
[44] Aaker and Joachimsthaler, p. 193
[45] www.interbrand.com and *Businessweek*, "Best Global Brands" 2001 to 2005
[46] Bodo, Peter, "The Three Stripes are Back in the Game," *Tennis,* 1997.
[47] Brookman, *Faye*, "Adidas' Fragrant Moves," *WWD,* 1999.

"Crystal Superstar" that retailed for nearly $700.[48]  Renowned Japanese fashion designer Yohji

Yamamoto was appointed Creative Director of the new adidas Sport Style division in 2002.[49]

One of the reasons Yamamoto agreed to collaborate with adidas was that he has been impressed

by the way the brand's three-stripes motif has endured for more than fifty years.[50]  In 2004,

adidas and designer Stella McCartney announced a partnership to develop the "adidas by Stella

McCartney" sport performance collection, a functional sport performance range for women that

debuted in the US, Japan and Europe in spring/summer 2005.[51]  In this way, adidas shoes and

apparel have become fashion statements and status symbols.  This fact is reflected in a global

study of the most popular brands among the important fashion- and status-conscious teen

demographic.  In this study, Adidas ranked third overall in brand preference among teens, ahead

of Nike, which ranked fourth.[52]

### Three Stripes and the Superstar[53]

49.     The Three Stripes symbol has been a symbol of the company for more than 50

years. The stripes were popularized on the famous soccer shoe known as the "Samba," a line that

adidas continues to manufacture today.  The Samba gained popularity because it made for better

traction on snow, ice, and frozen ground, enabling play year-round.

50.     In the 1960s, as adidas expanded into other sports such as basketball with the

"Superstar," it continued to leverage the Three Stripes symbol, a shortcut used to convey the

same level of quality and authenticity that the brand stood for in soccer.  By the mid-1970s, three

---

[48] Deeny, Godfrey, "Adidas Creates Luxury Sneaker with Swarovski," www.fashionwindows.com
[49] *"At A Glance": The adidas Story,* www.adidas-group.com
[50] "Fall Preview: Fashion - Biggest Buzz" *Time Magazine*, September 3, 2001, www.time.com
[51] *"At A Glance": The adidas Story,* www.adidas-group.com
[52] GenWorld Teen Study, January 2006.
[53] This section on adidas' three stripes and its superstar model draws on the expert report of Scott Galloway

quarters of all NBA players were wearing Superstar shoes, and the Superstar soon became a brand symbol in its own right. Indeed, the Supterstar was worn by such prominent athletes as Kareem Abdul-Jabbar, Julius "Dr. J" Erving, Artis Gilmore, Doug Collins, Billy Knight, and Mack Calvin. Since its introduction and rise to brand symbol, the appearance of the Superstar, with its unique combination of three stripes on the side of the shoe parallel to equidistant small holes, a rubber "shell toe," a particularly flat sole and a colored portion on the outer back heel section, referred to as a "heel patch," has remained largely the same.[54]

51.    Symbols generally can evoke a brand through their relationship with the associations that define a brand, creating a "shortcut" to recalling the brand and its value. The Coca-Cola Company, for example, owns such a strong brand symbol in the shape of its Coca-Cola bottle:

> The Coca-Cola bottle is widely regarded as the most universally recognisable [sic] item of packaging in the history of trade and commerce. The bottle itself is heavy, anachronistic, and expensive but such is its appeal and its recognition value that Coke can never abandon it. The bottle is idiosyncratic in shape but it (together with the red livery and the distinctive typefaces) has come to be a significant aspect of the brand identity of Coke. It is one of the few truly global phenomena in the world of marketing, and one of the few brand symbols that appear to transcend all linguistic and cultural barriers. Such is its potency as a symbol that one tends to forget it began its life as a practical piece of packaging.[55]

52.    The Three Stripes symbol and the Superstar design (see Exhibits 9 and 10) in this case serve two very important roles. First, they enable consumers to identify the adidas brand in various usage contexts, in which scrutinizing the product or its word mark(s) may not be possible. For example, at athletic events under circumstances where the adidas name or logo cannot be discerned, the Three Stripes symbol and Superstar design serve an important function

---

submitted in Adidas America and Adidas-Salomon AG v. Payless Shoesource
[54] Jorgenson Dec. ¶ 30.

of identifying source. Even walking down the street, the adidas brandmark on the tongue of a

shoe may not be visible, but the Superstar design enables potential consumers to know

unequivocally that they are looking at an adidas shoe.

53.    Second, the Three Stripes symbol and the Superstar design are visual means by

which consumers express allegiance to and identification with the values of the adidas brand, a

phenomenon that occurs throughout the apparel industry with symbols such as the Ralph Lauren

polo pony. The users of these brands form a brand community,[56] a concept to describe groups of

users that strongly identify with a particular brand and share similar attitudes and tastes that

enhance their identification with other users of the same brand. Harley Davidson is commonly

given as an example of a strong brand community,[57] because owners of Harley motorcycles

closely identify with the core values of the brand – independence, ruggedness, and power – and

this increases the extent to which they identify with each other in order to form riding clubs and

other formal and informal gatherings of owners.

54.    In the apparel business, the desire within a brand community to obtain products

often has to do with seeing them on star athletes, celebrities, or famous musicians; adidas spends

millions of dollars annually for Tim Duncan (basketball), David Beckham (soccer), Sergio

Garcia (golf), and other athletes to wear its products. Similarly, adidas spends a significant

amount ensuring the Superstar shoes are placed in movies, advertisements, and magazines on the

feet of models, actors, and celebrities. Consumers may not have read about these contracts or be

aware of the product placement program, but they are evident in the footwear and apparel that

[55] O Sullivan, Paul, "It's Not What You Make, It's the Way You Say It," *Irish Marketing Review,* 1998.
[56] Muniz, Albert M. Jr. and O'Guinn, Thomas C. (2001) "Brand Community," *Journal of Consumer Research* (27) March: pp. 412-432.
[57] McAlexander, James H. and Schouten, John W. (2002) "Building Brand Community." *Journal of Marketing* (66) Winter, p. 8.

their heroes wear.  A hip-hop fan may think to himself, "I like Missy Elliott, I want to stand for

what she stands for: style, grace, and attractiveness." All of these thoughts are communicated

when the consumer purchases and wears the Superstar or other shoes bearing the Three Stripes.

   55.    In the following section, I will use the concept of brand equity to identify the

sources of adidas' brand strength, and analyze the manner in which the presence of Kmart's

look-alike shoes in the market diminishes that strength.


### Damage to the adidas Brand

   56.    A brand with equity possesses four asset dimensions: A) awareness, B)

associations, C) perceived quality and D) loyalty.  I will address these asset dimensions to illustrate

the adverse effects of the simultaneous presence in the market of K-Mart's two- and four-stripe

shoes.


### *A) Awareness*

   57.    Brand awareness refers to the familiarity of the brand and its branding elements

(e.g. name, logo, etc.).  Awareness is an important asset dimension but not the most important;

brands must have strong, favorable, and unique associations with loyal consumers in order to

derive sustainable brand strength.  Without awareness, however, a brand would have little hope

of establishing other asset dimensions of brand strength.  Therefore, awareness is a necessary but

not sufficient element of brand strength.

   58.    Adidas has achieved high awareness in the apparel market over the course of its

58-year history.  As the second largest footwear brand in the world, adidas is today a household

name.  A recent study confirmed this by measuring adidas' aided brand awareness as 94 out of

100 among 14-30 year-olds in the U.S.[58] This score was higher than any other shoe brand except Nike, which scored 96. This study also measured "brand presence," which is a function of how much respondents agree with the statement "I see a lot of this brand." Adidas scored 64 on brand presence, again second only to Nike, which had brand presence of 75. As this study indicates, consumers are very familiar with adidas, therefore awareness can be considered high.

59.     Adidas gains awareness in the market by using high-profile marketing and advertising to promote its products to a national audience. It consistently spends over $600 million a year globally to ensure that a broad audience of consumers is exposed to its products with advertisements in television media, national newspapers and magazines, outdoor media such as billboards and buses, sponsorships, the Internet and other media. In 2004, adidas launched a high profile national advertising campaign titled "Impossible is Nothing" that cost $50 million and used TV commercials, magazine ads, billboards, and other media. Streaming internet ads featuring a "fantasy bout" between Muhammad Ali and his daughter, also a boxer, registered 5 million views during a two-week period alone.[59]

60.     That same year, adidas was the official sponsor of the most-watched athletic contest in the world, the Summer Olympics. Through independent athlete and team sponsorships, Adidas outfitted 4,000 athletes and made equipment for 26 of 28 sports played during the Olympics.[60] This sponsorship ensured adidas was the "leading brand in terms of visibility"[61] to the billion-strong worldwide audience for the Olympics, and was viewed by the company as an "invaluable way to build brand awareness that [adidas] hopes will translate into

---

[58] "Adidas Brand Navigator" Icon Added Value presentation, November 2005. Aided awareness is the percentage of respondents who claim to have seen a brand when given a stimulus such as a logo or product
[59] Oser, Kris. "Adidas Mines Possibilities with Web Effort." *Advertising Age*, May 3, 2004.
[60] Yee, Amy. "Adidas wins sponsorship race," *Financial Times*, March 17, 2004, p. 31.
[61] Adidas annual report, 2004

sales in the longer term."[62]

61.     Adidas footwear and apparel is sold at adidas' own Sport Performance stores and retail stores nationwide, including athletic shoe and sporting goods stores such as Foot Locker, the Athlete's Foot, The Sports Authority, Finish Line, Champs, plus department stores such as Bloomingdales, Nordstrom, Fred Meyer, Sears, and Bealls.  Adidas also sells its footwear and apparel on the Internet, where it has established a significant web presence both with its e-commerce shopping portal, shopadidas.com and via availability on major third-party e-commerce sites such as Eastbay.com and Zappos.com.

62.     Adidas possesses high awareness as a result of the number of impressions created by its high national advertising, its own-brand retail stores, its availability at prominent department and specialty stores, and the millions of consumers who purchase and wear adidas footwear and apparel.

63.     The extraordinary likeness of the Kmart 2-stripe and 4-stripe shoe designs with the classic adidas 3-stripe mark indicates an attempt on the part of Kmart to benefit from adidas' pre-established awareness in the footwear and apparel market.  The 2-stripe and 4-stripe shoes by Kmart feature a number of the same design elements that call to mind the classic adidas Superstar shoe specifically (e.g., the shell toe, flat sole, and heel patch, see Exhibits 1, 2, 5, 7, 8) in addition to the iconic 3-stripes symbol (see Exhibits 1-8).  Other design elements serve to further establish this likeness on some of the Kmart shoe models, such as the perforations alongside the stripes (see Exhibits 1, 2, 3, 4, 7) and the "jagged edge" stripes on at least one Kmart shoe (see Exhibits 5, 8).  As noted above, adidas has achieved a significant level of brand awareness, trust and loyalty among consumers.  On the other hand, Kmart's limited penetration

---

[62] Yee, Amy. "Adidas wins sponsorship race," *Financial Times*, March 17, 2004, p. 31.

in the footwear market to date suggests that consumers are more likely to associate the 2-stripe and 4-stripe shoe designs with adidas, than with Kmart itself.

64.    Given the similarities between the visual cues used by Kmart on its 2-stripe and 4-stripe shoes and those with which adidas has built its high awareness, I conclude that it is probable that consumers will be confused as to the source of Kmart's 2-stripe and 4-stripe shoes. This conclusion is based on my considerable academic and professional experience researching and advising brands, and on materials relevant to this case including the report of Dr. Marian Friestad and the reports of Dr. Gerald Ford, which I will discuss in detail in the following section. The confusion could manifest itself in several ways. First, casual observers glancing at the product might think that the shoes are in fact a new design from adidas. Observers who more closely inspect the shoes might think that adidas is supplying Kmart with private-label goods that Kmart is then selling under a different name. Or shoppers might think that adidas has licensed its classic designs to Kmart.

65.    Furthermore, I conclude that the similarities between Kmart's shoes and classic adidas designs are so closely tied as to be intentional; hence Kmart is attempting to exploit this confusion to trade on adidas' brand awareness in order to build sales of its own shoes. This is potentially damaging to adidas due to the strategic importance of maintaining brand awareness in preserving brand equity in the footwear market.

## B) Associations

66.    A second key asset of any brand is strong, favorable and unique brand associations. Brand associations are anything 'linked' in memory to a brand.[63] An association

---

[63] David Aaker, *Managing Brand Equity*, The Free Press, 1991

can be a visual image (the gecko lizard for Geico), a feature (iPod's design), an attribute (Volvo's safety), a gesture (Allstate's hand gesture associated with the tagline: "You are in good hands with Allstate"), or a benefit (Crest's cavity prevention). Such associations form the core of how consumers evaluate a brand on an ongoing basis.

67.    Adidas triggers positive and valuable associations in the minds of consumers. Specifically, consumers associate adidas with Performance, Original, Active Participation, and Quality.[64]

68.    Adidas' Performance associations are built by its reputation for innovative equipment that can help the world's top athletes and the casual sports enthusiast perform better. The brand's performance associations are further enhanced by the fact that one of its two main lines is called the "Performance" line and its own-brand stores, which feature the latest innovative and leading-edge products from the Performance line, are called "adidas Sport Performance" stores.

69.    Adidas strove to reinforce its Performance associations when it introduced its high-end Equipment sub-brand in 1991.[65] The Equipment brand represented the best footwear and apparel that adidas had to offer, a notion reinforced by advertising that focused primarily on the product and its technology-based performance. The cutting-edge image of the Equipment sub-brand was further aided when adidas decided to migrate its older styles to the casual user and fashion markets.

70.    The simultaneous presence in the market of Kmart's 2-stripe and 4-stripe shoes will negatively effect adidas' ability to maintain associations with Performance. Kmart itself is

---

[64] From discussion of "Adidas Brand Identity" in Aaker, David and Joachimsthaler, Erich, *Brand Leadership, pg.* 185;

[65] "The adidas story," www.press.adidas.com

not a performance brand, and it does not sell performance brands in its footwear and apparel sections. If consumers exposed to Kmart's shoes experience confusion regarding the source of the shoes and attribute some connection with adidas, as I contend they will, then it is likely that adidas' associations with performance will be eroded.

71.    Adidas also maintains associations with Original. As the first major athletic shoe brand, with a heritage stretching back more than 50 years, it can plausibly lay claim to being an originator of the athletic footwear market. Its shoes were worn by prominent athletes during every decade since its founding. Adidas highlighted this fact with a 1995 ad campaign featuring famous athletes from history such as Czech Olympic champion Emil Zapotek and boxer Muhammad Ali and the tagline "We knew then – we know now," a message that "communicated adidas' claim to authenticity, heritage, and leadership."[66] Adidas launched the "Originals" sub-brand to further reinforce this illustrious past. The Originals line is comprised of "throwback" footwear and apparel that mimic classic designs of years past. For example, the Adidas Rome shoe, which debuted in 1960 to commemorate the Olympic Games held there, was relaunched as an Original. Recently, Originals created a Muhammad Ali shoe that mirrors a design he wore in his heyday. Today, Originals accounts for 15 percent of all shoe sales for the company.

72.    Again, the Kmart 2-stripe and 4-stripe shoes will negatively affect adidas' ability to conjure associations of the original. Kmart does not have a heritage in footwear, nor are its footwear products known for having authentic links to sports history. The very existence of a knock-off product works against the establishment of links with adidas and the concept of original.

73.    Whereas Nike "equates performance with winning and top athletes," Adidas is

"more about participation."[67]  The associations with active participation are built on the fact that adidas "is inclusive and supports every player, every level, every game, every gender, and every age."[68]  The company's approach to sponsorship further reinforces its active participation associations.  While it does have endorsement deals with top athletes such as Kevin Garnett, David Beckham, Marat Safin, and Sergio Garcia, the focus of adidas' sponsorship deals are toward major global events such as the Olympics or the World Cup, sports associations, and teams such as the national soccer teams of Germany, Spain, and France and the Bayern Munich, Real Madrid, and Chelsea soccer clubs.

74.    Adidas also sponsors a number of events that encourage active participation, most notably the Boston Marathon and the adidas Streetball Challenge basketball tournament.  Adidas has been the "Official Footwear and Apparel Outfitter" for the Boston Marathon for 17 years, and since 1999 has sponsored a related long-term, year-round running program for Boston area youths.[69]  The Streetball Challenge basketball tournaments, open to all ages in cities all over the world, actively encourage participation even for spectators to play a role.  For example, courts are available for those who wish to play but are not competing, special areas were designated where young players could develop their skills, and top players mingled with the fans.[70]  Following the success of the Streetball Challenge, adidas branched other open-forum sporting events such as the Predator Challenge soccer tournament and the Adventure Challenge, which involved outdoor sports.

75.    Kmart, on the other hand, does not evoke associations with active participation

---

[66] Aaker, David and Joachimsthaler, Erich, *Brand Leadership, pg.* 189
[67] Aaker, David and Joachimsthaler, Erich, *Brand Leadership, pg.* 186
[68] Aaker, David and Joachimsthaler, Erich, *Brand Leadership, pg.* 186
[69] www.bostonmarathon.org
[70] Aaker, David and Joachimsthaler, Erich, *Brand Leadership, pg.* 192

with its footwear. Its shoes harbor none of the associations with athletes, teams, and sports activities that adidas expends considerable effort engendering. Kmart's shoes are more similar to shoes intended for casual use, not for active participation. Therefore, adidas will be less likely to trigger associations with active participation if consumers mistakenly think it is selling shoes in Kmart or licensing its designs to Kmart.

76.    A brand has value when the associations consumers hold about the brand are strong, favorable, and unique.[71] Of these, favorable and unique associations contribute most to brand strength.

77.    Favorable associations are those that are desirable to consumers and are successfully delivered by the brand over time. For an association to be favorable, consumers must find it relevant and appealing and believe that the brand can sustainably provide these associations going forward.

78.    Adidas' associations are favorable. First, the adidas brand is closely aligned with its young, active audience. Through its product design and communications, Adidas has created a brand that is exceptionally relevant to its target demographic of young adult men and women. Additionally, the company has proven to consumers that it will deliver the designs they desire. I have found that the brand's commitment to consistency is applicable to both adidas advertising and its lines of footwear.

79.    Furthermore, adidas' brand associations are unique. As a result of its large set of associations, adidas possesses uniqueness in the footwear market that contributes to a highly differentiated brand. When taken separately, the associations of adidas may be shared among one or more competitor footwear labels, yet the combination of its associations are unique in the

industry and contribute significantly to adidas' strong brand. It has been shown that brands can achieve distinctiveness by creating networks of associations that, though individually they may be shared with other brands, collectively they are unique and memorable.[72] Adidas' set of associations – Performance, Original, Active Participation, and Quality – is unique to the footwear industry and has allowed the brand to thrive since its reinvention in the mid-1990s. Since the footwear market is highly competitive, this unique set of associations is particularly important for adidas' continued success in the business. If, as a result of the confusion in the marketplace resulting from Kmart's sale of 2-stripe and 4-stripe shoes, adidas' ability to trigger one or more of these associations in the minds of consumers is reduced, then the uniqueness of its set of associations will be diminished.

80.    Since adidas' unique set of associations, a considerable source of its brand strength, will be negatively affected by these attempts of Kmart to replicate its design, then so too will adidas' brand strength be diminished. Kmart's attempts at replicating adidas' unique design, which must be intentional because they are too numerous to be merely coincidental, increase the possibility that consumers will confuse the two brands and dilute the impact of adidas' strong, favorable, and unique associations. As a result of this confusion, adidas' brand equity will be eroded.

### C) Perceived Quality

81.    Perceived quality is "the customer's perception of the overall quality or superiority of a product or service with respect to intended purpose, relative to alternatives."[73]

---

[71] Kevin Lane Keller, *Strategic Brand Management*, Prentice Hall, Upper Saddle River, New Jersey, 2003
[72] Gregory S. Carpenter, et. al. "Market-Driving Strategies: Toward a New Concept of Competitive Advantage." in *Kellogg on Marketing*, John Wiley, 2001
[73] David Aaker, *Managing Brand Equity*, The Free Press, 1991

Perceived quality is an important component of brand strength since it is the source of many brands' competitive advantage. It is an association, but it is often separated out because of its strategic importance. Indeed, perceived quality is one of adidas' core brand associations, but I will discuss it separately here.

82.    Adidas has high levels of premium quality in the minds of consumers. Consumers' perception of adidas as a provider of premium quality products encourages trial and repeat purchases. Over time, the adidas logo and 3-stripes mark has evolved into a promise of quality and good value. Adidas' ability to successfully establish itself as an icon of quality footwear has greatly eased its extension outside of the footwear category. The same promise of quality and good value that was once solely applicable to footwear is now extendable to its apparel, equipment, and lines of fragrance and accessories.

83.    Its premium perceptions stem from its availability at specialty sporting goods stores such as Foot Locker and Champs and major department stores such as Nordstrom's. Additionally, adidas' flagship Performance footwear product adds to the brand's premium associations with leading-edge technology and style and premium price points exceeding $125 per pair in some cases. Finally, the co-branded partnerships with leading high-end fashion designers such as Yohji Yamamoto and Stella McCartney have enhanced adidas' premium perceptions in the minds of consumers.

84.    The premium quality image of a brand can be diluted if a brand is perceived by consumers to be ubiquitous and available to the mass market at a discount. This can happen if a brand over-extends and becomes so widely available in downmarket stores that core customers no longer desire to own the brand. The following two examples illustrate the danger of brand ubiquity in the mass market and discount stores.

31

85.    **Izod Lacoste** is an example of the dangers of over-extending a well-known brand and diluting its premium image.  The Lacoste brand, specifically the polo shirt, revolutionized men's sportswear, with the Lacoste brand and the crocodile logo became an American icon.  General Mills bought the rights to the Lacoste brand in 1970, and did not strive to maintain a premium image for the brand.  The logo was used on a wide assortment of clothing, including outfits for infants and toddlers. General Mills manufactured the shirts in the Far East, compromising the quality and prestige of the brand.  Although the brand peaked in sales in 1982 ($450 million) with much of it coming from the classic polo shirt, sales began to slow in 1983. General Mills began to cut prices and relaxed its distribution policy, dumping hundreds of thousands of shirts on discounters. The brand lost credibility and prestige after the shirts turned out in discount stores and counterfeits.  After sales plummeted in 1984, General Mills spun off the Lacoste business under Crystal Brands.  Crystal Brands failed to revive the brand and the Lacoste Group resumed control over the Lacoste brands with the help of a worldwide manufacturer, Devanley in 1992.  Izod Lacoste also found its brand distributed in discount outlets.  In addition, the brand did not maintain adequate product quality control.

86.    **Ocean Pacific** (Op) is an example of a apparel company that started out as a strong brand and was then damaged by over-extension.  In the 1970s and early 1980s, Op defined the surfing world.  By the mid-1970s Op was tripling its sales every year. In the 1980s, however, Op went mainstream and then fell part.  Op went into inland action sports of skateboarding, snowboarding, and motorcross. Under this strategy, Op became overexposed in discount stores. Op cachet was tarnished and replaced by fast-growing, cool, new brands energized by the reinvigorated interest in surfing. "Op couldn't have been any more dead than it was in the '90s. When you become un-cool, there's no price you can put on that" (Richard

Baker, current CEO). Sales peaked at about $350 million in 1989. The company went bankrupt in 1992. The most important strategy for the company today is to resurrect the brand. Op recruited Richard Baker as CEO. To regain the 'authenticity' of the brand, Baker also brought back Junior Jenks, the son of the company's founder to contribute his lifelong experience in surfing to the design team. They followed with a manufacturing, distribution, and branding campaign that tethered Op vintage designs with its heritage, yet gave it a life that was modern and, above all else, uniquely "Op". Sales are now recovering – sales were estimated at $200 million for 2002.

87.    Adidas reinforces its premium quality perceptions through controlled distribution in own-brand stores and select retailers. It does not sell its goods in low-end mass market retail and discount stores such as Wal-Mart and Kmart. To have adidas branded footwear products on the shelves at these stores, alongside other footwear products of lesser quality and sophistication, would cause many consumers to question adidas' quality. It has been shown that "[t]he manner by which a product is sold or distributed can have a profound impact on the resulting equity and ultimate sales success of a brand."[74] The physical store environment is one example of how the manner by which a product is sold or distributed can affect equity. Kmart's environment of displaying mass quantities of product at low prices with minimal on-floor sales support would not support adidas' perceptions of premium quality.

88.    Additionally, the reputation and image of Kmart as a financially troubled discount retailer would also counter premium quality perceptions. Other major footwear brands follow a similar policy of not selling to discount retailers, as evidenced by Nike's decision in 2005 to stop selling its products in Sears stores, a move that was attributed to Nike's fear that following

Sears' merger with Kmart Nike shoes would be available in Kmart.[75]

89.     The possibility of confusion between the Kmart shoes and the adidas models, combined with the Kmart shoes' significantly lower price point (one adidas knockoff model called the Footstar Soho retails for $17.99 at the Kmart in Astor Place, New York City) will damage consumer perceptions of adidas as a source of premium quality footwear.  Consequently, adidas' brand equity will be diminished.

90.     Furthermore, the presence of the knockoff Kmart shoes in the mass market may cause adidas to appear overexposed and thereby lose its premium perception.  As the Lacoste and Ocean Pacific examples referenced above demonstrate, overexposure can critically damage a brand's premium perceptions.  Kmart's actions also erode the ability of adidas to set premium price points and also provide value for customers.  Once consumer perceptions of adidas as a premium product are damaged, the company will lose the ability to set premium price points in the retail channel.


### D) Loyalty

91.     Loyalty is "a measure of the attachment that a customer has to a brand. It reflects how likely a customer will be to switch to another brand."[76]  Typically, a brand with more loyalty has higher brand value. Brands like Harley-Davidson exemplify the highest levels of loyalty.  Few brands have customers who are so deeply loyal that customers tattoo the brand logo on their skin.  Brand Loyalty is "the heart" of any brand's value.

92.     Adidas demonstrates significant customer loyalty.  The company enjoys the

---

[74] Keller, Kevin, *Strategic Brand Management, pg.* 191.
[75] Yerak, Becky, "Nike won't sell athletic shoes to Sears/Kmart in 'brand management' move," *Chicago Tribune,* May 4, 2005.

repeat custom of a large number of loyal athletes and sports enthusiasts. This fact is supported by evidence from the Brand Keys annual "Customer Loyalty Leaders" survey.[77] In 2004, the survey ranked Adidas quite high in terms of brand loyalty, at number 40. This was well ahead of competitor Nike, which was number 101 on the list.

93.    While Kmart certainly has its loyal shoppers, I have seen no evidence to suggest that any of this loyalty can be attributed to its footwear. Any attempt by Kmart to trade on the strength of the adidas brand is likely to affect negatively adidas' level of customer loyalty. Adidas will lose a repeat purchase opportunity when customers are confused as to the source of the Kmart product and either purchase the Kmart item instead because they are unable to differentiate between the two brands, or elect not to purchase adidas shoes the next time they are in the market because of negative perceptions that develop as a result of this confusion. Consequently, the adidas brand community, a rich source of developing brand strength as outlined above, will lose "members." Given the close identification with the brand and others characteristic of a brand community, this membership loss could have potentially grave consequences for the entire brand community, and ultimately, for the adidas brand equity in general.

### Discussion of Confusion Surveys

94.    I have had the opportunity to review the results of two likelihood of post-sale confusion surveys submitted in this matter by Dr. Gerald Ford. Dr. Ford's surveys were conducted using what is referred to as the "Eveready" format, one of the generally accepted

---

[76] David Aaker, *Managing Brand Equity*, The Free Press, 1991
[77] "Brand Loyalty 2004," BrandWeek, October 25, 2004

methodologies for assessing trademark confusion.[78]  The first survey sought to assess the

likelihood of confusion stemming from the presence in the market of the 4-stripe Kmart

"Athletech" shoe (see Exhibit 7).  Controlling for noise in the data, this survey found that

15.74% of all respondents identified the Athletech shoe as being either made or put out by adidas

or put out with the authorization or approval of adidas.

    95.    The number of respondents in the control cell who identified the control shoe with

adidas is likely higher than it would have been if the clamshell toe was removed in the image of

the control shoe, which it was not in this survey.  A more accurate measure of confusion can be

obtained by comparing the difference in the test and control cells of the percentage of total

respondents who identified the defendants' shoes as being made or authorized by adidas *and*

indicated this response was due to the presence of stripes on the shoes.  This removes noise in

the data resulting from the fact that the adidas signature clamshell toe remains in the image of the

control shoe.  Using this analysis, the survey shows that 24.08% of all respondents identified the

Athletech shoe as being either made or put out by adidas or put out with the authorization or

approval of adidas *and* indicated this response was due to the presence of stripes on the shoe.

This 24.08% more accurately represents the level of confusion in the market.  These findings are

sufficient to meet the standard for likelihood of confusion testing, has been established in case

law as 15%,[79] and even in some courts as low as 11%.[80]

    96.    Dr. Ford conducted a second survey for this case, testing for confusion with

regard to Kmart's "Olympian" shoe (see Exhibit 8).  Controlling for noise in the data, this survey

---

[78] Itamar Simonson study
[79] Surveys finding 15% confusion among respondents were sufficient for the court to find a likelihood of confusion in the following cases: *James Burrough, Ltd.*, 540 F.2d at 279 (7th Cir. 1976), *Exxon Corp.*, 628 F.2d at 507, and *SunAmerica Corp. v. Sun Life Assurance Co. of Canada*, 890 F. Supp. 1559, 1580 (N.D. Ga. 1994)
[80] J. Thomas McCarthy, (2002) McCarthy on Trademarks and Unfair Competition at §24:92, p. 24-191.

found that 28.77% of all respondents identified the Olympian shoe as being either made or put

out by adidas or put out with the authorization or approval of adidas. This finding is sufficient to

meet the standard for likelihood of confusion testing mentioned above.

97.    Furthermore, the survey shows that much of this confusion can be attributed to the

presence of stripes on the defendant's shoe. Controlling for noise, the survey shows that 25.92%

of all respondents identified the Athletech shoe as being either made or put out by adidas or put

out with the authorization or approval of adidas *and* indicated this response was due to the

presence of stripes on the shoe. This is consistent with the finding regarding confusion

attributable to the presence of stripes for the Athletech shoe, which was 24.08%.

98.    A review of specific responses from the two surveys further supports the

contention that a likelihood of confusion exists, and that this likelihood is primarily attributable

to the presence of stripes. When asked, for example, "Why do you say that [the brand you

identified makes or puts out those shoes]?" respondents who identified adidas gave answers that

demonstrated their confusion, such as "Mainly because of the stripes," "It's characteristic of the

black stripe they usually have," "'Cause these lines are a trademark like that," "The stripes kinda

remind me of it," "The stripes and shell toe," "Because of the four stripes. I think that's their

mark," "Usually adidas has three stripes, but they want to put four," "I used to wear a pair that

look identical to it." These responses, and other similar ones from the survey, clearly show that

consumers are and will be confused by the 4-stripe Kmart shoes. The quantitative results based

on these responses give numerically support the conclusion that a likelihood of confusion exists.

As outlined above, this confusion would likely have a negative effect on the brand equity and

brand strength of adidas.

99.    Additionally, I have had the opportunity to review other likelihood of post-sale

confusion surveys submitted by Dr. Ford in support of other litigation cases involving adidas and retailers of 2-stripe and 4-stripe knockoffs, which I received from counsel for the plaintiffs.[81]  In each case, Dr. Ford employed the same survey methodology that he used in the present case. The studies I reviewed, conducted between 2002 and 2005, tested for confusion created by similar 2-stripe and 4-stripe models.  Each study supported the contention that a likelihood of post-sale confusion exists when similar 2-stripe and 4-stripe shoes are present in the market. After controlling for noise in the data, the level of confusion found by the surveys ranged from 17.49% to 41.45%.  These findings are also sufficient to meet the 15% standard for likelihood of confusion.  Given how vital the 3 stripes are in triggering associations in consumers' minds and contributing to overall adidas brand strength, as outlined in detail above, the existence of significant confusion stemming primarily from the presence of stripes on competitors' shoe models has the potential to be especially damaging to adidas.

      100.    Furthermore, of the studies that tested specifically for the role of stripes in generating this confusion,[82] the vast majority of respondents who identified the defendants' shoes as being either made or put out by adidas or was put out with the authorization or approval of adidas attributed their response to the presence of stripes in the shoes.  Specifically, after controlling for noise in the data, the percentage of total respondents who identified the defendants' shoes as being made or authorized by adidas *and* indicated this response was due to the presence of stripes on the shoes in question ranged from 16.67% to 33.81%.  By contrast, the

---

[81] The likelihood of post-sales confusion surveys by Dr. Ford that I reviewed were submitted in the following cases: *Adidas v. Target Corporation et. al.*, *Adidas v. Payless Shoes*, *Adidas v. Fortune Dynamic, Inc.*, *Adidas v. Steve Madden, Ltd*
[82] The surveys that tabulated the respondents attribution of their identification of the shoes as adidas to stripes in the shoe design were *Adidas v. Target Corporation et. al.*, and *Inc., Adidas v. Steve Madden, Ltd.*  Other studies tabulated responses in the more general category of "look or appearance features (i.e. trade dress)," which includes, but is not limited to, stripes.

range for the percentage of total respondents who attributed this response to another factor other than the stripes was 3.69% to 7.29%. This indicates that the presence of stripes on the knock-off models is by far the primary cause of the confusion evident in these surveys. As noted above, the prominent role of the 3-stripes in generating associations about adidas in consumers' minds renders the primary attribution of this confusion to the presence of stripes on the knock-off models potentially seriously damaging to the adidas brand.

101.    These surveys exhibit a pattern of confusion resulting from the presence in the market of 2-stripe and 4-stripe knock-off shoe models. Taken together, they demonstrate definitively that the presence of knock-off shoes engenders confusion among survey respondents, and therefore is likely to cause confusion among the general consumer population. This persistent existence of the likelihood of confusion, primarily attributable to the use of stripes on the knock-offs, has the potential to damage the adidas brand.

## Summary of Implications for Adidas

102.    I have already noted that Kmart's 2-stripe and 4-stripe shoes contain many elements found in adidas' shoe designs, which are numerous enough to suggest that Kmart's actions are a deliberate effort to leverage adidas' strengths in awareness, associations, perceived quality and loyalty in order to aid its own footwear business. I conclude that Kmart is benefiting from the brand strength of adidas without regard for the negative effects that will accumulate to the adidas brand, and furthermore is likely contributing to confusion in the marketplace regarding the source of its 2-stripe and 4-stripe shoes.

103.    Given the importance of brands within the consumer apparel and footwear

industries, Kmart's intentional "borrowing" of brand strength is highly likely to significantly harm adidas. This potential to harm is particularly acute in the strategically important young adult demographic, for whom brands have been demonstrated to play a vital role in purchase decisions.

104. This borrowing of brand strength by Kmart will have adverse consequences for adidas, including the following as I have described above:

a) Potential confusion among consumers.

b) Diminished ability for adidas to be identified by consumers as high-quality footwear and apparel.

c) Eroded ability of adidas to set premium price points for its footwear and apparel.

d) Eroded brand equity.

105. Overall, given the importance of strong brands within the footwear and consumer apparel industry, Kmart's intentional leveraging of adidas' equity with its 2-stripe and 4-stripe shoes is highly likely to significantly harm adidas.

106. Kmart has placed adidas' one of most important assets, its brand, in a potentially harmful situation. The centrality of a brand to a company's financial well-being cannot be underestimated. The competitive and fragmented nature of the apparel industry heightens the importance of maintaining a strong brand, making its brand's survival crucial to the continued well-being of adidas.

107. If allowed to proliferate in the footwear market, Kmart's 2-stripe and 4-stripe shoes are likely to cause long-term damage to the brand which adidas has built over more than 50 years.

My opinions and the conclusions that support them are based on the evidence I have examined as of the date of this report.

Executed this 7 day of February 2006.

_____
Erich Joachimsthaler

**Full Resume, Publications, Academic Credentials and Past Expert Testimony List**

a)    ERICH A. JOACHIMSTHALER, Ph.D.

**Residence**:                                                    **Office:**
311 Amsterdam Avenue, # Ph-B                 107 Grand Street, 6th Floor
New York, New York 10023                          New York, New York 10013

Tel. 1-917-441-9141                                      Tel. 1-212-965-0900
Cell 1-917-679-8614                                      Fax 1-212-941-0442

Email: ej@vivaldipartners.com

**Education**

| | | | |
|---|---|---|---|
| Post-Doctoral Research Fellow | 1987 - 1988 | | Harvard Business School |
| Doctor of Philosophy | 1981 - 1985 | | University of Kansas Business Administration |
| | | Specialization: Marketing and Quantitative Methods | |
| Master of Science | 1980 - 1981 | | University of Kansas Marketing Research |
| Vordiplom | 1979 - 1980 | | University of Frankfurt Economics |
| Diplom Betriebswirt | 1976 - 1979 | | Fachhochschule Giessen-Friedberg Business Administration and Computer Science/ |

**Doctoral Dissertation**                 "Lp-Norm Estimation in Discriminant Analysis."
                                                    Chairs: John L. Lastovicka and Kenneth O. Cogger

**Academic Experience**

2004    -                    Visiting Professor of Business Administration
                             Department of Marketing, Instituto Estudios Superios de la Empresa
                             (IESE), Barcelona

1994    -    1998       Rust Visiting Professor of Business Administration

|  |  |  | Colgate Darden Graduate School of Business Administration<br>University of Virginia, Charlottesville |
|---|---|---|---|
| 1989 | - | 1994 | Associate Professor of Marketing<br>Department of Marketing, Instituto Estudios Superios de la Empresa (IESE), Barcelona |
| 1985 | - | 1987 | Assistant Professor of Marketing<br>Department of Marketing, University of Houston, Houston |
| 1982 | - | 1984 | Adjunct Professor of Management<br>Institute of Safety and Systems Management, University of   Southern California, Los Angeles |
| 1981 | - | 1985 | Graduate Instructor in Marketing<br>School of Business and School of Journalism, University of Kansas, Lawrence |

## Work Experience

| 1999 |  |  | Founder and Chief Executive Officer, Vivaldi Partners, New York, London, Amsterdam, and Munich. |
|---|---|---|---|
| 1998 | - | 1999 | Chairman, Prophet Brand Strategy, New York and San Francisco. |
| 1995 | - | 1998 | Aaker-Joachimsthaler & Partners (AJ&P), Charlottesville and Berkeley. AJ&P was acquired by Prophet Brand Strategy in January of 1999. |
| 1990 | - | 1994 | Alza Limited - Strategic Marketing and Reseach Consultancy, Barcelona. |

## Professional Memberships

American Marketing Association (AMA)
The Institute of Management Science (TIMS) - Marketing College
The Conference Board
European Academy of Marketing (EAM)
European Society for Opinion and Marketing Research (ESOMAR)

## PERSONAL INFO

Erich is married to Daniela Gomez. Daniela was born in Santa Fe, Argentina and is an audiologist with a specialty for hearing disorders. They have two daughters, Sara, and Sophia and one son, Julian.

43

# PUBLICATIONS

## A. Publications

Brand Strategy and International Marketing

Der Zweck heiligt die Mittel, **Absatzwirtschaft**, 2004.

Ist das Markenarchitektur-Konzept noch zeitgemaeß?, **Absatzwirtschaft Online**, 2004.

Muessen die Marken in Zukunft ihre Herkunft verleugnen?, **Absatzwirtschaft**, 2003.

Mitarbeiter: Die vergessene Zielgruppe fuer Markenerfolge, **Absatzwirtschaft**, 2002.

Je kleiner desto besser, **Absatzwirtschaft**, 2002.

Getting the most out of your branding effort, **Markenartikel,** 2002.

Aufbau von Marken im Zeitalter der Post-Massenmedien, **Moderne Markenfuehrung**, 2001, 3. Auflage, Franz-Rudolf Esch (Eds), Gabler Verlag, Wiesbaden, with David Aaker.

Top Marken Strategien: Markenwert schaffen und absichern, **Absatzwirtschaft**, 2000.

The Branding Relationship Spectrum: The Key to the Brand Architecture Challenge, **California Management Review**, 2000, with David A. Aaker.

Brand Leadership, **Brandweek,** 2000, with David A. Aaker.

Brand Leadership, **The Free Press**, New York, 2000, with David A. Aaker. Translated in German, Spanish, Italian, Finnish, Japanese, Korean, and Portugese.

The Lure of Global Branding, **Harvard Business Review,** 1999, with David A. Aaker.

Building Brands without Mass Media Advertising: Lessons from Europe, **Harvard Business Review**, 1997, with David A. Aaker.

IMOS: An International Market Opportunity Screening System, **Journal of International Marketing**, 1994, with Antonie Stam and V. Kumar.

After the Wall: Marketing Guidelines for Eastern Europe, **Sloan Management Review**, 1991, with John A. Quelch; reprinted in: Después del Muro: Pautas de Comercialización para Europa del Este, **Alta Dirección**, 1992 and European Marketing: Readings and Cases, Chris Halliburton and Reinhard Hünerberg, Addison-Wesley, 1993.

El Valor del País de Origin (The Value of Country of Origin Information), **Actualidad de Economia**, 1991.

Methodology

New Answers for Old Questions: Conjoint Analysis Takes the Guess Work out of Marketing Decisions, **Dirección Farmaceutica**, 1994, with Paul Green.

Mathematical Programming Procedures for the Classification Problem in Discriminant Analysis: A Review, **Multivariate Behavioral Research**, 1990, with Antonie Stam.

A Robust Mixed-Integer Approach to Establish Classification Rules for the Discriminant Problem, **European Journal of Operational Research**, 1989, with Antonie Stam.

Solving the Classification Problem in Discriminant Analysis Via Linear and Nonlinear Programming Methods, **Decision Sciences**, 1989, with Antonie Stam.

Four Approaches to the Classification Problem in Discriminant Analysis, **Decision Sciences**, 1988, with Antonie Stam.

4MODE1 AND 4MODE2: Fortran IV Programs for the Four-Mode Components Analysis Problem, **Journal of Marketing Research**, (Computer Abstracts), 1985, with John Lastovicka.

RELCON: A Program for the Estimation of Internal Consistency of Composites with Congeneric Measurement Properties, **Journal of Marketing Research**, (Computer Abstracts), 1985, with Lane Curtis.

Technology, Strategy and Industrial MarketingBuying/Selling

Decision Support System Implementation: A Meta Analysis, **Management Information Systems (MIS) Quarterly**, 1992, with Maryam Alavi.

Sales Resource Allocation with Multiple Conflicting Objectives: An Interactive Decision Support Aid, **Decision Sciences,** 1991, with Antonie Stam and Lorraine Gardiner.

Order (Market) Selection Given Multiple Conflicting Objectives and Goals: An Interactive Marketing-Manufacturing Decision Model, **Decision Sciences**, 1989, with Antonie Stam and Lorraine Gardiner.

Influence of Formalization on the Organizational Commitment and Work Alienation of Salespeople and Industrial Buyers, **Journal of Marketing Research,** 1988, with Ronald Michaels, William Cron, and Alan Dubinsky.

Multicriteria Issues in Marketing: A Sales Resource Allocation Example and Potential Areas of Future Research, **Lecture Notes in Economics and Mathematical Systems Series**, 1988, Springer Verlag, with Lorraine Gardiner and Antonie Stam.

Individual Difference Factors in the Satisfaction and Usage of a Marketing Decision Support System, **Journal of Marketing Research**, 1987, with George Zinkhan and Thomas C. Kinnear.

Role Stress Among Industrial Buyers: An Integrative Model with Implications for Marketing, **Journal of Marketing**, 1987, with Ronald E. Michaels and Ralph L. Day.

Methodology and Consumer Behavior

Measurement Validity of VALS and a Custom Lifestyle Typology with Multiplicative Factoring of Multimethod- Multitrait Matrices, **Journal of Marketing Research**, 1990, with John Lastovicka and John P. Murry.

Improving Personality-Behavior Relationships, **Journal of Consumer Research**, 1988, with John Lastovicka.

A Lifestyle Typology to Model Young Male Drinking and Driving, **Journal of Consumer Research**, 1987, with John Lastovicka, John P. Murry, and Gaurav Bhalla.

Optimal Stimulation Level, Exploratory Behavior Models, **Journal of Consumer Research**, 1984, with John Lastovicka.

**B. Books & Book Chapters**

"Strategie und Architektur fuer Markenportfolios" in *Handbuch Markenartikel*, to be published in 2004, Manfred Bruhn, Gabler Verlag, Wiesbaden, with Markus Pfeiffer.

*Brand Leadership*, The Free Press, New York, 2000, with David A. Aaker. Translated in German, Spanish, Italian, Finnish, Japanese, Korean, and Portugese.

"Branding Challenges For Transitional Economy Firms in Local Markets," in *Marketing Issues in Transitional Economies*, 1999, Rajeev Batra, Kluwer Academic Publishers, Norwell, Massachusetts, with Jordi Garolera and Dana Pillsbury.

"Nestle Buitoni: The House that Mamma Built," in *Relationship Marketing: Strategy and Implementation*, 1999, Helen Peck, Adrian Payne, Martin Christopher, and Moira Clark, Butterworth-Heinemann, Oxford, with Edward Hickman.

## C. Working Papers & Teaching Notes, etc.

Eastman Kodak: Digital & Applied Imaging, Darden Educational Material, 1996.

Energia General (Eg3): Retail Service Stations in Argentina, Darden Educational Material, 1996.

Nike Europe, IESE Case Publication No. M-968, 1995.

Renault SA, IESE Case Publication No. M-966, 1995.

Hugo Boss AG, IESE Case Publication No. M-965, 1995.

IBM Ambra, IESE Case Publication No. M-963, 1995.

ABB: Electrical Motors, Case Study, 1995.

CCNR-Coca-Cola Nestlé Refreshments, Case Study, 1995.

Corporate Brands, IESE Working Paper.

The Andrex Case Story, IESE Case Publication No. M-952, 1994.

The Nestlé Buitoni Case Story: The House that Mamma Built, IESE Case Publication No. M-953, with Edward Hickman, 1994.

Marketing Metamorphosis: From Products to Brands to Consumers, IESE Working Paper No. MN-282, 1994.

Building Global Brand-Consumer Relationships, IESE Working Paper No. MN-294, 1994.

Maintaining Global Brand-Consumer Relationships, IESE Working Paper No. M-293, 1994.

Conjoint Analysis Takes the Guess Work Out of Pharmaceutical Marketing Decisions, IESE Publication No.: MN-284, with Paul Green, 1994.

The Häagen-Dazs Story, IESE Case Publication No. M-940, with Peter Taugbol, 1994.

The Swatch Story, IESE Case Publication No. M-930, 1993.

Anfi del Mar, S.A., IESE Case Publication No. M-888, with Madhur Mehta 1993; Teaching Note No.: MT-8, and Supplementary Material No.: M-924.

RCI: Service Quality and Its Measurement, IESE Case Publication No. M-905 with Brian Hare, 1993; Teaching Note for RCI M-10.

## EXPERT WITNESS EXPERIENCE

*PepsiCo, Inc. v. The Coca-Cola Company*, 98 Civ. 3282 (LAP), expert consultation for Plaintiffs.

*Empresa Cubana del Tabaco d.b.a. Cubatabaco v. Culbro Corporation and General Cigar Co., Inc.*, 97 Civ. 8399 (RWS), expert consultation for Plaintiffs.

*Peter Norton v. Eileen Norton*, BD 326 561, expert consultation for defendant, trial.

*Deere & Company v. MTD Holdings Inc., formerly known as MTD Products Inc.*, expert consultation for Plaintiffs, deposition.

*United Parcel Service of America, Inc. v. The Gator Corporation* expert consultation for defendant, deposition.

*Verizon v. Nextel*, deposition

*Exide v. Enersys*, deposition

*Remo Imports, Ltd v. Jaguar Canada, Inc. and Jaguar Cars Limited (T-1473-91)* expert consultation for Jaguar

*Brighthouse LLC v. Advance Newhouse Inc, d/b/a, Advance/Newhouse Partnership, and Brighthouse Networks, LLP,* expert consultation for Plaintiffs

*O'Neill Inc. v. Joint Services International BV,* expert consultation for Plaintiffs