IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ADIDAS AMERICA, INC. and ADIDAS
SALOMON AG,

                Plaintiffs,                    CV-05-120-ST

      v.                         REDACTED FINDINGS AND
                                     RECOMMENDATIONS

KMART CORPORATION; FOOTSTAR, INC.;
MERCURY INTERNATIONAL TRADING
CORP.; ELAN IMPORTS CO., INC.; NEXTTEC
INTERNATIONAL, INC.; and INNOVATIVE
CUSTOM BRANDS INTERNATIONAL, INC.,

                  Defendants.

STEWART, Magistrate Judge:

      This is an action for trademark infringement and related state-law claims brought by

adidas America, Inc. and adidas Salomon AG (collectively, "adidas"), alleging that defendants,

KMart Corporation ("KMart") and Footstar, Inc. ("Footstar") (collectively, "defendants")[1] have:

(1) breached the terms of a settlement agreement entered into by adidas and defendants in 2002;

---

[1] Four other entities are named as defendants in this case. However, the present summary judgment motions involve only the claims against and the defenses raised by KMart and Footstar. When collectively identifying KMart, Footstar, and the other four named defendants, this court refers to "all defendants."

and (2) infringed on adidas's "Three-Stripe Mark" by marketing, selling, and offering for sale imitations of its "Superstar" and "Superstar 2G" shoes (Complaint, ¶¶ 37-39) and by marketing, selling, and offering for sale other goods which bear a confusingly similar imitation of adidas's Three-Stripe Mark (*id*, ¶ 40).

The matters now before the court are defendants' Motion for Summary Judgment (docket #42) and adidas's Motion for Partial Summary Judgment (docket #104).  The court previously considered four motions to strike.  None of the material that was stricken will be considered in connection with the summary judgment motions.  For the reasons set forth below, both summary judgment motions should be denied.

## UNDISPUTED FACTS

In 2002, adidas became aware that KMart was offering for sale and selling footwear that appeared to be a four-stripe version of adidas's Superstar shoe.  *See* Heilbronner Decl,[2] ¶ 9. adidas was aware of only two four-stripe styles being sold by KMart in 2002, a women's version with four blue stripes (the "Soho Shoe") and a boys' version with four black stripes (the "Route 66 Shoe").

On May 22, 2002, adidas filed an adversary proceeding (the "2002 lawsuit") in the United States Bankruptcy Court for the Northern District of Illinois, alleging that KMart's sale of the Soho Shoe and the Route 66 Shoe infringed adidas's Three-Stripe Mark and Superstar Trade Dress.  Heilbronner Decl, Ex 1.

The Complaint in the 2002 lawsuit sought, *inter alia*, an injunction against KMart preventing the sale of any footwear bearing confusingly similar imitations of the Three-Stripe

---

[2] Citations to depositions and declarations are to the last name of the witness or declarant and to the page of the deposition transcript or paragraph of the declaration.

Mark, including the Soho Shoe and the Route 66 Shoe.  Footstar notified adidas that it was indemnifying KMart in connection with the dispute because Footstar was responsible for sales of the shoes at issue.  Henn Decl,  ¶ 2; Heilbronner Decl, ¶ 12.  In a June 28, 2002 letter to counsel for adidas, counsel for Footstar stated that defendants "have offered athletic shoes with four stripes for decades."  Dooley Decl, ¶ 6, Ex. 3; Heilbronner Decl, ¶ 13; Henn Decl, ¶ 3, Ex 1.

Before KMart filed an Answer, the parties entered into a Settlement Agreement with an effective date of October 15, 2002.  Dooley Decl, Ex 4; Feldman Decl, Ex 1.  The 2002 Settlement Agreement defines . . . **[REDACTION OF CONFIDENTIAL INFORMATION: remainder of paragraph and next three paragraphs]**.

Following execution of the 2002 Settlement Agreement, adidas dismissed the adversary proceeding with prejudice.

In January of 2005, adidas became aware that defendants were selling a shoe which adidas considers to be a four-stripe imitation of its Superstar 2G shoe.  Backman Decl,  ¶ 6.  Shortly thereafter, on January 26, 2005, adidas filed the present lawsuit.

## CLAIMS AND DEFENSES ALLEGED IN THE PRESENT LAWSUIT

In the Third Amended Complaint,[3] adidas alleges the following seven claims for relief: (1) breach of contract against KMart and Footstar ("First Claim"); (2) federal trademark infringement in violation of 15 USC § 1114 against all defendants ("Second Claim"); (3) federal unfair competition in violation of 15 USC § 1125(a) against all defendants ("Third Claim"); (4) federal trademark dilution in violation of 15 USC § 1125(c) against all defendants ("Fourth

---

[3] Defendants filed their Motion for Summary Judgment before adidas filed the Third Amended Complaint.  However, the claims alleged against defendants in the Second Amended Complaint are the same claims alleged in the Third Amended Complaint which simply added more defendants.  Therefore, this court will treat the cross-motions as applying to the Third Amended Complaint.

Claim"); (5) state trademark dilution and injury to business reputation against all defendants ("Fifth Claim"); (6) unfair and deceptive trade practices against all defendants ("Sixth Claim"); and (7) common law trademark infringement and unfair competition against all defendants ("Seventh Claim").  adidas does not allege any claim for trade dress infringement.

In response, defendants filed Answers each raising 11 affirmative defenses, including an Eighth Affirmative Defense that adidas's claims are barred by laches, estoppel, and/or waiver. Answer and Affirmative Defenses to Third Amended Complaint (docket #133 (Footstar) and docket #134 (KMart)).

## ANALYSIS

### I.  Issues Raised by Cross-Motions for Summary Judgment

On November 23, 2005, defendants filed a Motion for Summary Judgment (docket #42) against adidas's:  (1) Second through Seventh Claims based on laches and the statute of limitations; (2) Fourth Claim (federal trademark dilution) because defendants' first use predates the statute; (3) Fourth and Fifth Claims (federal and state trademark dilution) because adidas cannot prove essential elements; (4) First Claim (breach of contract) because adidas seeks to resurrect claims lost through its delay; (5) Second Claim (federal trademark infringement) because defendants' first use of two and four stripe marks predates adidas's registrations; and (6) Second, Third, Fourth, and Seventh Claims based on the doctrine of *res judicata*.

On February 13, 2006, adidas responded with a Motion for Partial Summary Judgment (docket #104) on its First Claim (breach of contract) and against defendants' affirmative defense of laches on the basis of the 2002 Settlement Agreement.

### II.  Scope of the Three-Stripe Mark

adidas alleges that it owns several federal trademark registrations, including:  (1) five marks registered with the PTO between January 11, 1994, and September 21, 1999, and covering "footwear" or "athletic footwear"  (Third Amended Complaint, ¶¶ 16-20); (2) seven marks registered with the PTO between May 27, 1969, and October 12, 1999, and covering various items of apparel and a mark on a box (*id*, ¶ 21 and Ex 7); (3) and two marks registered with the PTO on December 14, 2004, and September 27, 2005, and covering "footwear, namely, slides" (*id*, ¶¶ 22-23 and Exs 8-9).

In this case, adidas claims common law and statutorily-protected rights in what it terms its "Three-Stripe Mark" which it seeks to protect as used on its footwear products.  According to adidas, the Three-Stripe Mark encompasses three, parallel, equidistant stripes and, in the context of this lawsuit, involves the display of the mark in a diagonal fashion on the side of athletic shoes.  However, the color, spacing, and serrated edges of the stripes may vary.  Although the federal trademark registrations cited in adidas's pleadings are somewhat dissimilar, each footwear or athletic footwear registration prominently displays three, parallel, equidistant and diagonal stripes on the side of the footwear.  adidas claims, and defendants do not contest, that the scope of the federal trademark registrations of the Three-Stripe Mark is as broad as adidas's common law rights in the Three-Stripe Mark.

In the 2002 lawsuit, adidas alleged infringement of its Three-Stripe Mark against only two specific shoe models and also alleged claims for trade dress infringement against those same two shoe models.  In this case, adidas alleges infringement claims against about 25 models of footwear manufactured and sold by defendants which are "confusingly similar" to the Three-Stripe Mark because they display two or four parallel, equidistant and diagonal stripes on the

side of athletic footwear.  However, adidas has chosen not to pursue any trade dress claims against any of those shoes.

In addition, adidas limits its requests for damages and injunctive relief solely to post-settlement sales and activities by defendants.

## III.  Cross-Motions on Laches Defense

Both parties move for summary judgment on the affirmative defense of laches. Defendants argue that adidas's Lanham Act claims (Claims Two, Three, and Four), as well as its claims for federal and state law trademark dilution, trademark infringement, and unfair competition (Claims Four, Five, Six and Seven), are barred by laches based on adidas's delay in seeking to enforce its Three-Stripe Mark against shoes with two and four stripes.  In response, adidas raises a variety of issues which it contends bar invocation of the laches defense.  For the reasons that follow, this court concludes that defendants are not barred from raising a laches defense, but that material issues of disputed fact both as to the factual basis of the merits of the defense, as well as to whether defendants' infringement (if any) was willful, preclude granting summary judgment on laches at this juncture.

///

///

### A.  Contractual Bar to Laches Defense

adidas asserts that the laches defense is barred by the terms of the 2002 Settlement Agreement which includes . . . [**REDACTION OF CONFIDENTIAL INFORMATION: remainder of paragraph**].

#### 1.  Scope of Release of Pre-Settlement Activity

6 - REDACTED FINDINGS AND RECOMMENDATIONS

At the time of the 2002 Settlement Agreement, defendants were selling 11 different models of athletic shoes with two and four stripes. *See* letter from counsel dated April 28, 2006. The 2002 Settlement Agreement . . . **[REDACTION OF CONFIDENTIAL INFORMATION: remainder of paragraph]**.

adidas contends that a defense of laches contravenes the 2002 Settlement Agreement because . . . **[REDACTION OF CONFIDENTIAL INFORMATION:  remainder of paragraph]**.

## 2.  Legal Standards Governing Contract Interpretation

The 2002 Settlement Agreement provides that . . . **[REDACTION OF CONFIDENTIAL INFORMATION:  remainder of sentence]**.  Settlement agreements are interpreted under the ordinary rules of contract interpretation. *Ziebert v. Sun Valley Lumber, Inc.*, 198 Or App 162, 168, 107 P3d 668, 671, *rev denied*, 339 Or 66, 118 P3d 802 (2005).  Thus, the first question is whether the text of the disputed term(s) is unambiguous as a matter of law in the context of the document as a whole, and if so, the analysis ends. *Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019, 1021 (1997).  A contract is unambiguous if its meaning is "so clear as to preclude doubt by a reasonable person." *Brunick v. Clatsop County*, 204 Or App 326, 338, 129 P3d 738, 745 (2006) (citation omitted).  A court may consider evidence concerning the circumstances underlying the formation of the contract in determining whether a contractual term is ambiguous. *Id* (citations omitted).

If the contractual term is unambiguous, the court construes the terms of the contract as a matter of law. *Yogman*, 325 Or at 361, 937 P2d at 1021.  In contrast, if a contractual term is ambiguous, the trier of fact must examine extrinsic evidence of the parties' intent and interpret

the term consistently with that intent.  *Id* at 363-64, 937 P2d at 1022 (citations omitted).  If the contractual term remains ambiguous after these two analytical steps, then the court relies on maxims of contractual construction.  *Id* at 364, 937 P2d at 1022.

### 3.  Paragraph 2

adidas first asserts that . . . **[REDACTION OF CONFIDENTIAL INFORMATION: remainder of section]**.

### 4.  Paragraph 3

adidas also argues that . . . **[REDACTION OF CONFIDENTIAL INFORMATION: remainder of paragraph and next three paragrahps]**.

Moreover, this court rejects adidas's argument that if defendants prevail on their laches defense, it will impede adidas's ability to enforce the Three-Stripe Mark.  Laches is a "personal defense which merely results in a loss of rights as against one defendant."  *Sweetheart Plastics, Inc. v. Detroit Forming, Inc.*, 743 F2d 1039, 1046 (4th Cir 1984) (citation omitted).  As a result, defendants in this action can assert laches only with respect to the shoes they sell or offer to sell which have two and four stripes, leaving unaffected adidas's right to enforce its Three-Stripe Mark against third-party infringers.

As a result, this court concludes that the 2002 Settlement Agreement bars the laches defense only as to the Subject Shoes defined by that agreement, but not as to other shoes.

### B.  Willful Infringement

adidas also argues that laches cannot bar its suit because defendants are guilty of willful infringement.  The Ninth Circuit recognizes this "deliberate piracy" exception to laches.  *Danjaq LLC v. Sony Corp*, 263 F3d 942, 956-57 (9th Cir 2001).  In *Danjaq*, the Ninth Circuit adopted the

definition of "willful infringement" that is used elsewhere in the Copyright Act, 17 USC

§ 504(c)(2).  *Id* at 957.  Accordingly, "willful" means "conduct that occurs 'with knowledge that

the defendant's conduct constitutes . . . infringement.'"  *Id* at 957-58 (citations omitted).

When defendants first began using stripes on shoes in the 1970s, they certainly were

aware of the Three-Stripe Mark.  Lava Depo, pp. 36-38; Perlmutter Depo, pp. 31-21; Crespi

Depo, pp. 52-53.  This knowledge alone, without evidence of some intent to benefit from and

capitalize on adidas's goodwill, does not permit an inference of a nefarious intent sufficient to

preclude a laches defense through "willful infringment."  *Sweats Fashions, Inc. v. Pannill*

*Knitting Co, Inc.*, 833 F2d 1560, 1565 (Fed Cir 1987) ("an inference of 'bad faith' requires

something more than mere knowledge of a prior similar mark").

However, the situation changed by the time defendants signed the 2002 Settlement

Agreement which . . . [**REDACTION OF CONFIDENTIAL INFORMATION:  remainder**

**of sentence**].  adidas has submitted evidence that since October 15, 2002, defendants have sold

and continue to sell shoes that are imitations of the Superstar (except for the number of stripes)

and virtually identical to the Subject Shoes and that such similarities between the shoes is

intentional in order to trade on adidas's brand awareness.  Expert Report of Dr. Erich

Joachimsthaler (docket #100) ("Joachimsthaler Report"), ¶¶ 63 & 65; Expert Report of

Dr. (Michael) Tuan Pham (docket #99) ("Pham Report"), ¶ 57.

To the extent that defendants have sold the Subject Shoes or any "confusingly similar

imitations" of the Subject Shoes since October 15, 2002, this court agrees that they acted

willfully and are not entitled to a laches defense.  However, whether defendants' shoes are

"confusingly similar" to the Subject Shoes is a question of fact.  Moreover, multiple shoe models

are at issue in this case, and clearly not all of the shoe models at issue represent intentional copying of the Subject Shoes. Thus, it is premature to dismiss the laches defense as a whole at this juncture.

### C. Progressive Encroachment

adidas also argues that defendants cannot raise a laches defense because they have progressively encroached on its mark. "[L]aches cannot bar injunctive relief when an infringing user progressively encroaches over time." *Grupo Gigante S.A. De CV v. Dallo & Co., Inc.*, 391 F3d 1088, 1103 (9th Cir 2004) (citation omitted). The progressive encroachment "doctrine allows a plaintiff to delay when a defendant engages in *de minimus* infringement at first, but then gradually encroaches on the plaintiff's market." *Id*, citing *E-Systems, Inc. v. Monitek, Inc.*, 720 F2d 604, 607 (9th Cir 1983). As a result, the trademark owner is given "some latitude in the timing of its" objecting to alleged infringement. *Kellogg Co. v. Exxon Corp.*, 209 F3d 562, 571 (6th Cir), *cert denied*, 531 US 944 (2000).

This doctrine does not apply here. The thrust of adidas's progressive encroachment argument is that due to changes in market conditions and consumer buying habits, adidas's view of defendants as competitors has changed over time, such that they are now in direct competition. Hildreth Decl, ¶¶ 3-8. In contrast, case law points at some change in the *defendant's* use of the mark as the defining characteristic of a successful claim of progressive encroachment. "[Progressive encroachment] requires something about the defendant's use of the mark to have changed significantly." *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n*, 311 F Supp 2d 1023, 1034 (D Or 2004).

There is some authority for the proposition that progressive encroachment might take the form of the "junior user of a mark mov[ing] into direct competition with the senior user, selling the same 'product' through the same channels and causing actual market confusion." *Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp. of Cal.*, 694 F2d 1150, 1154 (9th Cir 1982), *cert denied*, 463 US 1208 (1983).  Because the focus in a progressive encroachment analysis is on the conduct of the junior user, it is irrelevant whether consumer choices or market conditions change the senior user's view of whether the junior user is a direct competitor.  "Several courts have found the guiding question in an encroachment analysis to be whether the defendant has directed its marketing or manufacturing efforts in such a way that the defendant is placed more squarely in competition with the plaintiff." *Tillamook Country Smoker, Inc.*, 311 F Supp 2d at 1034 (internal quote marks and citations omitted).

The record reveals no evidence that defendants, who are the junior users, have made any significant changes in their manufacture, marketing, and sale of shoes with two and four stripes over time.  Instead, they have continued to sell athletic shoes bearing two and four stripes exclusively through KMart.  Business "growth alone does not infringement make." *Prudential Ins. Co. of Am.*, 694 F2d at 1154.  Accordingly, the progressive encroachment doctrine is inapplicable and does not preclude invocation of a laches defense by defendants.

### D.  Merits of Laches Defense

Having concluded that the terms of the 2002 Settlement Agreement do not bar defendants' assertion of a laches defense, this court now turns to the merits of that defense.

Laches is a disfavored defense in trademark cases. *E & J Gallo Winery v. Pasatiempos Gallo S.A.*, 905 F Supp 1403, 1414 (ED Cal 1994).  As a result, it applies "only where the

trademark holder knowingly allowed the infringing mark to be used without objection for a lengthy period of time." *GoTo.com v. Walt Disney Co.*, 202 F3d 1199, 1209 (9th Cir 2000). In order to prevail on a laches defense, a party must show: (1) that the claimant unreasonably delayed in filing suit; and (2) as a result of the delay, the party suffered prejudice. *Tillamook Country Smoker, Inc,* 311 F Supp 2d at 1030, citing *Danjaq*, 263 F3d at 955. When examining whether the delay has been unreasonable, the court must "focus on the conduct upon which the claimant bases its infringement claim: 'the relevant delay is the period from when the plaintiff knew (or should have known) of the allegedly infringing conduct.'" *Id* at 1032, quoting *Danjaq*, 263 F3d at 952 (emphasis and additional citation omitted). However, "[l]aches is not a doctrine concerned solely with timing. Rather, it is primarily concerned with prejudice." *In Re Beaty*, 306 F3d 914, 924 (9th Cir 2002).

There are "two chief forms of prejudice in the laches context – evidentiary and expectations-based." *Danjaq*, 263 F3d at 955. "Evidentiary prejudice includes such things as lost, stale, or degraded evidence, or witnesses whose memories have faded or who have died. A defendant may also demonstrate prejudice by showing that it took actions or suffered consequences that it would not have, had the plaintiff brought suit promptly." *Id* (citations omitted). As an equitable doctrine, laches "ultimately . . . requires a consideration of the circumstances of each particular case and a balancing of the interests and equities of the parties." *Tillamook Country Smoker, Inc.*, 311 F Supp 2d at 1030-31 (internal quotations and citations omitted). The Ninth Circuit has directed trial courts considering a laches defense to a trademark claim to evaluate factors such as the strength and value of the trademark rights asserted, the plaintiff's diligence in enforcing the mark, harm to the senior user if relief is denied, whether the

junior user acted in good faith ignorance of the senior user's rights, the degree of competition between the senior and junior users, and the extent of harm suffered by the junior user due to the senior user's delay. *E-Systems, Inc.*, 720 F2d at 607.

Defendants have submitted evidence of past sales and advertising which tend to prove that they have sold millions of shoes with two and four stripes consistently since the 1970s. As a result, they argue that adidas's delay in filing this suit for nearly 30 years is unreasonable. adidas responds that the delay is not 30 years, but is only two years and three months, calculated from October 15, 2002, when the 2002 lawsuit against KMart was settled, and January 27, 2005, when this lawsuit was filed.

Here, the gravamen of adidas's trademark claims is that defendants are infringing on its Three-Stripe Mark, consisting of three, parallel, equidistant and diagonal stripes on the sides of athletic footwear. Thus, the issue is when adidas knew or should have known that defendants were selling millions of pairs of two and four stripe shoes bearing a design confusingly similar to that Three-Stripe Mark.

adidas contends that it was unaware of defendants' sales of two and four stripe shoes in the 1970s, 1980s, or 1990s. Beebe Decl, ¶¶ 7-8; Woodburn Decl, ¶¶ 6-7; Hildreth Decl, ¶¶ 6-7. As proof, it has submitted evidence that it first learned of defendants' allegedly infringing conduct in February 2002, when it saw the Soho shoe depicted in an advertising flyer and shortly thereafter located a Route 66 shoe in a KMart store. Heilbronner Decl, ¶ 9. Within three months of that discovery, adidas filed the 2002 lawsuit and asserts that it broadly drafted its complaint to include other infringing footwear models that it might discover during the litigation. *Id*, ¶ 14. That case settled prior to any discovery being taken. *Id.* It was during the settlement

negotiations that adidas's attorney learned that Footstar had been selling striped shoes for decades.

Other evidence indicates, however, that adidas acquired actual knowledge as to defendants' alleged infringement as early as April 2001 when it filed a request for an extension of time to file an opposition to the application of a third-party to register a four-stripe mark on an athletic shoe. Footstar filed an opposition to the application asserting that it had been selling striped shoes for decades. The application was later withdrawn, obviating any need for adidas to file a formal opposition. adidas argues that it never formally filed an appearance in that registration proceeding, implying that the registration proceeding provides an inadequate basis on which to impute knowledge of Footstar's assertion that it had been selling striped shoes for decades. Nevertheless, adidas's participation in that proceeding, however minimal, provides a basis from which a factfinder could reasonably conclude that adidas acquired knowledge of Footstar's striped shoe sales by April 2001.

In addition, adidas's aggressive policing of its Three-Strip Mark also casts doubt on adidas's professed ignorance of defendants's sales of two and four stripe shoes in the 1970s, 1980s and 1990s. As noted in *McDonald's Corp. v. Druck & Gerner, DDS, P.C.*, 814 F Supp 1127, 1137 (NDNY 1993), "it is difficult to reconcile Plaintiff's own emphasis on its aggressive policing of its trademarks with its simultaneous claims of ignorance of Defendant's existence."

adidas's explanation for its apparent unawareness of defendants' sales of two and four striped shoes in the three prior decades is that: (1) KMart was not a direct competitor; (2) its shoes were sold in entirely different channels of trade; and (3) it had no reason to investigate sales of shoes in mass-market discount outlets like KMart. Beebe Decl, ¶¶ 7-9; Woodburn Decl,

¶¶ 5-8; Hildreth Decl, ¶¶ 4-8; Richey Decl, ¶¶ 3, 5; Joachimsthaler Report, ¶ 87.  The thrust of

this argument is that the proliferation of Superstar "knock offs" in the mass-market discount

stores beginning around 2000 caused adidas to focus its attention on the discount segment.

Jorgenson Report, ¶¶ 32-35, 43; Heilbronner Decl, ¶ 8.  As it became aware of sales of infringing

shoes in sufficient quantities or in channels of trade that presented more than *de minimus*

infringement, adidas took action by sending demand letters and filing lawsuits.  Backman Decl,

¶¶ 5, 8-11, 12, Ex 1; Heilbronner Decl, ¶¶ 3-7.  It also conducted surveys demonstrating that

consumers mistakenly believed shoes with two or four stripes were put out by or with the

authorization of adidas.  Ford Decl, ¶¶ 58-67.  Because the strength of its Three-Stripe Mark has

ebbed and flowed,[4] adidas contends that its delay in policing the discount market was reasonable.

Defendants counter that, irrespective of the reduced strength of the Three-Stripe Mark in

the 1980s and 1990s, adidas was required, but failed, to actively police its mark and that this

lapse in adidas's policing efforts cannot be held against defendants who sold 10 million shoes in

the past 30 years.  However, a trademark owner is "not required to constantly monitor every

nook and cranny of the entire nation and to fire both barrels of [its] shotgun instantly upon

spotting a possible infringer."  *Cullman Ventures, Inc. v. Columbian Art Works, Inc.*, 717 F Supp

96, 127 (SDNY 1989).

A searching review of the record reveals genuine disputes over issues of material fact

concerning whether adidas knew or should have known of defendants' manufacture and sale of

footwear bearing designs with two or four stripes prior to April 2001 and whether any purported

delay in filing this lawsuit was reasonable under the circumstances.  Accordingly, this court

---

[4] *See* Section VII C(1) *infra*.

concludes that summary judgment on the laches defense is not appropriate on this basis at this juncture.[5]

### E.  Injunctive Relief

adidas contends that the laches defense should be dismissed as to injunctive relief which is not barred by laches.  The Ninth Circuit has noted that "laches is generally not a bar to prospective injunctive relief."  *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F3d 829, 840 (9th Cir), *cert denied*, 537 US 1047 (2002) (citations omitted).  However, that general rule is tempered by the recognition that laches may nevertheless be applied if the defendant would be prejudiced by a prospective injunction.  *Id*.  Moreover, "in many instances, the delay may be so prolonged and inexcusable that it would be inequitable to permit the plaintiff to seek injunctive relief as to future activities."  *Seven-Up Co. v. O-So-Grape Co.*, 283 F2d 103, 106 (7th Cir 1960), *cert denied*, 365 US 869 (1961).

The record contains little or no evidence as to how defendants might be prejudiced by a prospective injunction.  However, as discussed above, the record does present a factual dispute over the length and reasonableness of adidas's delay in pursuing its claims against defendants.  A factfinder may well conclude that adidas knew or should have known of defendants' allegedly infringing conduct some 30 years prior to the filing of the 2002 lawsuit and, in that event, the balance of other equitable factors may well make application of laches appropriate.

---

[5]  This court notes that the thrust of defendants' "evidentiary prejudice" argument is that they have lost evidence regarding their laches defense, not that they have lost evidence tending to disprove adidas's claims of infringement.  Assuming that defendants succeed in proving that adidas knew or should have known of its shoe sales and that its delay in seeking to prevent defendants' alleged infringement was unreasonable, defendants will also be required to demonstrate evidentiary or expectation prejudice in order to prevail on their laches defense.  Because defendants may rely on either type of prejudice to support their laches defense, this court need not at this juncture resolve the issue of whether a loss of evidence to support a laches defense (as opposed to the loss of evidence tending to disprove the infringement claim) is sufficient to constitute "evidentiary prejudice."

Accordingly, a ruling the applicability of the laches defense to adidas's request for injunctive relief must await resolution of that factual issue.

**IV.  Cross-Motions on First Claim for Breach of Contract (First Claim)**

Defendants contend that adidas's First Claim for breach of contract should be dismissed because it merely restates adidas's trademark claims that are precluded through laches.  This court disagrees.  As discussed above, the 2002 Settlement Agreement allows adidas to sue . . . **[REDACTION OF CONFIDENTIAL INFORMATION:  remainder of sentence]**.  Thus, the breach of contract claim is an alternative (albeit perhaps unnecessary) claim to the trademark infringement claims.

adidas contends, in turn, that by filing a motion for summary judgment on the ground of laches, defendants have breached **[REDACTION OF CONFIDENTIAL INFORMATION]** the 2002 Settlement Agreement as a matter of law because **[REDACTION OF CONFIDENTIAL INFORMATION:  remainder of sentence]**.  As discussed above, this court concludes that the laches defense is not barred by paragraph 3 of the 2002 Settlement Agreement.  As a result, adidas is not entitled to summary judgment on its breach of contact claim on that basis.

**V.  Statute of Limitations (Second through Seventh Claims)**

Defendants also argue that adidas's Second through Seventh Claims are barred by the statute of limitations, although they acknowledge that no Ninth Circuit case has expressly applied a statute of limitations as a separate defense to a trademark infringement claim independent of a laches defense.

The Ninth Circuit has noted that the "interplay between laches and the statute of limitations for Lanham Act claims is somewhat elusive," but declined to resolve the issue of whether an independent statute of limitations defense is permitted. *Jarrow Formulas, Inc.*, 304 F3d 829 at 836. Instead, the Ninth Circuit has simply posited that "[g]iven the equitable character of § 43(a) actions, Congress might have intended that laches be the sole timeliness bar to suit." *Id* at 836-37 (citations and footnote omitted).

Whatever the ultimate resolution of that issue, the limitations period begins to run from the time adidas knew or should have known about its cause of action. adidas contends that it filed this lawsuit approximately three weeks after learning about defendants' sale of the particular shoes at issue in this case, well before the expiration of the relevant statute of limitations. As noted above, defendants contend that they sold 11 of the 25 shoe models at issue before the effective date of the 2002 Settlement Agreement of which adidas knew or should have known when it signed the 2002 Settlement Agreement. At best, this presents a factual issue that cannot be resolved on summary judgment.

Furthermore, even assuming a statute of limitations defense might bar some portion of adidas's claims, adidas is still entitled to relief arising from defendants' ongoing infringement within the limitations period. Accordingly, defendants are not entitled to summary judgment on the basis that Claims Two through Seven are barred by a statute of limitations defense.

## VI. *Res Judicata* **(Second, Third, Fourth and Seventh Claims)**

Defendants also argue that the Second, Third, Fourth, and Seventh Claims are barred by *res judicata*. An action may be barred by *res judicata* when an earlier suit "(1) involved the same 'claim' or cause of action as the later suit, (2) reached a final judgment on the merits, and

(3) involved identical parties or privies." *Mpoyo v. Litton Electro-Optical Sys.*, 430 F3d 985, 987 (9th Cir 2005) (citation omitted).  The doctrine "bars not only all claims that were actually litigated, but also all claims that 'could have been asserted' in the prior action."  *Int'l Union of Operating Engineers-Employers Constr. Indus. Pension, Welfare & Training Trust Funds v. Karr*, 994 F2d 1426, 1430 (9th Cir 1993) (citation omitted).

Both the 2002 lawsuit and this lawsuit involve claims of alleged infringement between the same parties concerning adidas's Three-Stripe Mark.  In addition, the 2002 lawsuit was dismissed with prejudice which serves as a final judgment on the merits.  *Lawlor v. Nat'l Screen Serv. Corp.*, 349 US 322, 327 (1955).  However, dismissal of the 2002 lawsuit does not bar adidas's Second, Third, Fourth, and Seventh Claims for two reasons.

First, the majority of the shoe models at issue in this case were not offered for sale when the 2002 lawsuit was dismissed, such that claims against them were not and could not have been asserted in the 2002 lawsuit.

Second, the 2002 lawsuit was dismissed pursuant to the terms of the 2002 Settlement Agreement which specifies which claims were released.  By applying the *res judicata* doctrine, defendants apparently seek to bar all claims that could have been asserted in the 2002 lawsuit but were not released by the 2002 Settlement Agreement.  Defendants cannot use the doctrine of *res judicata* to trump the terms of the 2002 Settlement Agreement.  As discussed above, the 2002 Settlement Agreement only released claims that . . . **[REDACTION OF CONFIDENTIAL INFORMATION: remainder of sentence]**.  Although adidas could have asserted claims in the 2002 lawsuit as to the 11 shoe models at issue here which defendants offered for sale prior to

2002, those claims do not arise from the Subject Shoes.  Thus, *res judicata* does not apply to bar adidas's claims as to those shoes.

## VII.  Use Predating Statute or adidas's Registrations (Second, Fourth & Fifth Claims)

Most of defendants' remaining arguments concern the effect of the timing of their manufacture and sale of athletic shoes on adidas's Second, Fourth, and Fifth Claims.  Defendants contend that the Second Claim (federal trademark infringement on a registered mark under 15 USC § 1114) is barred because defendants' first sales of athletic shoes bearing designs with two and four stripes predates adidas's registrations.  Similarly, defendants contend that any damages requested in the Fourth Claim (federal trademark dilution) are barred because their first use of designs with two and four stripes predates the enactment of the Federal Trademark Dilution Act, 15 USC § 1125 on January 16, 1996.  In addition, defendants argue that the Fourth and Fifth Claims (federal and state trademark dilution) fail as a matter of law because adidas cannot establish essential elements of those claims.

### A.  Federal Trademark Infringment Claim (Second Claim)

Defendants argue that adidas's claim for infringement of a registered mark under 15 USC § 1114 fails because their use of two and four stripes on shoes began as early as 1976 and predates adidas's registrations.  The filing of an application to register a mark constitutes constructive use of the mark conferring a right of priority against any other person "except for a person whose mark has not been abandoned and who, prior to such filing . . . has used the mark." 15 USC § 1057(c)(1).

The statute refers to "the mark," not to a mark that is confusingly similar to the mark. Here the mark which is the subject of the Second Claim for federal trademark infringement is the Three-Stripe Mark as set forth in various federal trademark registrations.

Defendants correctly note that their use of two and four stripe shoe designs began in about 1976 before most of adidas's trademark registrations and that the only trademark registrations by adidas prior to 1976 (in 1969 and 1973) were not for footwear.  Third Amended Complaint, Ex 7.   However, defendants do not claim a prior use of the Three-Stripe Mark, but only a prior use of two and four stripes.[6]  Applying the strict language of 15 USC § 1057, defendants' argument cannot be premised on the prior use of a confusingly similar mark, but only on prior use of "the mark."  Defendants' use of two and four stripes cannot be equated as a matter of law to prior use of the Three-Stripe Mark.[7]

In any event, the record presents significant issues of material fact as to the scope and continuity of defendants' use of two and four stripe designs.  adidas points out that defendants have submitted no records to substantiate their use of two or four parallel stripes on footwear for several seasons or for a period of years.  Livorsi Depo, p. 102; Feldman Decl, Ex 14; Lenich Depo, pp. 231-34.  Although defendants explain that older records are missing and fill in the

---

[6]  "For certain time periods, Footsmart also sold shoes featuring three such stripes."  Livorsi Decl, ¶ 6. But absent more specificity as to when Footsmart sold shoes with three stripes, this evidence is insufficient to prove a prior use.

[7]  When denying adidas's motion for partial summary judgment on claims for federal and state trademark infringement and unfair competition in another case relating to its Three-Stripe Mark, this court has held that adidas has no "monopoly" on stripes, a generic design element:

> If the court were to conclude on summary judgment, as adidas urges, that four diagonal serrated stripes are confusingly similar to the adidas mark of three diagonal serrated stripes, then virtually any configuration of stripes in any number between two and five, on shoes, clothing, or athletic equipment, could also be said to infringe on at least one of adidas' various three-stripe marks.  This could ultimately confer upon adidas a virtual monopoly on stripes, a generic design element.

*Adidas Am., Inc. et al. v. Target Corp., et al.*, Civil No. 01-1582-RE, Opinion and Order (docket #195), p. 11.

documentary gap with deposition testimony, adidas disputes the quality of that evidence.  adidas also disputes the quality of defendants' evidence concerning its sales, arguing that defendants lack evidence as to how many of the striped shoes depicted in the catalogs actually were sold and that defendants sold striped shoes that bear designs quite dissimilar to the designs at issue here. Weighing the quality of the evidence is best reserved for the factfinder.

**B.  Damages for Federal Dilution (Fourth Claim)**

Defendants contend that adidas's federal dilution claim (Fourth Claim) is barred to the extent that it seeks damages because defendants' first use predates the enactment of the Federal Trademark Dilution Act, 15 USC § 1125, on January 16, 1996.  "[A]pplication of the FTDA is not retroactive because it only authorizes prospective relief."  *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F3d 1002, 1009-10 (9th Cir 2004), *cert denied*, 544 US 974 (2005) (citations omitted).  However, adidas is only seeking damages for defendants' sale of shoes after January 1, 2002, a date well after the FTDA was enacted.  Therefore, adidas is not seeking to apply the FTDA retroactively and can recover all damages sought in this case for violation of the FTDA.

**C.  Federal and State Dilution Claims (Fourth & Fifth Claims)**

**1.  Whether Fame of Three-Stripe Mark Preceded First Use of Two and Four Stripe Marks**

Defendants contend that adidas has submitted no evidence that when defendants began using stripes in the 1970s, adidas's Three-Stripe Mark was famous.  However, adidas has submitted evidence that it has consistently used its Three-Stripe Mark in connection with footwear since 1952 and that by the early 1970s, the Three-Stripe Mark and the Superstar shoe were well-known and famous.  Jorgenson Decl, ¶¶ 7, 17, 19-23, 29, 30-35; Joachimsthaler

22 - REDACTED FINDINGS AND RECOMMENDATIONS

Report, ¶¶ 39, 45-48, 52-54.  The strength of the Three-Stripe Mark did not begin to ebb until the late 1970s and on into the 1990s as adidas's position as market leader declined to a 3% market share in 1992.  Joachimsthaler Report, ¶ 40.  However, by the late 1990s, due largely to extensive marketing efforts, the Three-Stripe Mark had rebounded and surpassed the strength it had received in the early 1970s.  *Id* at ¶¶ 46-48.

### 2.  <u>Whether adidas Suffered Actual Dilution</u>

Defendants assert that adidas cannot demonstrate actual dilution.  In response, adidas has submitted an expert opinion identifying numerous ways in which defendants' continued sale of two and four stripe footwear dilutes the distinctiveness of the Three-Stripe Mark by: (1) reducing brand equity within the footwear market; (2) negatively affecting the strength of the mark in the minds of consumers; (3) eviscerating the perception of the mark as signifying quality and a premium product; and (4) impacting consumer loyalty associated with the mark.  Joachimsthaler Report, ¶¶ 65, 70, 72, 75, 80, 89-93; *also see* Pham Report, ¶¶ 87-92.  This evidence is sufficient to create a genuine issue of material fact both as to actual dilution under the FTDA, 15 USC § 1125, and as to the likelihood of dilution under ORS 647.107.

### 3.  <u>Whether Two or Four Stripes are Identical or Nearly Identical to Three-Stripe Mark</u>

The FTDA requires proof that defendants' use of two or four stripes is "identical or nearly identical" to the Three-Stripe Mark.  *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F3d 894, 905 (9th Cir 2002).  For two marks to be considered "nearly identical," they must be "similar enough that a significant segment of the target group of customers see the two marks as essentially the same."  *Playboy Enter., Inc. v. Welles*, 279 F3d 796, 806 (9th Cir 2002).  This is a higher standard than proving that marks are "confusingly similar."

To prove that the marks are "nearly identical," adidas has submitted an expert opinion that some of defendants' two and four stripe shoes "feature a number of the same design elements that call to mind the classic Superstar shoe specifically (e.g., the shell toe, flat sole, and heel patch. . .) in addition to the iconic 3-stripes symbol."  Joachimsthaler Report, ¶ 63.  Since this opinion concerns design elements in addition to the type and number of stripes, its evidentiary value is questionable.  However, adidas also has submitted another expert opinion that substantial portions of the population believe that two and four stripes on athletic shoes are made or put out by adidas or with adidas's authorization or approval due to the stripes.  Ford Decl, ¶¶ 9, 14, 50, 52, 56, 59-60, 63-66, 70, & 72.  Although this opinion specifically refers only to the likelihood of confusion and evidence of secondary meaning (*id*, ¶¶ 47, 53, 61, 67, & 73-76), the survey results may be sufficient to prove that defendants' use of two or four stripes is "identical or nearly identical" to the Three-Stripe Mark.

Whether or not marks are identical or nearly identical is "context-and/or media-specific and factually intensive in nature."  *Savin Corp. v. Savin Group*, 391 F3d 439, 453 (2nd Cir 2004), *cert denied*, 126 S Ct 116 (2005).  Although the evidence submitted by adidas is open to attack, it is at least sufficient to create a genuine issue of material fact to preclude summary judgment.

///

///

///

## **RECOMMENDATIONS**

For the reasons stated above, defendants' Motion for Summary Judgment (docket #42) and plaintiffs' Motion for Partial Summary Judgment (docket #104) should be DENIED.

## **SCHEDULING ORDER**

24 - REDACTED FINDINGS AND RECOMMENDATIONS

Objections to these Findings and Recommendations, if any, are due July 7, 2006.  If no objections are filed, then the Findings and Recommendations will be referred to a district judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendations will be referred to a district judge and go under advisement.

DATED this 15th day of June, 2006.

/s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge