IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ADIDAS AMERICA, INC. and ADIDAS
SALOMON AG,

                Plaintiffs,                            CV-05-120-ST

      v.                                          FINDINGS AND
                                                        RECOMMENDATION

KMART CORPORATION; FOOTSTAR, INC.;
ELAN IMPORTS CO., INC.; and NEXTTEC
INTERNATIONAL, INC.,

                Defendants.

STEWART, Magistrate Judge:

      This is an action for trademark infringement and related state law claims brought by adidas America, Inc. and adidas Salomon AG (collectively, "adidas"), alleging that defendants, KMart Corporation ("KMart") and Footstar, Inc. ("Footstar") (collectively, "defendants"),[1] have: (1) breached the terms of a settlement agreement entered into by adidas and defendants in 2002;

---

[1] Two other entities named as defendants have been dismissed (dockets #194 and #214). Two other entities are still named as defendants. However, the present summary judgment motions involve only the claims against and the defenses raised by KMart and Footstar. When collectively identifying KMart, Footstar, and the other two named defendants, this court refers to "all defendants."

1 - FINDINGS AND RECOMMENDATION

and (2) infringed on adidas's "Three-Stripe Mark" by marketing, selling, and offering for sale imitations of its "Superstar" and "Superstar 2G" shoes (Complaint, ¶¶ 37-39) and by marketing, selling, and offering for sale other goods which bear a mark confusingly similar to adidas's Three-Stripe Mark (*id*, ¶ 40).

This court previously denied defendants' cross-motions for summary judgment. Opinion and Order (docket #215), adopting Findings and Recommendation (docket #186) ("F&R"). In that ruling, this court concluded that: (1) the parties' 2002 Settlement Agreement bars a laches defense as to the Subject Shoes defined by that agreement, but not as to other shoes (F&R, p. 13); (2) a laches defense is also barred as "any confusingly similar imitations" of the Subject Shoes since October 15, 2002, due to defendants' wilful infringement (*id* at 15); and (3) summary judgment was otherwise precluded by disputed factual issues, including whether (a) the shoe models at issue in this case are confusingly similar to the Subject Shoes (*id* at 15); (b) adidas knew or should have known of defendants' manufacture and sale of footwear bearing designs with two or four stripes prior to April 2001 (*id* at 21); and (c) any purported delay in filing this lawsuit was reasonable under the circumstances (*id*).

Now before this court is defendants' Renewed Motion for Partial Summary Judgment (docket #279) against the Second through Seventh Claims. For the reasons set forth below, that motion should be denied.

///
///
///
///

2 - FINDINGS AND RECOMMENDATION

**ANALYSIS**

I. **Procedural Background**

    A. **Claims and Defenses**

The Third Amended Complaint alleges the following seven claims for relief: (1) breach of contract against KMart and Footstar ("First Claim"); (2) federal trademark infringement in violation of 15 USC § 1114 against all defendants ("Second Claim"); (3) federal unfair competition in violation of 15 USC § 1125(a) against all defendants ("Third Claim"); (4) federal trademark dilution in violation of 15 USC § 1125(c) against all defendants ("Fourth Claim"); (5) state trademark dilution and injury to business reputation against all defendants ("Fifth Claim"); (6) unfair and deceptive trade practices against all defendants ("Sixth Claim"); and (7) common law trademark infringement and unfair competition against all defendants ("Seventh Claim"). adidas does not allege any claim for trade dress infringement.

In response, defendants filed Answers raising 11 affirmative defenses, including an Eighth Affirmative Defense that adidas's claims are barred by laches, estoppel, and/or waiver. Answer and Affirmative Defenses to Third Amended Complaint (docket #133 (Footstar) and docket #134 (KMart)).

    B. **Issues Raised by This Motion**

In their Renewed Motion for Partial Summary Judgment, defendants contend that: (1) newly discovered evidence proves that adidas had actual knowledge of defendants' sale of striped shoes since 1971, thus entitling defendants to summary judgment against the Second through Seventh Claims based on their laches defense; (2) the trademark dilution claim fails because adidas cannot prove that its mark was "famous" when defendants started selling striped

3 - FINDINGS AND RECOMMENDATION

Case 3:05-cv-00120-BR   Document 307-2   Filed 07/13/07   Page 4 of 17

shoes in the 1970s; and (3) the trademark claims against KMart fail because KMart never "used the mark in commerce."

## II. Laches Defense

Defendants argue that adidas's Lanham Act claims (Second and Third Claims), as well as its claims for federal and state law trademark dilution, trademark infringement, and unfair competition (Fourth, Fifth, Sixth and Seventh Claims), are barred by laches based on adidas's delay in seeking to enforce its Three-Stripe Mark against shoes with two, three, and four stripes. This portion of defendants' motion raises an issue previously considered by this court and is in the nature of a motion for reconsideration. Reconsideration is appropriate "in the face of the existence of new evidence, an intervening change in the controlling law, or as necessary to prevent manifest injustice." *Navajo Nation v. Confederated Tribes and Bands of the Yakima Indian Nation*, 331 F3d 1041, 1045 (9th Cir 2003), citing *Mustafa v. Clark County Sch. Dist.*, 157 F3d 1169, 1178-79 (9th Cir 1998). However, a "motion for reconsideration should not be granted, absent highly unusual circumstances . . . [and] may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Kona Enterprises, Inc. v. Estate of Bishop*, 229 F3d 877, 890 (9th Cir 2000) (citations and emphasis omitted).

For the reasons stated below, to the extent that defendants' renewed motion is based on their laches defense, it should be denied.

### A. "New" Evidence

Defendants rely on the following "new" evidence in support of their bid for summary judgment: (1) a response to interrogatories in a 1971 lawsuit filed by adidas against Suave Shoe

4 - FINDINGS AND RECOMMENDATION

Corporation ("Suave") (Supplemental Mehrbani Decl. (docket #288), Exs. 2-3) and a letter sent by Suave to adidas when settling a 1994 lawsuit (*id*, Ex 5), both of which identified Meldisco (a division of Footstar) as a retailer of allegedly-infringing three-striped shoes; (2) a letter from Target to adidas in 1997 in response to a cease and desist letter from adidas, bringing to adidas's attention "a slide shoe offered for sale and sold by Kmart, which has four stripes" (*id*, Ex. 6); and (3) testimony by William Beebe that during the 1980s and 1990s, he "became aware of a K-Mart store selling a knock-off shoe" (*id*, Ex. 7).

A searching review of the materials submitted by the parties reveals that this evidence is not "new," but instead is evidence that defendants either obtained through discovery or could have obtained from the public records well before the previous round of summary judgment motions. Both the 1994 Suave letter and the 1997 Target letter were produced to defendants in discovery in October 2005, a month before defendants filed their initial summary judgment motion on November 23, 2005. Roberts Decl (docket #298), ¶¶ 2-4. Similarly, the 1971 documents were available in the public record (Mehrbani Decl, ¶ 6, Exs. 1-3) and readily available prior to the prior round of summary judgment motions.

When defendants filed the first volley of summary judgment motions on November 23, 2005, over six months before dispositive motions were due on May 30, 2006. Order dated November 7, 2005 (docket #34) (amending case schedule). While discovery was voluminous and obtained through third parties, nothing in the record indicates that defendants lacked ample time and opportunity to present this evidence with their first summary judgment filing. Additionally, even if the one month period prior to the filing of the summary judgment motions was not sufficient, defendants were permitted to supplement the record in mid-February 2006

5 - FINDINGS AND RECOMMENDATION

over strenuous objections by adidas (Order dated January 17, 2006 (docket #130), granting Motion to Supplement the Record (docket #75)) and exercised their opportunity to file objections to this court's prior F&R in mid-July 2006.  Defendants may not cure their failures to submit this evidence at any or all of these junctures by submitting it now.  "The overwhelming weight of authority is that the failure to file documents in an original motion or opposition does not turn the late filed documents into newly discovered evidence." *Sch. Dist. No. 1J, Multnomah County, Oregon v. ACandS, Inc.*, 5 F3d 1255, 1263 (9th Cir 1993), *cert denied*, 512 US 1236 (1994) (quotation marks and citations omitted).  Thus, this court declines to reconsider its prior ruling on laches based on the belated documentary evidence.

This leaves defendants' submission of the testimonial evidence of William Beebe. Beebe's deposition was taken on December 21, 2006, several months after this court's final ruling on the initial summary judgment motions.  In response to a question asking whether he was "aware whether or not K-Mart did knock-offs of – sold knock-offs of shoes in the '80s and much of the 1990s," Beebe responded: "I can't be specific on that, but I would have to think so." Beebe Depo. (Supplemental Mehrbani Decl., Ex. 7), p. 103.  He later testified that during the 1980s and 1990s, he was generally aware of K-Mart selling a knock-off shoe because "it was a topic of conversation" (*id* at 112) and that "[w]hen I see a knock-off in a particular place, I will pass that information on to my superior, my management" (*id* at 115).  However, in two later declarations, Beebe clarified that, while he occasionally saw knock-off shoes on people's feet and occasionally mentioned to his superiors that he had seen knock-off shoes in the marketplace, he did not know who sold those knock-off shoes and did not report any specific retailer to his superiors.  Beebe Decl. (docket #116), ¶ 9; Beebe Decl. (docket #296), ¶ 5.  In his latest

declaration, he also explained the nuances of what he intended by his deposition testimony answers.  Beebe Decl. (docket #296), ¶¶ 6-8.  Despite defendants' efforts to characterize Beebe's declarations as contradicting his deposition testimony, those declarations do not contain the types of direct contradictions that justify disregarding them as sham.  *See Hambleton Bros. Lumber Co. v. Balkin Enterprises, Inc.*, 397 F3d 1217, 1225 (9th Cir 2005) ("a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony").  Accordingly, Beebe's testimony does not advance defendants' efforts to reignite the laches issue.

Defendants have artfully highlighted additional evidence that was perhaps not submitted or emphasized previously.  They may also be correct to define the issue as when adidas was first aware of any infringing use of either two, three, or four equally spaced, parallel, diagonal stripes in the midfoot portion of the uppers on athletic footwear.  However, the evidence remains sketchy and disputed as to what adidas knew or should have known, given that it did not perceive discount retailers as competitors, at least before the early 1990s.  In addition, defendants point out that Lawrence Lava, a buyer for women's and men's athletic shoes, testified that he was not aware of adidas shoes in the 1970s and 1980s and did not become aware of adidas's use of three stripes or presence in the athletic footwear market until 2000, which is further proof that the parties were operating in different markets.  As a result, a jury could conclude that adidas had no reason to do anything to enforce its mark against defendants in response to the information defendants have presented from 1971, 1994, and 1997.

In short, the materials now submitted by defendants do provide additional ammunition for defendants' arguments that adidas knew or should have known of infringing activities by

7 - FINDINGS AND RECOMMENDATION

defendants at some earlier point in time and should have more closely policed the activities of discount retailers, including KMart. However, even assuming they were entirely "new" bits of evidence justifying reconsideration, these materials simply add fuel to the hotly disputed issues of material fact on the laches issue and are not sufficient to overcome adidas's countervailing evidence.

### B. Intervening Change in Controlling Law

Defendants also contend that two new decisions by the Ninth Circuit in the past year are important for the court to consider. In both *Miller v. Glenn Miller Prods., Inc.*, 454 F3d 975 (9th Cir 2006) ("*Glenn Miller*") and *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n*, 465 F3d 1102 (9th Cir 2006), the Ninth Circuit granted summary judgment against trademark infringement claims based on laches. Following the decision in *Glenn Miller*, the parties submitted supplemental objections to the F&R, extensively briefing their respective positions on that case. Plaintiffs' Supplemental Brief Regarding *Glenn Miller* (docket #211) and Supplemental Memorandum in Support of Objections to Findings and Recommendations (docket #212). The Ninth Circuit's decision in *Tillamook Country Smoker, Inc.* was never considered by this court in connection with the prior round of summary judgment motions.[2] However, neither *Glenn Miller* nor *Tillamook Country Smoker, Inc.* appreciably changed the law relative to the laches issue and, at least with respect to the *Glenn Miller* case, this court has already considered the parties' respective positions as to its import.

///

---

[2] The parties' supplemental briefs regarding *Glenn Miller* were filed on August 16, 2006, and the F&R was adopted several weeks later on September 7, 2006. Order (docket #215). The Ninth Circuit's decision in *Tillamook Country Smoker, Inc.* was issued a little over a month later on October 11, 2006. Thus, the Ninth Circuit's reasoning in that case was neither cited nor considered in this court's decision on the prior round of summary judgment motions.

8 - FINDINGS AND RECOMMENDATION

///

### C. <u>Wilful Infringement</u>

Defendants also seek reconsideration of this court's ruling that to the extent they sold confusingly similar imitations of the Subject Shoes since October 15, 2002, they have willfully infringed adidas's mark. Since adidas complains that defendants have been infringing its mark since the 1970s, defendants see no sense in precluding them from asserting laches based solely on some conduct in 2002 or later. Relying on a Supplemental Declaration of William Lenich, they also argue that adidas cannot prove the fraudulent intent necessary for willful infringement. Reconsideration on that issue should be denied due to the lack of any new evidence or law. Furthermore, defendants' argument fails to comprehend the scope of the 2002 Settlement Agreement on which this ruling was based.

### D. <u>Restarting of Laches Clock</u>

Although objecting to defendants' motion as nothing more than an unwarranted motion to reconsider, adidas renews one of its legal arguments made in the prior round of summary judgment motions with respect to the impact of the 2002 lawsuit. In that regard, adidas made two arguments. First, it argued that the terms of the 2002 Settlement Agreement contractually preclude defendants from raising a laches defense. This court rejected that argument. However, in the briefing on the previous round of summary judgment motions, adidas also pointed out that it had filed suit against KMart for the sale of four-striped athletic shoes in 2002. As a result, it argued that the relevant time period for calculating laches for the present lawsuit was between the time of settlement of the 2002 lawsuit (late 2002) and January 2005 when this lawsuit was filed. Memorandum in Opposition to Defendants' Motion for Summary Judgment (docket

#111), pp. 10-11; Reply in Support of Plaintiffs' Motion for Partial Summary Judgment (docket #164), pp. 16-17.  This argument, made in one lone paragraph in each of two prior briefs, was lost in the melee and never resolved by this court.  In this round of briefing, adidas has devoted over three pages to the subject.  Memorandum in Opposition to Defendants' Renewed Motion for Partial Summary Judgment (docket #295), pp. 4-8.  Thus, the time is ripe for its resolution.

   The 2002 lawsuit alleged infringement of the Three Stripe Mark and trade dress infringement against two specific shoe models.  This lawsuit, in contrast, alleges infringment claims against about 25 models of footwear which are "confusingly similar" to the Three Stripe Mark and includes no trade dress claim.  Despite these difference, adidas contends that the 2002 lawsuit (Declaration of Michael K. Heilbronner (docket #115), Ex. 1) restarted the laches clock with respect to the same claims alleged here (trademark infringement, unfair competition, and dilution) against the same type of footwear (athletic shoes) bearing the same design element (equally spaced, parallel, diagonal stripes in the midfoot portion of the upper).  Michael K. Heilbronner, the attorney whose "duties included oversight of adidas's brand protection and enforcement program within the United States, including enforcement of the company's rights in the Three-Stripe Trademark and Superstar Trade Dress" from December 1997 through part of April 2004, noted that the "allegations of the Complaint [in the 2002 lawsuit] were drafted broadly to permit adidas to later include other infringing two- or four-stripe footwear models adidas would have become aware of during discovery in the 2002 Action."  Heilbronner Decl., ¶ 17.  During negotiations to settle the 2002 lawsuit, counsel for Footstar told Heilbronner that "Footstar and KMart had been selling footwear with two and four stripes for many years," but

the case settled "before adidas could take discovery to test the veracity or scope of [that] claim." *Id*, ¶¶ 13-14.

adidas is not seeking damages in this case for any shoes sold prior to the 2002 Settlement Agreement.  This court has already ruled that the laches defense does not bar claims based on sales of the Subject Shoes as defined in that agreement or "any confusingly similar imitations" of the Subject Shoes since October 15, 2002, due to defendants' wilful infringement.  F&R, pp. 13, 15.  Therefore, the laches defense, if applicable, would only bar defendants' sales of athletic shoes since October 15, 2002, which bear confusingly similar imitations of the Three Stripe Mark, but which are not the Subject Shoes or confusingly similar imitations of the Subject Shoes.         The refiling of a claim does not restart the statute of limitations clock.  However, laches is different that the statute of limitations because it is an equitable defense that requires evidence not only of delay, but also of prejudice to the defendant.  In fact, given extraordinary delay and prejudice to the defendant, laches can bar a statutorily timely claim.  *Danjaq LLC v. Sony Corp.*, 263 F3d 942, 953-54 (9th Cir 2001).

The issue here is whether adidas's current claims of infringment have been delayed since 2002, as claimed by adidas, or since the 1970s, as claimed by defendants.  The difficulty in resolving this issue stems from the fact that adidas is not pursuing its infringement claims against specific shoes sold by defendants that are confusingly similar to specific shoes sold by adidas.  Instead adidas is pursuing infringement claims against all athletic shoes sold by defendants since 2002 which bear a specific design element (equally spaced, parallel, diagonal stripes in the midfoot portion of the upper).  The specific design element, whether in the form of two, three or four stripes, has allegedly been used by defendants on athletic shoes since the 1970s.

11 - FINDINGS AND RECOMMENDATION

*Danjaq* is instructive on how to resolve this issue.  In that case, the plaintiff brought infringment claims in 1998 stemming from recent re-releases of 1962 and 1997 Bond movies on DVD.  The Ninth Circuit rejected an exception to the laches bar for a re-release of an original work because "[t]his exception would effectively swallow the rule of laches, and render it a spineless defense," noting "[i]n analogous contexts, similar theories have been roundly rejected." *Id*, citing *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F3d 813, 821-22 (7th Cir 1999) ("Without the availability of the application of laches to a claim arising from a continuing wrong, a party could, theoretically, delay filing suit indefinitely.").  The Ninth Circuit concluded that the "perfect overlap between the alleged infringements in the DVD releases and the original movies requires us to treat them the same for purposes of laches."  *Id* at 954.  The court acknowledged a difference between re-leases and new material:

> This is not to say that every re-release must always be treated like the original.  After all, when old works are transferred to new media, they often are modified or adorned with new material. . . . These added-on materials may be separately protectable for intellectual property purposes and, in certain circumstances, might be treated differently (for purposes of laches) than the underlying work.  But that factual situation is not before us . . . .  Here, it has simply been alleged that DVDs "and other new media" contain the same infringing elements as the movies that they reproduce.  In this situation, the new medium and the old should be treated as one.

*Id*.

As a result, the court found that laches barred the plaintiff's claims and that the clock on delay was not stopped by an intervening lawsuit in 1961 against a different party and was only tolled momentarily, if at all, by an intervening lawsuit in 1976.

adidas may have objected to defendants' alleged infringement by filing suit in 2002, but termination of that suit merely tolled the laches clock, rather than turning it back to zero.

12 - FINDINGS AND RECOMMENDATION

Alleging an infringment now of the same design element that also existed in the 1970s is not a new instance of infringment, but is more in the nature of a continuing wrong.

The cases cited by adidas are distinguishable because the defendant's alleged infringement involved the use or sale of a trademarked phrase or name by the use of a single allegedly confusing phrase, name or product). In *Tri-Star Pictures, Inc. v. Unger*, 14 F Supp 2d 339 (SD NY 1998), the producers of a motion picture titled "Return from the River Kwai" were sued for trademark infringement, unfair competition, dilution, and injury to business reputation by the plaintiffs who owned rights in the movie "Bridge on the River Kwai." The court held that the title of "Return from the River Kwai" infringed the marks of "Bridge on the River Kwai" and "River Kwai." *Id* at 362. In *Official Airline Guides, Inc. v. Churchfield Publ'ns, Inc.*, 756 F Supp 1393, 1403-04 (D Or 1990), *aff'd*, 6 F3d 1385 (9th Cir 1993), the publisher of a travel directory and owner of trademark for "OAG Travel Planner" established a likelihood of confusion with the defendant's publication of "The Travel Planner," but not with defendant's publications "The Travel Planner USA" or "USA Travel Planner." In *Clamp Mfg. Co. v. Enco Mfg. Co., Inc.*, 870 F2d 512, 513 (9th Cir), *cert denied*, 493 US 872 (1989), the manufacturer of cantilevered "C" clamps with an expired patent sold under the trademark "KANT-TWIST" sued the distributor of virtually identical cantilevered "C" clamps designated in the distributor's catalog as "Enco NO-TWIST clamps." And in *TIME, Inc. v. T.I.M.E. Inc.*, 123 F Supp 446 (SD Cal 1954), The Intercity Motor Express, Inc., doing business as "T.I.M.E." (printed) and "time" (spoken) was sued by the plaintiff, Time, Incorporated, a magazine publisher.

Unlike those cases, the alleged infringement at issue here takes the form of a specific design on the sides of multiple models of athletic shoes produced over the course of several

13 - FINDINGS AND RECOMMENDATION

years. adidas asserts that each model of defendants' athletic shoes (manufactured, distributed, sold following the 2002 Settlement Agreement) exhibits two or four equally spaced, parallel, diagonal stripes in the midfoot portion of the uppers. This is a design element that, according to defendants, dates back to the 1970s and has been used on many different models of shoes. Other parts of the shoes may change over time, such as the color, width of stripe, type of edging, sole, toe, etc., but adidas is only attacking the one consistent design element. Thus, defendants are not barred from contending that the period of delay for the purpose of laches began before the 2002 lawsuit.

### E. Injunctive Relief

Finally, citing *Glenn Miller*, adidas once again argues that the laches defense should be dismissed as to injunctive relief. This argument was raised by adidas both in the briefing on its prior summary judgment motion and in objections to the F&R. Reply in Support of Plaintiffs' Motion for Partial Summary Judgment (docket #164) pp. 19-20; Plaintiffs' Objections to Findings and Recommendations (docket #200), pp. 20-23. This court declines to reconsider its ruling on that issue.

### III. Federal and State Dilution Claims (Fourth & Fifth Claims)

Defendants next contend that adidas's trademark dilution claims fail because adidas cannot prove that its mark was famous in the 1970s when defendants first began using stripes on shoes. However, this court previously considered and rejected this argument (F&R, p. 27-28) and the renewed motion by defendants presents no new evidence on this issue. Accordingly, to the degree defendants' renewed motion for summary judgment is directed at the trademark dilution claims, it should be denied.

## IV.  Whether the Infringing Product Was "Used In Commerce" by KMart

Finally, Kmart contends that it is entitled to summary judgment against adidas's trademark claims because Kmart has not "used [the infringing products] in commerce" as required under 15 USC §§ 1114(1) and 1125(a).  This is a new issue that was not presented in the prior round of summary judgment motions.

Kmart relies on *Maxwell v. Kmart*, 851 F Supp 1343 (D Minn 1994), a patent infringment action brought against Kmart and Melville Corporation ("Melville") (Footstar's predecessor)[3] for illegally using a tie which connected shoes into matched pairs.  In *Maxwell*, the plaintiff alleged that KMart and Melville infringed on a patent for a device or system used to connect shoes which did not have any laceholes, buckles, or other apertures through with a filament that can be threaded to join matching shoes.  KMart leased space to Melville, which in turn paid rent to KMart, a portion of which depended upon the percentage of sales and gross profits attributable to shoe sales.  KMart argued that it was not liable because the plaintiff could not show that KMart made, used or sold any shoes connected by the allegedly infringing fastening systems.  The court agreed and granted KMart summary judgment as to claims for: (1) direct infringement due to the lack of evidence that it used Melville as an agent or that Melville was an alter ego of KMart; and (2) active inducement of infringement because it had no control over the manufacture of the shoes or the accused devices and there was no proof that it intended to induce Melville's alleged infringement or cause the acts that constituted the alleged infringement.

However, *Maxwell* did not discuss or address advertising an allegedly infringing trademark, which is a critical distinction.  The accused product in *Maxwell* was a non-design

---

[3] Melville operated the shoe departments in KMart stores through its "Meldisco" subsidiaries.  For purposes of this discussion, this court refers to Melville when referring to either Melville or its Meldisco subsidiaries.

15 - FINDINGS AND RECOMMENDATION

fastening device used for the convenience of the seller and not advertised to the consumer.  In contrast, the Three Stripe Mark at issue here is a design element of adidas's athletic shoes, and adidas asserts that the infringing marks were prominently displayed in advertising circulars and in-store signage over which KMart exercised considerable control.  Defendants' allegedly infringing marks were featured in multiple weekly advertising circulars distributed throughout KMart sales regions across the United States.  Doner-Douglas Decl., ¶ 2.  adidas has presented evidence that KMart was involved in setting the themes for the circulars, provided input on which shoes would or would not appear in the circulars, tracked the effectiveness of the circulars, and has the final say on advertising.  *Id*, ¶ 4; Douglas Depo. (Roberts Decl., Ex. 5), pp. 12, 16-17; Dunn Depo. (Roberts Decl., Ex 6), pp. 20, 23-25, 64-65; Schwartz Depo. (Roberts Decl., Ex 9), pp. 9-12.  Additionally, KMart exercised control over in-store signage directing customers into the shoe departments of KMart stores.  Dunn Depo, pp. 39-42.  This type of control over and involvement in advertising activity is sufficient to distinguish *Maxwell*.  *See Playboy Enters. Int'l, Inc. v. Muller*, 314 F Supp 2d 1037, 1040-41 (D Nev 2004); *Miller Brewing Co. v. Carling O'Keefe Breweries of Canada, Ltd.*, 452 F Supp 429, 442 (WD NY 1978).

      Even if not liable for direct infringement, KMart may be liable for "contributory infringment" if it:  "(1) intentionally induced the primary infringer to infringe, or (2) continued to supply an infringing product to an infringer with knowledge that the infringer is mislabeling the particular product supplied."  *Perfect 10, Inc. v. Visa Int'l Service Ass'n*, – F3d – , 2007 WL 1892885 *13 (9th Cir July 3, 2007) (internal quotation marks and citation omitted).  One variety of such contributory infringement is when the defendant "suppl[ied] the necessary marketplace

16 - FINDINGS AND RECOMMENDATION

for [the sale of the infringing product] in substantial quantities." *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F3d 259, 265 (9th Cir 1996); *see also Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*, 955 F2d 1143, 1148-49 (7th Cir 1992).  KMart was a party to the 2002 lawsuit and Settlement Agreement and the record reveals that it provides the space for the allegedly infringing activities, processes the sales of the allegedly infringing products, and receives a portion of the gross revenue from those sales.  This is more than sufficient to preclude summary judgment in favor of KMart on this issue.

## RECOMMENDATION

For the reasons stated above, defendants' Renewed Motion for Summary Judgment (docket #279) should be DENIED.

## SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due **July 30, 2007**.  If no objections are filed, then the Findings and Recommendation will be referred to a district judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district judge and go under advisement.

DATED this 13th day of July, 2007.

/s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge